UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-23675-CIV-ALTMAN-Reid

DISTRICT THEATERS, INC., *et al.,*

　　　Appellants,

v.

CINEMEX HOLDINGS USA, INC., *et al.,*

　　　Appellees.

_____/

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA – MIAMI DIVISION

*In re:  Cinemex Holdings USA, Inc.*
*Case No. 20-14696-LMI*

**INITIAL BRIEF OF THE APPELLANTS**

Michael D. Seese, Esq.
Florida Bar No. 997323
mseese@seeselaw.com
101 N.E. 3rd Avenue, Suite 1270
Fort Lauderdale, Florida 33301
Telephone No. (954) 745-5897

*Counsel for the Appellants*

## LIST OF INTERESTED PARTIES

1.  Michael D. Seese, counsel for Appellants

2.  Seese, P.A., counsel for Appellants

3.  James H. Wyman, counsel for Appellants

4.  Hinshaw & Culbertson, LLP, counsel for Appellants

5.  PJ Solomon, LP, investment bankers for Appellants

6.  Richard Brail, investment banker for Appellants

7.  Omar Khan, sole shareholder of the corporate Appellants and individual Appellant

8.  S.C.G.C. Inc., SCGM Inc., SCG-B Inc., SCG-VP Inc., District Theaters Inc., SCG-WR LLC, SCG-CS Inc., SCGK Inc., SCG-SW Inc., SCG-WL Inc. and SCG-N Inc., the corporate Appellants

9.  Cinemex Holdings USA, Inc., the reorganized debtor and an Appellee

10. Cinemex USA Real Estate Holdings, Inc., a debtor and an Appellee

11. Patricia B. Tomasco, counsel for Appellees

12. Juan P. Morillo, counsel for Appellees

13. Gabriel F. Soledad, counsel for Appellees

14. Jeffrey P. Bast, counsel for Appellees

15. Brett Amron, counsel for Appellees

16. Quinn Emanuel Urguhart & Sullivan, LLP, counsel for Appellees

17. Bast Amron LLP, counsel for Appellees

18. The Honorable Laurel M. Isicoff, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Florida

19. The GUC Claims Trust

20. Berger Singerman, LLP, counsel for the GUC Claims Trust

21. Brian G. Rich, counsel for the GUC Claims Trust

i

22. Pachulski Stang Ziehl & Jones, LLP, counsel for the GUC Claims Trust

23. Robert J. Feinstein, counsel for the GUC Claims Trust

24. Bradford J. Sandler, counsel for the GUC Claims Trust

## CORPORATE DISCLOSURE STATEMENT

Khan is the sole shareholder of the corporate Appellants. Upon information and belief, no publicly traded entity has an interest in the outcome the case or appeal and there are no known publicly traded entities among these parties.

*/s/ Michael D. Seese*
Michael D. Seese, Esq.
FBN 997323
Counsel for Appellants

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ……………………..1

STATE OF THE BASIS OF APPELLATE JURISDICTON …………......1

APPLICABLE STANDARD OF REVIEW ………………………………1

STATEMENT OF THE CASE AND FACTS ……………………….........2

Background ………………………………………………………………...2

    1.      Sales process …………………………………………….....3

    2.      Initial Process Letter and LOI ……………………….…......4

    3.      The Tours ………………………………………………….....6

    4.      The Final Process Letter ……………………………….....8

    5.      The Bid …………………………………………………...12

    6.      Exclusivity …………………………………………………13

    7.      Equity Purchase Agreements ………………………………13

    8.      COVID Summary …………………………………………..15

    9.      Closing ……………………………………………………17

    10.    Texas Litigation and Bankruptcy …………………….……20

    11.    Claims and Objections ……………………………………20

    12.    The Trial …………………………………………………...20

SUMMARY OF THE ARGUMENT …………………………………....21

                                                                      **Page**

ARGUMENT. …………………………………………………………..22

    A.    The bankruptcy court erred in concluding that the Khan
           Parties failed to satisfy Section 8.1(D)(5) of the EPAs by
           Failing to deliver the escrow agreement …………………….22

    B.    The bankruptcy court erred in concluding that the Khan
           Parties failed to satisfy Section 8.1(B) of the EPAs by
           failing to comply with Section 7.1(A)(a) and Section
           7.1(A)(d) of the EPAs …………………………………….…24

    C.    The bankruptcy court erred in concluding that the Khan
           Parties failed to satisfy Section 8.1(B) of the EPAs by
           failing to comply with Section 7.9(A)(a) of the EPAs ……...34

    D.    The bankruptcy court erred in concluding that the Khan
           Parties failed to satisfy Section 8.1(B) of the EPAs by
           failing to comply with Section 7.2 of the EPAs ……….……37

    E.    The bankruptcy court erred in concluding that the Khan
           Parties failed to comply with Section 7.4 of the EPAs ……..44

    F.    The bankruptcy court erred in concluding that the Debtors
           did not breach the EPAs ……………………………………48

    G.    The bankruptcy court erred in concluding that the Khan
            Parties repudiated the EPAs …………………….…………51

CONCLUSION …………………………………………………………..54

CERTIFICATE OF COMPLIANCE …………………………………….55

CERTIFICATE OF SERVICE …………………………………………….56

# TABLE OF AUTHORITIES

**Page**

## Cases

*Stewart Title Guar. Co. v. Roberts-Dude,*
 497 B.R. 143 (S.D. Fla. 2013) ……………………….............................1

*In re Englander*, 95 F.3d 1028 (11th Cir. 1996) ………..……………….....1

*Kaiser Aero. & Elecs. Corp. v. Teledyne Indus.*
*(Piper Aircraft Corp.)*,
244 F.3d 1289 1295 (11th Cir. 2001) …………………………………….1

*United States v. Gypsum,* 333 U.S. 364 (1948)…………………………..1

*Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc.*
*and Fresenius SE & Co. KGAA,* No. C.A. 2018-0300-JTL,
2018 Del. Ch. LEXIS 325 (Del. Ch. Oct. 1, 2018), *aff'd,*
2018 De. *LEXIS* 548 (Del. Dec. 7, 2018) ………………………………….26

*Cineplex Inc. and Cineworld Group PLC and*
*1232743 B.C. Ltd.,* 2021 ONSC 8016 ……………………….…27, 28, 29

*AB Stable VIII LLC v. Maps Hotels and Resorts One, LLC,*
2020 WL 7024929, at *71 (Del. Ch. 2020)………………..……31, 32, 33

*Philips Services, Inc. v. Luntz (In re Philips Services, Inc.)*,
248 B.R. 541 (Bankr. D. Del. 2002) …………………………………...49

*In re Karfakis*, 162 B.R. 719 (Bankr. E.D. Pa. 1993)……………...49, 50

*Heilwood Fuel Co., Inc. v. Manor Real Estate Co.,*
405 Pa. 319 (1961) …………………………………………………49

*In re Broastripe, LLC,* 435 B.R. 245 (Bankr. D. Del. 2010) …………52

**Page**

**Statutes**

28 U.S.C. § 158(a) …………………………………………..…….....1

28 U.S.C. § 1334 …………………………………………..…………1

**Rules**

Fed.R.Bankr.P. 8015(a) …………………………………..…………55

## STATEMENT REGARDING ORAL ARGUMENT

The Appellants respectfully request that this Honorable Court grant oral argument.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court had subject matter jurisdiction of the proceeding under 28 U.S.C. §§ 157 and 1334. This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a).

## APPLICABLE STANDARD OF REVIEW FOR ISSUES PRESENTED

"The district court must accept the bankruptcy court's factual findings unless they are clearly erroneous, 'but reviews a bankruptcy court's legal conclusions *de novo*.'" *Stewart Title Guar. Co. v. Roberts-Dude* 497 B.R. 143, 150 (S.D. Fla. 2013) (quoting *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996)). "Mixed questions of law and fact are also reviewed *de novo*." *Id.* 149-150. "De novo review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *Kaiser Aero. & Elecs. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1295 (11th Cir.). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

1

## STATEMENT OF THE CASE AND FACTS

This is an appeal of the *Memorandum Opinion on Objection to the Khan Parties' Claims (ECF #1153)* [**DE 244**][1] (the "Opinion"), which was entered by the United States Bankruptcy Court on October 4, 2021, following a trial held on May 20, 2021, June 18, 2021, and July 9, 2021 (collectively, the "Trial"). The *Notice of Appeal* was timely filed on October 14, 2021 **(DE 258).**

## Background

Omar Khan ("Khan") is the sole owner of the following (collectively, the "Companies" and, together with Khan, the "Khan Parties" or the "Appellants"): S.C.G.C. Inc., SCGM Inc., SCG-B Inc., SCG-VP Inc., District Theaters Inc., SCG-WR LLC, SCG-CS Inc., SCGK Inc., SCG-SW Inc., SCG-WL Inc. and SCG-N Inc. (**TR1 72:11-14**). Each of the Companies owns and operates as a "Star Cinema Grill" (individually, a "***Business***" and, collectively, the "***Businesses***"). Each Business is a dine-in theater and offers food and beverage to go. (**TR1 70:1, TR1 72:1-3**). There

---

[1] In this Brief, (a) "DE" references electronic docket entries in Case No. 20-14695-LMI or Case No. 20-14696; all references to DE are to Case No. 20-14696 unless *695 is denoted, in which case the reference is to Case No. 20-14695; a reference to DE 100-10 is to DE 100, which has multiple exhibits attached; and (b) "TR" references the trial transcripts of the proceedings conducted by the Court on May 20, 2021 ("TR1"), June 18, 2021 ("TR2"), and July 9, 2021 ("TR3"); a reference to "TR2 285:2-3" would mean the Transcript from June 18, 2021, page 285, lines 2-3.

are ten theater locations in Texas, including one under construction, and one theater in Naperville, Illinois. (**TR1 72:5-8**).

1.     **Sales Process**

On December 3, 2019, Khan engaged PJ Solomon, an investment banking firm, to assist the Khan Parties with a process for the sale of Khan's ownership in the Companies (the "<u>Process</u>"). (**DE 87**). Richard Brail ("<u>Brail</u>"), co-head of the Global Technology, Media, & Telecommunications Group at PJ Solomon, and an experienced advisor in the theater exhibition sector, served as lead advisor to the Khan Parties. (**TR1 76:7-9, TR2 291:8-10, TR2 294:5-10, TR2 296:24-25, TR2 297:1-8**).

PJ Solomon prepared and populated an electronic data room (the "<u>Data Room</u>") with extensive information including: (a) a confidential information memorandum ("<u>CIM</u>"); (b) financial information on each of the theaters; (c) material contracts with vendors; (d) lease agreements; (e) documents pertaining to food concessions; (f) employees; (g) employee benefits and compensation; (h) sound, projector and other equipment, including maintenance and warranty agreements; (i) extensive information about the theaters (**TR2 297:23-25; TR2 298:1-25; and TR2 299:1-5**); and (j) extensive information and plans pertaining to the theater under construction in Woodlands, Texas. (**TR2 299:6-9**).

3

The CIM included: (a) an executive summary; (b) overview of operations; (c) map of theater locations; (d) theater opening timeline[2]; (e) summaries of revenue/theater level cash flow; (f) select interior concept photographs; (g) theater summaries by run rate/theater level cash flow; (h) theater location, size, opening dates, numbers of screens, attendance, and revenues; (i) corporate overhead; (l) corporate/management organization chart; (k) operations overview; (l) select menu items; (m) LED screen, seating, and private screening room descriptions; (n) vendor summaries; and (o) financial information and theater statistics per theater (2016-2018); and (p) photos, and description of local competitors. (**DE 145).**

## 2.    Initial Process Letter and LOI

On December 19, 2019, PJ Solomon circulated a letter (the "Initial Process Letter") to potential bidders for the Companies (**DE 104-6**) including Cinemex USA Real Estate Holdings, Inc. and Cinemex Holdings USA, Inc. (collectively, the "Debtors")**.** The Initial Process Letter provided that initial offers must be received by January 14, 2020. (**DE 104-6**). Brail testified at Trial that, during this time, extensive conversations occurred with potential bidders, including the Debtors

---

[2] All but 2 of the theaters opened starting in May 2015. (**DE 145).**

regarding Khan's requirement that the transaction close by March 31, 2020. (**TR2 304:11-16**).

On January 14, 2020, the Debtors provided an initial, non-binding offer (the "<u>LOI</u>") to purchase Khan's ownership in the Companies for $87,500,000.00 (**DE 57**). The offer presented was not contingent on financing. In the offer, the Debtors stated: (a) "CMX expects to conduct and substantially complete its material due diligence within 45 days after the documents subject to this review and previously requested from the Company and their respective affiliates are made available in the online data room established by the Company[,]"; and (b) "[w]e are confident that Star Cinema Grill is a perfect fit for CMX's growth strategy and CMX is a perfect fit for Star Cinema Grill stakeholders. Star Cinema Grill matches perfectly CMX's current business model and expansion plans into Texas in the United States." (**DE 57**).

On January 15, 2020, the Debtors were invited to the Data Room (**DE 58**) and, on January 21, 2020, the Debtors provided a list of persons to have access to the Data Room. (**DE 59**).

Thereafter, the parties and their respective advisors[3] participated on conference calls relating to the Companies (**TR2 306:1-8**), and the Debtors, and their

---

[3] The Debtors advisors were Simpson Thatcher & Bartlett, LLP ("<u>Simpson Thatcher</u>") and PricewaterhouseCoopers, S.C. ("<u>PwC</u>"). The Khan Parties were advised by PJ Solomon and Honigman LLP ("<u>Honigman</u>").

advisors, submitted requests for additional information to be added to the Data Room and for specific responses to questions about financials or contracts. (**TR2 305:22-25).**

### 3.     The Tours

Following the LOI, PJ Solomon and the Debtors coordinated a management presentation and tours of the Texas theaters (the "Tours"), which took place, in-person, during February 5 and 6, 2020. (**TR2 306:1-8, TR2 358:2-7, TR2 408:16-23).** Those attending for the Debtors included: (a) Rogelio Velez, chief executive officer of the Debtors; (b) Javier Ezquerro, chief operating officer of the Debtors; (c) Luis Castelazo, chief financial officer of the Debtors; (d) Ximena Carreno, general counsel for the Debtors; (e) Alejandro Muhech, head of construction for the Debtors; and (f) Jose Marti ("Marti"), chief development officer for the Debtors[4]. (**DE 61; DE 85, 18:3-12, 29:2-21**).

Those attending for the Companies included: (a) Khan; (b) Brail and a colleague from PJ Solomon; (c) John Walsh, Vice President of Operations; (d) Jason Ostrow, Vice President of Development; and (d) Ron Mock, chief financial offer. (**TR2 308:16-25).** The Companies' corporate chef participated and spoke extensively about the kitchen and culinary operations. (**TR2 308:12-15).**

---

[4] At Trial, Marti testified he was only able to participate in visits to 4 of the theaters.

The Debtors were not permitted to identify themselves as potential purchasers of the Companies, but were permitted to identify themselves as potential investors, which, according to Brail, is common during a sales process. (**TR2 404:8-18**). General managers from various theaters spoke with the Debtors' representatives and participated in the Tours, (**TR2 407:22-25, TR2 408:1-6**), while some servers providing food and beverage service answered questions as well. (**TR2 345:11-25**).

At Trial, Brail and Khan testified to the following about the Tours: (a) each theater was visited; (b) representatives of the Debtors and the Companies toured the bathrooms, projection rooms, auditoriums, and kitchens; (c) theaters were fully operational, and movies played in the auditoriums; and (d) food and beverages were served at each location. Marti testified and confirmed that the tours covered (a) parking lots, (b) lobbies, (c) box offices, (d) concession areas, (e) auditoriums, (f) restrooms, (g) kitchens, and (h) projection rooms, (**TR3 492:4-11**), but he could not recall whether movies were playing in all auditoriums.[5] (**TR 577:16-24**).

Brail testified: (a) the Debtors opted to forego any HVAC and roof inspections, since the theaters were all fairly recent buildings, and applauded the condition of the theaters; (b) the theaters were incredibly clean, modern, and in good condition; and (c) while it was originally contemplated that information technology

---

[5] *See infra* note 6.

("IT") representatives of the Debtors would participate in the tours, PJ Solomon participated on calls with IT representatives of the Debtors prior to the Tours and answered all questions, which Brail believed accounted for their absence from the Tours. (**TR2 310:2-25, TR2 311:1-22, TR2 346:6-25).** Marti confirmed that IT representatives had participated on a number of calls with PJ Solomon prior to the Tours. (**TR3 582:5-13).**

**4.      Final Process Letter**

On February 18, 2020, PJ Solomon circulated a letter to all potential bidders, including the Debtors (the "Final Process Letter"). (**DE 104-7**). The Final Process Letter provided guidelines for submitting a formal bid to purchase Khan's interests in the Companies, including: (a) the deadline to present offers was March 3, 2020; (b) due diligence should be completed prior to submitting an offer; and (c) Khan's expectation was that the closing would occur no later than March 31, 2020. (**DE 104-7**). Brail testified that extensive discussions occurred between the parties regarding the closing date and the emphasis placed upon closing prior to March 31, 2020, due to the liquidity needs of Khan in connection with another business deal. (**TR2 326:2-14).** Brail testified that "we were very transparent with all the bidders that Omar Khan had a real estate deal that he needed to fund at the end of March." (**TR2 326:2-7).** "So March 31st was absolutely integral to these conversations around this

transaction, valuation, timing, speed, certainty and value were all integral." (**TR2 326:12-14.**)

As additional support for closing no later than March 31, 2020: (a) Brail testified that conversations occurred with the Debtors' counsel regarding a possible closing on March 26, 2020, which was corroborated by the February 19, 2020, e-mail from the Debtors' counsel to the Khan Parties counsel, in which counsel advised that the Debtors were amenable to closing by March 26, 2020. (**DE 140**); (b) an e-mail from the Debtors' vice-president of human resources, dated March 12, 2020, on which Marti was copied, in which she expressed excitement over having reached a successful agreement for the acquisition of Star Cinema Gill and stated, in part, that "[t]he closing date for nine existing theaters and one under construction (Woodlands) will be 3.31.20, meaning we take possession on 4.1.20" (**DE 91**); and (c) the e-mail dated March 18, 2020, in which the Khan Parties' counsel advised the Debtors' counsel and others, including Marti, that, "I understand our clients have discussed and all parties are on the same page and pushing to close on March 31st." (**DE 75**).

The Final Process Letter provided that "inspections" were expected to occur after signing of an agreement. (**DE 104-7**). "Inspections" was not defined in the Final Process Letter; however, Brail testified that "inspections" were intended as being

third-party inspections (e.g., HVAC and roofing), while Marti testified that "inspections" were not limited to HVAC and roofing. (**DE 104-7).**

According to Marti, an inspection prior to closing was fundamental. (**TR3 505:11-14**). Marti testified during Trial that an "inspection" entails the following: (a) seeing the operations, including the parking lot, lobby, box office, auditorium, bathrooms, projection and sound, food service, and kitchen; (b) reviewing the quality of the construction and maintenance; (c) looking over IT and technology; and (d) seeing how people are trained. (**TR3 494-505**.)

Marti testified and acknowledged that, during the Tours, the Debtors' representatives (a) visited the parking lots, lobbies, box offices, auditoriums, bathrooms, and projection rooms; (b) toured the kitchens and auditoriums; and (c) were served food and beverages during the management presentation. (**TR3 579-580**). Marti acknowledged opting out of HVAC and roof inspections but noted that the Debtors' head of construction went onto the roof of at least one of the theaters. (**TR3 579-580**). Marti also testified that Tours lasting 45 minutes per location would not be sufficient to conduct an inspection. (**TR3 503:19-21**). Brail, who has experience in over twenty theater transactions (**TR2 296:7-10**), including five involving the Debtors (**TR2:296-297**), testified during cross-examination that a one-hour visit was more than sufficient time to evaluate a theater's operations. (**TR2**

10

**372:16-19)**. The Tours lasted approximately one hour at each theater. (**TR2 359:8-10).**

Following the Tours, Marti testified that a trip to Houston was scheduled for March 17, 2020 for purposes of conducting inspections[6] (**TR3  P521:13-16**); however, the Debtors "postponed" the trip because (a) the Khan Parties closed the theaters on March 17, 2020, and (b) the Debtors wanted to protect the safety and health of their employees in light of COVID-19.[7] (**TR3 524:1-19).**

In discussing the effects of the theaters closing on March 17, 2020, Marti emphasized that the Debtors "needed to inspect a functioning theater." (**TR3 524:16-19)**. However, on March 15, 2020, Khan advised the Debtors of the Companies' intention to modify showtimes due to reduced attendance, to which Marti responded, "feel free, according to the EPA, to make any operational changes you decide are beneficial for SCG." (**DE 53-15**). On March 16, 2020, the Companies advised the

---

[6] By e-mail dated March 13, 2020, the Debtors' chief operating officer notified Khan and others that the Debtors' operations team and personnel from human resources would be traveling to Houston on Tuesday, March 17, 2020. (**DE 73**). The Debtors' chief operating officer stated, in part, "***we*** would like to meet at ***one location*** somewhat close to the airport around 1pm. We will bring a Presentation about CMX and embrace the opportunity to meet some of the Star Cinema Team-Members." (**DE 73**). There is no mention about any inspections taking place.

[7] On March 17, 2020, at 9:16 p.m., which was the same day the alleged inspections were to have occurred, the Debtors vice-president of human resources sent what appears to be a company-wide e-mail announcing that the Debtors were "restricting all nonessential travel, both internationally and domestically[,]" and "[i]f you have a reason to travel which you feel is critical, you must receive approval of the VP or C-Suite in your reporting hierarchy." While restricted, it appears travel may have been permitted under certain circumstances. (**DE 49-9).**

Debtors of their intention to close the Illinois theater and wanted to confirm the Debtors' support, to which Marti responded, "please feel free to take any decisions according to the EPA." (**DE 47-31**). Marti testified at Trial that he "didn't tell them not to make modifications because that was . . . not a right I had." (**TR3 617:19-25, TR3 618:1-9**). Regardless, the Debtors voiced no objections to the proposed operational changes, including closing theaters, as of March 15 and 16, 2020.

**5.   The Bid**

On March 3, 2020, the Debtors submitted a bid (the "Bid*")* to acquire Khan's ownership in the Companies for an all-cash purchase price in the amount of $75,000,000.00 (the "Bid Letter") (**DE 49-8**). The Bid was not contingent on third-party financing and contained the following acknowledgement: "CMX hereby acknowledges that it has had an opportunity to conduct due diligence regarding the Company prior to making this Offer and has completed the bulk of its due diligence efforts, with only a few areas pending, which are mainly confirmatory." (**DE 49-8**).

Although the Bid was not accepted, Brail testified that discussions with the Debtors ensued, during which PwC was attempting to complete its financial analysis and gain a better understanding of working capital, considering the impact of COVID on net working capital. (**TR2 319:13-25**). Brail testified that one of PwC's concerns was the effects that COVID could have on cash flow. (**TR2 320:23-25; TR2 321:1-13**).

Brail's testimony was corroborated by a March 4, 2020, e-mail, from PwC to PJ Solomon, in which PwC provided the detail for the net working capital analysis and represented that the analysis reflected, in part, the "estimated impact of the coronavirus in the months to come . . .." (**DE 52-1**). Brail also testified that he had expressed to Marti during this time that the impact of the coronavirus could be quite severe, including the potential that theater closings could last for a few months or longer. (**TR2 394:3-15**).

**6.    Exclusivity**

To facilitate negotiations and finalize the transactional documents, Khan and the Debtors executed an exclusivity agreement on March 6, 2020 (the "<u>Exclusivity Agreement</u>"), in which they agreed to continue negotiating on an exclusive basis (the "<u>Exclusive Period</u>"). (**DE 65, TR1 92:17-21**). Brail testified that the Khan Parties agreed to exclusivity on the expectation the Debtors would close by March 31, 2020**. (TR2 322:20-25; TR2 323:1-2).** The Exclusivity Agreement provided that the Khan Parties would cease all discussions with other potential purchasers and refrain from entering into any other letter of intent or agreement with another potential purchaser during the Exclusive Period. (**DE 65**).

**7.    Equity Purchase Agreements**

During the Exclusive Period, the Debtors and Khan negotiated and finalized agreements governing the Debtors' acquisition of Khan's ownership in the

Companies, (**TR1 93:12-14),** and on March 10, 2020 (the "Effective Date"), the Khan Parties and the Debtors entered into the following agreements (collectively, the "EPAs"):[8]

(a)      *Equity Purchase Agreement* by and between (i) Khan, SCGC, SCGM, SCG-B, SCG-VP, District Theaters, SCG-WR, SCG-CS, SCGK, and SCG-WL, and (ii) the Debtors (the "Texas EPA"). (**DE 66**); and

(b)      *Equity Purchase Agreement* between (i) Khan and SCG-N, and (ii) the Debtors (the "Illinois EPA" and, together with the Texas EPA, the "EPAs" or "Agreements"). (**DE 67**).

The EPAs provided, among other things, the following:

> "**Material Adverse Effect**" means "any change, development, event, occurrence, fact, circumstance or condition, that, individually or taken as a whole, has or is reasonably likely to have (a) a material adverse effect upon the financial condition, business or results of operations of the Company Group [Khan Companies], including by substantially reducing the value of the Company Group or (b) a material adverse effect on the Equityholder [Mr. Khan] or any member of the Company Group to consummate the transactions contemplated hereby[.]

(**DE 66,67, p.9**) (the "MAE Clause").

> [P]rovided, however, none of the following (or the results thereof) shall be taken into account, either alone or in combination, in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur: (i) conditions generally affecting the United

---

[8] The Texas EPA governs the acquisition of Khan's equity interests in the Companies, other than SCG-N. The Illinois EPA governs the acquisition of Khan's equity interests in SCG-N.  Both EPAss contain similar terms, other than the purchase price, and the Illinois Agreement provided for a closing no earlier than April 10, 2020.

States economy, the regulatory environment or credit, securities, currency, financial, banking or capital markets . . . in the United States or elsewhere in the world, (ii) . . . any ***epidemics, pandemics, outbreaks, . . . or any other national or international calamity or crisis . . . .***

**(DE 66,67, p.9)** (the "<u>MAE Carveouts</u>") (emphasis added).

Thereafter, on March 13 and 16, 2020, the Debtors and the Khan Parties issued press releases regarding the transaction. (**DE 104-8 and 104-9).**

**8.     COVID Summary**

In the weeks leading up to execution of the EPAs, and beyond, COVID-19 was in the public domain, as evidenced by the following (the "<u>COVID Summary</u>"):

| *Date:* | *Event:* |
|---------|----------|
| 1-31-20 | U.S. Secretary of Health and Human Services declares a public health emergency due to COVID-19. (**DE 46-8)** |
| 3-1-20 | Florida Governor declares a public health emergency due to COVID-19.  (**DE 105-4)** |
| 3-3-20 | Debtors provide Bid. (**DE 49-8)** |
| 3-6-20 | Debtors and Khan Parties execute Exclusivity Letter**. (DE 65** |
| 3-9-20 | Florida Governor declares a state of emergency. (**DE 105-6)** |
| 3-9-20 | Illinois Governor declared all counties in the State of Illinois as disaster area.  (**DE 46-15)** |
|  |  |

15

| 3-10-20 | Debtors and Khan Parties execute the EPAs. **(DE 91 and 93)** |
| 3-11-20 | World Health Organization declares a global pandemic. **(DE 46-8)** |
| 3-11-20 | Miami-Dade County Mayor declares a state of local emergency. **(DE 105-7)** |
| 3-13-20 | Parties issue press release announcing acquisition of Companies. **(DE 104-8)** |
| 3-16-20 | Parties issue press release announcing acquisition of Companies. **(DE 104-9)** |

At the time the EPAs were executed, (**TR3 606:19-25**), Marti testified the Debtors believed COVID-19 would have a "very short-term effect" given the Debtors' prior experience with swine flu in Mexico during which some of the Debtors' theaters had closed for one or two-weeks and the majority had closed for a few days. (**TR3 607:1-22**). However, this position was contradicted by the PwC e-mail dated March 4, 2020, in which PwC considered the effects of COVID-19 in the "months to come," (**DE 141**)[9], and by Brail's testimony as to conversations with Marti in which Brail had expressed theaters could be closed for months or longer. (**TR2 393:22-25; TR2 394:1-15**).

---

[9] During Trial, Khan Parties' counsel was prohibited from cross-examining Marti about the March 4, PwC e-mail. TR3 607:24-25; 608, 609, 610:1-5.

COVID-19 had been present for more than one month when the EPAs were executed. The Debtors knew or should have known that COVID-19 could potentially have a long-term impact and was reasonably foreseeable to the parties. Nevertheless, the Debtors: (a) submitted the Bid on March 3, 2020; (b) entered the EPAs on March 10, 2020, which contained the MAE Clause and MAE Carveouts; and (c) issued press releases on March 13 and 16, 2020, just days after the World Health Organization had declared COVID a global pandemic.

**9.     Closing**

On March 24, 2020, the Khan Parties' counsel sent an email to Debtors' counsel (the "March 24 Email") attaching outstanding deliverables and advising that the closing conditions set forth in Section 8.1 of the EPAs had been satisfied. Counsel further advised that, in accordance with Section 3.1 of the EPAs, the closing was to take place no later than the second business day following satisfaction or waiver of the closing conditions set forth in Article 8 of the EPAs. (**DE 77**).

In a March 24, 2020, response by e-mail (the "March 24 Response"), counsel for the Debtors advised that "in light of COVID-19-related fallout, Cinemex will not and is not obligated to close this transaction. Among other things, Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters[,]" and "key personnel are located

in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." (**DE 104-10**).

While the border was closed to land travel, those restrictions did not apply to air travel or persons conducting business in the United States. (**DE 46-16**). The Debtors could have traveled to Houston if they wanted**.**

The Debtors also appeared to rely upon governmental orders in support of not being able to travel to Houston. For example, the Debtors submitted into evidence the Order of County Judge Lina Hidalgo (the "Harris County Order"). (**DE 44-23**). The Harris County Order, which became effective as of 11:59 p.m. on March 24, 2020 (a week after the alleged inspections were scheduled for March 17, 2020), directed individuals currently living in Harris County to stay at their place of residence, except to operate "Essential Businesses", such as restaurants that "serve food and/or alcohol by take out, delivery, or drive through services . . .." (**DE 44-23).** The Companies were, technically, authorized to operate, as they were able to provide food and beverage for takeout and off-premises consumption and, therefore, inspections could have occurred. (*See* **DE 44-23, P.3, ¶2(f))**.[10]

In a March 25, 2020, letter (the "March 25 Letter"), the Khan Parties' counsel disputed any right of the Debtors to back out of the EPAs and demanded that the

---

[10] The Governor of Illinois issued a similar order, Executive Order 2020-10, on March 20, 2020.

Debtors reverse their position and proceed to closing. (**DE 104-11**). The Khan Parties' counsel referenced, in part, the MAE Clause and MAE Carveouts. (**DE 104-11**).

On March 26, 2020, the Debtors, in response (the "March 26 Response"), asserted they were not required to close the "transaction" at the time since (a) the closing must physically occur in Houston, (b) they were entitled to perform a physical inspection of the theaters, and (c) they were further excused based on the doctrines of impossibility, impracticability, and frustration of purpose.[11] (**DE 105-1**).

To facilitate closing, Khan offered to: (a) send a private plane to transport the Debtors' representatives to Houston; (b) have a virtual closing; (c) use a third-party for purposes of conducting any inspections and/or closing; (d) discount the purchase price; and (e) postpone the closing. (**TR1 227:6-25; TR1 228:1-4; TR1 142:19-25; TR1 143:25; TR1 144:1-6**). None of the foregoing were accepted by the Debtors. (**TR1 142:19-25; TR1 143:25; TR1 144:1-6; TR3 528:1-25; TR3 529:1-25; TR3 530:1-25**). Brail testified that "it became very clear, especially on the 25th, that they [Debtors] had no intention of closing . . .." (**TR2 330:21-25**).

---

[11] See *infra*, note 21.

10.     **Texas Litigation and Bankruptcy**

On April 1, 2020, the Khan Parties commenced litigation against the Debtors before the United States District Court for the Southern District of Texas, case styled *Omar Khan et al. v. Cinemex Holdings USA, Inc.*, Case No. 4:20-cv-01178, in which they sued for breach of contract and specific performance (the "Texas Litigation"). (**DE 45-19).** A hearing on expedited injunctive relief was to be held during the week of April 27, 2020 (the "Injunction Hearing").

However, on April 25, 2020 (the "Petition Date"), the Debtors filed for bankruptcy (the "Cases"), which stayed the Texas Litigation and averted the Injunction Hearing.

11.     **Claims and Objections**

On July 6, 2020, the Khan Parties timely filed proofs of claim in the Cases (collectively, the "*Claims*"). (**DE 44-1 through DE 44-21).** On October 22, 2020, the Debtors filed the *Amended Objections to Claims* (the "Amended Objection"), [**DE 756 \*695**], and on November 13, 2020, the Khan Parties timely filed their *Response to Amended Objection to Claims*, (the "Response"). [**DE 816, \*695**].

12.     **The Trial**

The bankruptcy court conducted the Trial on the Amended Objection and Response on May 20, 2021, June 18, 2021, and July 9, 2021. The Court issued the

Opinion on October 4, 2021, and no trial on damages occurred. On October 18, 2021, the Khan Parties filed their Notice of Appeal.

## SUMMARY OF ARGUMENT

The bankruptcy court erred in concluding that a failure to deliver an escrow agreement resulted in a failure of condition under Section 8.1(D)(5) of the EPAs. The Debtors failed to provide information necessary to execute the escrow agreement and, therefore, the Debtors cannot rely upon Section 8.1(D)(5), consistent with Section 8.3 of the EPAs. Moreover, the Debtors never asserted any failure to deliver an escrow agreement before Trial, including in (a) the email and correspondence exchanges between counsel between March 24-26, 2020, (b) the April 17, 2020, correspondence from the Debtors' counsel, (c) any pleadings filed by the Debtors in the Texas Litigation, including the Debtors' motion to dismiss, or (d) the Amended Objection.

The bankruptcy court erred in concluding the Khan Parties failed to satisfy Section 8.1(B) of the EPAs due to a failure to comply with Sections 7.1(A)(d), 7.2, and 7.9 of the EPAs. At all times, the Khan Parties provided the Debtors with reasonable access to Corporate Employees, the properties, and books and records, as required by Sections 7.1(A)(d), 7.2, and 7.9 of the EPAs. The Debtors' only witness at Trial (other than Brail) testified that the Khan Parties never denied the Debtors access to employees, properties, or books and records. Moreover, the

Debtors made no effort, let alone reasonable best efforts, to cause the conditions to close to occur. Furthermore, the Khan Parties maintained officers, directors, and employees as required by Section 7.1(A)(d) until after the Debtors' breaches of the EPAs and, therefore, did not violate Section 7.9 of the EPAs.

The bankruptcy court erred in concluding that the Khan Parties did not use reasonable best efforts to close the transaction. The Khan Parties made every effort to cause the closing to occur within the meaning of Section 7.4 of the EPAs.

The Court erred in finding that the Khan Parties repudiated, and the Debtors did not breach, the EPAs. The Debtors breached the EPAs and, therefore, the Khan Parties properly declared breaches of the EPAs.

## ARGUMENT

**A.** **The bankruptcy court erred in concluding that the Khan Parties failed to satisfy Section 8.1(D)(5) of the EPAs by failing to deliver the escrow agreement.**

Section 8.1(D)(5) provides, in part, that "[o]n or prior to the Closing Date, the Equityholder (Khan) "will have delivered (or caused to be delivered) to Buyer" . . . "[t]he Escrow Agreement, duly executed by the Equityholder and the Escrow Agent." (**DE 66,67, Section 8.1(D)(5)**. The bankruptcy court concluded that, "[w]hile, arguably, the Escrow Agreement could have been delivered at closing, it was not possible for a signed Escrow Agreement to be provided at a March 26 closing." (**DE 244, p.26, ¶100**).

22

In support of its conclusion, the bankruptcy court referenced and relied upon a March 18, 2020, e-mail in which the Khan Parties' counsel stated to Debtors' counsel, "I understand our clients have discussed and all parties are on the same page and pushing to close on March 31st." **(DE 75).** "'[T]he Escrow Agreement will need Buyer's KYC [know your customer] information at least 5 business days prior to closing [3/25]. [We ask that your please prioritize these requests.]'" **(DE 244, p.27, ¶101; DE 75)**. The Court then concluded, "[t]hus, the Khan Parties' counsel knew when he sent the March 24 Email that a closing on March 26 was not possible." *Id.* In other words, if the KYC information would have had to be provided by March 25, 2020, to close on March 31, 2020, then the Khan Parties knew on March 24, 2020, that a March 26, 2020, closing was not possible.

However, the bankruptcy court's conclusion was erroneous. First, five business days prior to March 31, 2020, was *March 24, 2020* (not March 25, 2020), assuming a March 31, 2020, closing. The Debtors did not provide the KYC information on March 24, 2020. Even if the Debtors had provided the information on March 24, 2020, the Khan Parties and the Debtors could have closed on or before March 31, 2020, which was prior to the commencement of the Texas Litigation on April 1, 2020. Any failure of condition under Section 8.1(D)(5) would have been caused by the Debtors, as the Debtors failed to provide the KYC information. Section 8.3 of the EPAs provides, "[n]o Party may rely on the failure of any

condition set forth in this <u>ARTICLE 8</u> to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts to cause the Closing to occur, as required by <u>Section 7.4(A)</u>." (**DE 66,67, Section 8.3**). Section 7.4 also provides that "[e]ach Party will use reasonable best efforts to cause the conditions to Buyer, the Companies' and the Equityholder's respective obligations to consummate the Closing to be satisfied . . .." (**DE 66,67, Section 7.4**). Accordingly, the Debtors could not have relied on any failure to deliver the escrow agreement, since they failed to provide the KYC information.

Second, there was no mention of any escrow agreement in (a) the March 24 Response (**DE 104-10),** (b) the March 26 Letter (**DE 105-1**), or (c) the April 17, 2020, correspondence from Debtors' counsel. (**DE 106-3**). Nor did the Debtors raise a failure of condition based on any escrow agreement in (a) any of the pleadings they filed in the Texas Litigation, including in the Debtors' motion to dismiss, (**DE 100, 102, 106-3**), or (b) the Amended Objection. Accordingly, the Debtors waived the condition of an escrow agreement under Section 8.1(D)(5).

Therefore, the bankruptcy court erred in finding and concluding that the Khan Parties failed to satisfy Section 8.1(D)(5).

**B.    The bankruptcy court erred in concluding that the Khan Parties failed to satisfy Section 8.1(B) of the EPAs by failing to comply with Section 7.1(A)(a) and Section 7.1(A)(d) of the EPAs.**

24

Section 8.1(B) of the EPAs provides that the Khan Parties shall have "performed and complied . . . with all of the covenants and agreements required to be performed by the Khan Parties" under the EPAs, including Section 7.1(A)(a). Section 7.1(A) provides, "[f]rom the date hereof until the Closing or termination of this Agreement by its terms, <u>except</u> (i) as otherwise expressly provided in this Agreement [EPAs] or (ii) as described on Schedule 7.1(A), the Companies shall use commercially reasonable efforts to . . . (a) conduct the Business in the Ordinary Course" (*EPAs*, Section 7.1(A)(a)) and "(d) keep available the services of their respective directors, officers and employees (excluding . . . resignations in the Ordinary Course)[.]" (**DE 66,67, Section 7.1(A)(d)).**

The bankruptcy court erred in concluding that the "Khan Parties had departed from their ordinary course of business prior to the purported closing date, and in doing so, breached their covenant under Section 7.1(A)(a) of the EPAs." (**DE 244, P.32, ¶120).** The bankruptcy court also erred in concluding that the "Khan Parties failed to satisfy the covenant to keep available the services of their respective directors, officers and employees, as required under Section 7.1(A)(d) of the EPAs and therefore failed to perform a condition precedent to closing under Section 8.1(B) of the EPAs." (**DE 244, p.33, ¶124)** (footnote omitted).

Section 7.1(A) contains exceptions. The first exception to Section 7.1(A)(a) and Section 7.1(A)(d) appears in Section 7.1(A)(i) and provides, in part, that "*except*

*(i) as otherwise expressly provided in this Agreement . . ..*" (**DE 66,67, Section 7.1(A)(i))** (emphasis added). The parties included the MAE Clause and the MAE Carveouts in the EPAs. (**DE 66,67, p.9**).

In analyzing "material adverse effect" clauses, the Delaware Chancery Court, in *Akorn, Inc. v. Fresenius Kabi AG, Quercus Acquisition, Inc., and Fresenius SE & Co. KGAA,* No. C.A. 2018-0300-JTL, 2018 Del. Ch. LEXIS 325 (Del. Ch. Oct. 1, 2018), *aff'd,* 2018 Del. LEXIS 548 (Del. Dec. 7, 2018), noted that:

> 'The typical MAE clause allocates general market or industry risk to the buyer, and company-specific risks to the seller.' From a drafting perspective, the MAE provision accomplishes this by placing the general risk of a MAE on the seller, then using exceptions to reallocate specific categories of risk to the buyer. Exclusions from the exceptions therefore return risks to the seller. . .. 'For example, a buyer might revise the carve-out relating to industry conditions to exclude changes that disproportionately affect the target as compared to other companies in the industries in which such target operates.'

2018 Del. Ch. LEXIS 325, at *112-13 (internal citations omitted).

In *Akorn*, the court found that, as is common, the agreement at issue started with a "general statement of what constitutes a MAE. It next carves out certain types of events that otherwise could give rise to a MAE. It then creates two broad exceptions to the carve-outs . . . ." *Akorn*, 2018 Del Ch. LEXIS 325, at *119. This also occurred with the EPAs, as the Khan Parties and the Debtors started with the MAE Clause and then clearly and unambiguously allocated the risk of a pandemic (COVID-19) to the Debtors.

26

The bankruptcy court here found and concluded that "the Parties were fully aware of the COVID-19 pandemic at the time the EPAs were signed[.]" **(DE 244, p.43, ¶163**. Having assumed the risk of a pandemic, the Debtors should not be permitted to claim a breach of Section 7.1(A)(a) or Section 7.1(A)(d) based on the temporary closures (and any furloughs that followed) caused by the pandemic.

In *Cineplex Inc. and Cineworld Group PLC and 1232743 B.C. Ltd.,* 2021 ONSC 8016, a case recently decided by the Superior Court of Justice, Ontario on December 14, 2021[12], the court found in favor of the seller in a case in which the purchaser terminated the agreement based on an alleged failure to operate in the ordinary course of business. *Id.* at p.2. The seller had closed its theaters on March 16, 2020, due to COVID-19. *Id.* at p.5. Similar to the EPAs, the ordinary course covenant at issue provided, in part, "except (ii) as required or contemplated by this Agreement . . . or (iii) as required by Law, the Company shall . . . conduct its business in the Ordinary Course . . . and the Company shall, in good faith, use commercially reasonable efforts to maintain and preserve its . . . business organization, assets, properties . . . [and] employees . . .." *Id.* at p.6. "'Ordinary Course' is defined . . . to mean actions 'taken in the ordinary course of the normal day-to-day operations of the business of the Company . . . consistent with past practice.'" *Id.*

---

[12] The *Cineplex* opinion is being filed with the Court as supplemental authority.

In *Cineplex,* the agreement at issue included an obligation that the seller had complied with all covenants, as conditions to closing. *Id.* at p.7. The agreement also contained a "material adverse effect" clause that included any "outbreak of illness" which was excluded from being a material adverse effect. *Id.* at p.8. The buyer argued that the material adverse effect clause was separate from the ordinary course covenant and, therefore, the seller was "not permitted to deviate from the Ordinary Course, even in the face of the pandemic, and was required to operate as it usually did in non-pandemic times." *Id.* at p.23.

In siding with the seller, and although finding that "the conduct of the business during the Interim Period [between signing and closing] is governed by the Operating Covenant", the *Cineplex* court found that it "must read the agreement as a whole and not interpret the clause in a way that negates any other provision of the . . . [agreement]". *Id.* "[W]hen interpreting a contract, the overriding concern is to determine the intent of the parties and the scope of their understanding. In order to determine their intent and understanding, the court must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract." *Id.* The court concluded that "Cineplex [seller] cannot be held in default of the Ordinary Course covenant when it was prevented from conducting its normal day-to-day operations by government mandate." *Id.* at p.24. The actions "taken by

28

Cineplex . . . were commercially reasonable efforts to maintain and preserve the business once the theaters were closed." *Id.* "[T]he Company Material Adverse Effect clause squarely addressed the risk of a pandemic and allocated that systemic risk to the buyer, Cineworld." *Id.* at p.20.

Here, the bankruptcy court erred in finding that the Khan Parties breached Section 7.1(A)(a) Section 7.1(A)(d), since the theater closures and any furloughs that followed, were the direct result of COVID-19. If, as the bankruptcy court held, the temporary closures were commercially reasonable, then any actions taken by the Khan Parties in response to COVID-19 could not result in a breach of the covenants under Section 7.1(A)(a) or Section 7.1(A)(d) based on the MAE Carveouts.

The second exception to Section 7.1(A)(a) and Section 7.1(A)(d) appears in Section 7.1(A)(ii) which provides, in part, that, "except . . . (ii) as *described on Schedule 7.1(A)*," the Khan Parties shall use commercially reasonable efforts to comply with Section 7.1(A)(a) and Section 7.1(A)(d). **(DE 66,67, Section 7.1(A)(ii))** (emphasis added).  In discussing Schedule 7.1(A) of the EPAs, the bankruptcy court noted the following:

> Schedule 7.1(A) of the EPAs was amended in Schedule Supplement No. 1 (the 'Schedule Supplement') to add 'The COVID-19 Response.' The COVID-19 Response is defined in Schedule 5.5(c) of the Schedule Supp lement as follows –

> 1.     As a result of state and local requirements banning large public gatherings in response to COVID-19, as well as the declaration of a national state of emergency and the public guidance issued by the

Center for Disease Control and Prevention with respect thereto, the Company Group, as well as SCG-N, have taken a number of actions and adjusted their business operations accordingly in order to comply with such requirements, including temporarily closing all theaters (including all attached restaurants and dining areas) and suspending all operations while such restrictions remain in effect, which has been consistent with the industry-wide practice (collectively, the "COVID-19 Response").

**(DE 244, p.30, ¶116)**.

The bankruptcy court concluded that, "the Schedule Supplement *only* amended the representations and warranties of Articles 4 and 5 of the EPAs, *not* the covenants of the EPAs." (**DE 244, p.30, ¶117**). The bankruptcy court relied upon Section 7.5 of the EPAs, which provides, in part, the following:

The Companies and the Equityholder may prepare and deliver to Buyer supplements and/or amendments to the Schedules ( . . . in each case, such supplement, amendment or new Schedule being referred to as an '**Update**'), and each such Update shall be deemed to be an amendment to this Agreement for all purposes herein; provided that, any such Update shall be given effect solely for the purposes of determining whether there has been a breach of a representation or warranty for purposes of determining the fulfilment of the condition set forth in Section 8.1(A) but shall have no effect for purposes of the indemnification provisions under Article 11.

**(DE 66,67, Section 7.5)**.

The bankruptcy court erred in concluding that the Schedule Supplement only amended the representations and warranties of Articles 4 and 5 of the EPAs. Such an interpretation would render Section 7.1(A)(ii) a nullity. Section 7.1(A)(ii) is clear and unambiguous in providing that the Khan Parties were obligated to comply with

Section 7.1(A)(a) and section 7.1(A)(d) <u>except</u> <u>as</u> provided on Schedule 7.1(A), which incorporated the "COVID-19 Response" (or actions taken in response to COVID-19). It then follows that the Khan Parties and the Debtors incorporated the COVID-19 Response as an exception to compliance with Section 7.1(A)(a) and Section 7.1(A)(d). Therefore, the temporary closures due to COVID-19, which the bankruptcy court determined were commercially reasonable, could not result in a breach of the covenants set forth in Section 7.1(A)(a) and Section 7.1(A)(d).

Finally, the bankruptcy court cited to *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC, 2020 WL 7024929, at * 71 (Del. Ch. 2020)* for the proposition that "the ordinary course covenant 'impose[s] an unconditional obligation' to operate in the ordinary course consistent with past practice."'(**DE 244, p.32, ¶119**). Here, the bankruptcy court held that, "[w]here the parties choose to define 'ordinary course' as being 'consistent with past practice,' as is the case here, 'the court cannot look to how other companies responded to the pandemic or operated under similar circumstances.'" **(DE 244, p.31-32, ¶119)** (quoting *MAPS*, 2020 WL 7024929 at *71).

In referencing the *MAPS* decision, the bankruptcy court noted:

While, as the Khan Parties point out, the *MAPS* Opinion considered a 'MAE clause' that qualified 'past practices' with the word 'only', the language of the MAE clause in the *MAPS* Opinion and the MAE Clause in this case both refer to 'past practices.' The *MAPS* Opinion is clear that 'ordinary course' covenants did not permit a company to do

31

whatever such companies 'ordinarily would do when faced with a global pandemic.'

(**DE 244, p.31, ¶119**) (quoting *MAPS,* 2020 WL 7024929 at *70).

The underlying sale agreement[13] in MAPS to which the bankruptcy court referred obligated the seller to conduct the business "*only* in the ordinary course of business consistent with past practice" (*MAPS*, 2020 Del.Ch. LEXIS 353, at *168-69) (emphasis added). The *MAPS* court's holding was predicated, in part, on the parties' use of the term "only." The *MAPS* court held that, by using the adverb "***only***," "the parties created a standard that looks exclusively to how the business has operated in the past." *Id.* at *181. "[T]he court cannot look to how other companies responded to the pandemic or operated under similar circumstances." *Id.* Thus, the *MAPS* court held that it was prevented from considering the reasonableness of actions taken by seller in the face of COVID-19. *Id.* at *180-81.

In the EPAs, "Ordinary Course" means, "with respect to any Person, in the ordinary course of that Person's business consistent with past practice" and does <u>not</u> include the adverb "only". (**DE 66,67, p.10**). The bankruptcy court erred both in

---

[13] In *MAPS*, the purchase agreement, in question, was entered by the parties on ***September 10, 2019,*** which was six (6) months prior to the date of the Agreements. 2020 Del. Ch. LEXIS 353, at *2-3.

concluding that it was confined to considering the Khan Parties past practices and in its interpretation of the *MAPS* decision.[14]

Additionally, the agreement at issue in MAPS did not include a "commercially reasonable efforts" qualifier, as do the EPAs. *See generally id.* at *181-85. In *MAPS*, the bankruptcy court considered a "commercial reasonable efforts" qualifier, but not with respect to the Ordinary Course Covenant. Rather, the "commercially reasonable efforts" qualifier related to a different section of the agreement, which the court acknowledged was indicative of the parties' intentional effort to omit qualifying language in the Ordinary Course Covenant.

Section 7.1(A) of the EPAs obligated the Khan Parties to use "commercially reasonable efforts" to "conduct the Business in the Ordinary Course". **(DE 66,67, Section 7.1(A)(a)).** This is a critical difference that the bankruptcy court failed to consider when analyzing the *MAPS* decision. The bankruptcy court found that "the Khan Parties used commercially reasonable efforts to temporarily suspend operations of the SCG Theaters [.]" **(DE 244, p.28, ¶109).** It then follows that the Khan Parties used commercially reasonable efforts to operate the business in the ordinary course and, therefore, the bankruptcy court erred in concluding that the Khan Parties breached Section 7.1(A)(a).

---

[14] The *Chapter 11 Case management Summary* filed by the Debtors in the Cases provided they had closed their first theaters by March 16, 2020 (a day before the Khan Parties closed their theaters) and had closed all 41 of their theaters in 12 states by March 19, 2020. **(DE 106-2, p.3).**

Finally, as discussed *infra* regarding the Khan Parties' compliance with Section 7.9(A) of the EPAs, the bankruptcy court found that "Khan testified in his deposition that somewhere between a week to ten days after the theater closures on March 17, one hundred percent of employees were furloughed – well before any Outside Closing Date[.]" (**DE 244, pp 32-3, ¶122**). The bankruptcy court further held that "[i]t appears there was no reason for the furloughs other than to save costs." (**DE 244, p.33, ¶123**). If the temporary closures were "commercially reasonable," then it was also commercially reasonable to furlough employees while the theaters were temporarily closed in an effort to save costs and preserve the Business. Therefore, the Khan Parties could not have violated Section 7.1(A)(d) of the EPAs by failing to maintain directors, officers, and employees.

## C.   The bankruptcy court erred in concluding that the Khan Parties failed to satisfy Section 8.1(B) of the EPAs by failing to comply with Section 7.9(A) of the EPAs.

Section 8.1(B) of the EPAs provides that the Khan Parties shall have "performed and complied . . . with all of the covenants and agreements required to be performed by the Companies and the Equityholder" under the EPAs, including Section 7.9(A), which provides:

> From and after the date hereof until Closing Date, the Equityholder shall provide Buyer and its Affiliates with reasonable access to each Corporate Employee . . . and to the personnel record of each Corporate Employee, and Buyer and its Affiliates may conduct interviews and

discussions with such Corporate Employees regarding employment with Buyer and its Affiliates[.]

**(DE 66,67, Section 7.9(A)).**

The bankruptcy court erred in concluding that:

the Khan Parties furloughing of one hundred percent of its employees necessarily restricted reasonable access to Corporate Employees because, the Corporate Employees that were employed at the time of signing were no longer under the custody and control of the Khan Parties during a time when Cinemex was still actively seeking inspection of the theaters and access to the associated employees.

**(DE 244, p.38, ¶141)**.

The bankruptcy court found that:

Even if the covenant requirements of the EPAs had excused the shutdown of the theaters for purposes of forcing a closing, nothing in the shutdown orders or CDC guidelines required the Khan Parties to furlough employees or release executives. While there is a dispute regarding the timing of the furloughs, it is uncontroverted that SCG furloughed its employees. Khan testified in his deposition that somewhere between a week to ten days after the theater closures on March 17, one hundred percent of employees were furloughed – well before any Outside Closing Date[.]

**(DE 244, pp. 32-3, ¶122)**. The bankruptcy court continued:

It appears there was no reason for the furloughs other than to save costs. Thus, even though Cinemex could have inspected the theaters while they were closed, Cinemex personnel were not given the opportunity to discuss with on-site employees any operational questions or concerns that might have been raised during, or as part of, the inspection process.

**(DE 244, p.33, ¶123)**.

Khan testified during Trial "[t]hat [the furloughs] actually did not happen until– I believe until almost March – April 1ˢᵗ, or after the month was over, after the breach had occurred.  So, to clarify that, yes, people were furloughed after the month of March [2020], and as well it was after there was a breach that occurred, on in my opinion the breach had occurred." (**TR1 222:12-18**). Khan's trial testimony was uncontroverted and, therefore, the evidence demonstrated that any furloughs did not occur until following the Debtors' breach. In fact, the bankruptcy court alluded to an e-mail exchange on March 27, 2020, in which employees of the Khan Parties and the Debtors communicated regarding contracts in the Date Room. (**DE 244, p.34, n.24),** which demonstrates that the Debtors had access to employees. This was further corroborated at Trial by Marti, who testified that (a) "[t]here was no limitation on the communication between the SCG employees and Cinemex." (**TR3 624:19-23; TR3 625:1-2**); and (b) "[a]ccess was not denied to us" (**TR3 623:8-15**). In fact, the following exchanges occurred between the Khan Parties' counsel and Marti:[15]

> Q.    And likewise, Marti, between March 10ᵗʰ and March 24ᵗʰ, neither Khan, nor any representatives of Star Cinema Grills, denied Cinemex and its representatives from having access to corporate employees[,], correct?

---

[15] Marti testified at Trial that he did not believe the closing conditions had been satisfied for 2 reasons, which were (a) the Debtors had a right to perform inspections, and (b) the parties had not signed the escrow agreement. Tr. P.541, L13-22.  Marti did not mention having been denied reasonable access to Corporate Employees.

A.    Our people kept – continued discussions with people from Star Cinema Grills.  That communication always continued. It was not restricted. In fact, yes, the communication continued with the corporate employees.

**(TR3 623:16-25).**

Q.    Marti, in stating that the communications continued between Cinemex and Star Cinema Grills, isn't it fair to say then that no one from Star Cinema Grills denied Cinemex and its representatives access to the cinema – the Star Cinema employees?

A.    That's what I tried to respond to the previous question posed to me. The communication continued. There was no limitation on the communication between the SCG employees and Cinemex.

**(TR3 624:19-25; TR3 625:1-2).**

Accordingly, the bankruptcy court erred in concluding that the Khan Parties failed to comply with Section 7.9(A) and Section 8.1(B) of the EPAs.

**D.    The bankruptcy court erred in concluding that the Khan Parties failed to satisfy Section 8.1(B) of the EPAs by failing to comply with Section 7.2 of the EPAs.**

Section 8.1(B) of the EPAs provides that the Khan Parties shall have "performed and complied . . . with all of the covenants and agreements required to be performed by the Companies and the Equityholder" under the EPAs, including Section 7.2. Section 7.2 provides:

From the date hereof until the Closing . . . the Companies shall (A) afford Buyer and its counsel, accountants and other authorized agents and representatives (collectively, "Representatives") reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group; and (B) make available to Buyer and its

37

Representatives with such financial, operating and other data and information related to the Company Group as Buyer or any of its Representatives may reasonably request[.].

**(DE 66,67, Section 7.2).**

The bankruptcy court erred in concluding that the "Khan Parties did not provide reasonable access to the theaters by foreclosing Cinemex's ability to conduct the inspections – either by waiting to see if the theaters would open closer to the Outside Closing Date, or at least taking additional time to come to another resolution." (**DE 244, p.35, ¶130**).

The bankruptcy court held that, "[a]t the time of the March 24 Email where the Khan Parties declared all conditions to close were satisfied, the Parties were still negotiating the physical inspection of the theaters." (**DE 244, p.35, ¶131**). However, the bankruptcy court noted that while "[t]here is a dispute . . . as to whether an inspection of the SCG Theaters while they were closed would satisfy Section 7.2 of the EPAs . . .[,] Cinemex has not indicated where in the EPAs a physical inspection must take place while the theaters are operating." (**DE 244, p.36, ¶133**). The bankruptcy court further noted that "Mr. Marti testified as to a variety of reasons why the inspections needed to occur while the theater was in operation, **but** other than timing delivery of food and the food to table experience, the other 'live experience' requests seemed to have occurred during the February Tours." *Id.* (emphasis added). The bankruptcy court also found that "Cinemex *did* tour the

theaters while they were operating during the February Tours." *Id.* (emphasis in original).

During Trial, Brail testified that during the Tours of the theaters by the Debtors, "[t]hese theaters were operational. These tours took place in the afternoon, so people were in auditoriums, films were being shown." (**TR2 311:8-10**). Brail also testified that "when the final bid was submitted on March 3rd, I specifically asked Jose [Marti] whether or not they would be requiring any kind of HVAC or roof inspections because we were so focused on closing by March 31st. And he said no, these were all fairly recent buildings, and those would not be required . . . ." (**TR2 311:24-25; TR2 312:1-7**). Finally, Brail testified that, "[t]hey [the Debtors] applauded the condition of the theaters. These theaters were all incredibly clean, modern, [and] all in good condition." (**TR2 311:8-22**). Brail's testimony was uncontroverted.

During Trial, Marti testified that an "inspection" entails the following: (a) seeing operations, including the parking lot, lobby, box office, auditorium, bathrooms, projection and sound, food service, and kitchen; (b) reviewing the quality of the construction and maintenance; (c) looking over IT and technology; and (d) seeing how people are trained. (**TR3 494-505**). Marti further testified that, during the Tours, the Debtors' representatives (a) visited the parking lots, lobbies, box offices, auditoriums, bathrooms, and projection rooms; (b) toured the kitchens and

auditoriums; (d) were served food and beverages during the management presentation; and (e) the head of construction went onto the roof of at least one of the theaters. (**TR3 579-580**). Marti also acknowledged opting out of HVAC and roof inspections. *Id.* Considering Marti's testimony and his definition of "inspection," the Debtors performed those tasks during the Tours.

The Tours lasted approximately one hour at each theater. (**TR2 359:8-10**). Brail testified that a one-hour visit was more than sufficient time to evaluate a theater's operations. (**TR2 372:16-19**). However, Marti testified that 45 minutes per theater location would not be sufficient to conduct an inspection. (**TR3 503:19-21**). Yet, other than Brail, Marti was the only witness called to testify by the Debtors. During Marti's deposition conducted by the Khan Parties on November 10, 2020, in response to questioning as to the ordinary length of an *inspection*, Marti testified, "[w]ell, I have not performed or been on one of those visits, so I don't know exactly." "I don't think it would be less than three or four hours, but I've never been on one, so you would have to ask a technician or an operations person." (**DE 85, L9-15**).

In the March 24 Response, Debtors' counsel advised that "in light of COVID-19-related fallout, Cinemex will not and is not obligated to close this transaction. (**DE 104-10**). Among other things, Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters." (**DE 104-10**). Counsel for the Debtors went on to state that "key

personnel are located in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." (**DE 104-10**).

As discussed *supra*, the Debtors were never denied access to the Companies' theaters or employees, and contrary to the assertions of Debtors' counsel, the US/Mexico border was not closed. (**DE 46-16**).

The Debtors also relied upon governmental orders in support of not being able to travel to Houston. For example, the Debtors presented into evidence the Harris County Order, which ordered individuals currently living in Harris County to stay at their place of residence, except to operate "Essential Businesses", such as restaurants that "serve food and/or alcohol by take out, delivery, or drive through services . . .." (**DE 44-23**). Therefore, the Companies were, technically, authorized to operate[16], since they were able to provide food and beverage for takeout. *See* (**DE 44-23, P.3, ¶2(f)**).[17] As an Essential Business, the Debtors could have inspected the theaters but chose not to.

Regardless of whether the Tours were inspections, neither the Khan Parties nor their representatives ever prevented the Debtors from visiting or inspecting the

---

[16]The bankruptcy court misinterpreted the foregoing as a suggestion by the Khan Parties that the theaters were operating. *Opinion*, P.10, n.9. However, "Essential Business" status was referenced solely in connection with the Debtors being permitted to be on the **premises** for purposes of conducting any inspections or transition tasks.

[17] A similar order was issued by the Governor of Illinois on March 20, 2020. (**DE 46-15**).

Khan Parties' theaters and assets. In fact, Marti testified at Trial that, "[a]cess was not denied to us." (**TR1 263:8-15**). Marti further testified:

> Q:     [I]sn't it true between March 10th and March 24th [2020], that no one from Star Cinema Gills prevented, impeded or denied Cinemex or its representatives from conducitng any physical inspections of the Star Cinema Grill Theaters?
>
> A.     Star Cinema Grill never denied us having access to their theaters.

(**TR3 625:3-9**).

The Debtors could have inspected the Khan Parties theaters at any time from and after March 10, 2020, through March 24, 2020, [18] but by choosing not to, the Debtors cannot rely upon the failure of condition. Section 7.4 of the EPAs provides, in part, that, "[e]ach Party will use reasonable best efforts to cause the conditions to Buyer, the Companies' and the Equityholder's respective obligations to consummate the Closing to be satisfied [.]" (**DE 66,67, Section 7.4**).  Furthermore, Section 8.3 further provides that "[n]o Party may rely on the failure of any condition set forth in this ARTICLE 8 to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts to cause the Closing to occur, as required by Section 7.4(A)." (**DE 66,67, Section 7.4(A)).**

---

[18] On March 17, 2020, at 9:16 p.m., the Debtors' vice-president of human resources sent an e-mail to "All Users CMX," in which she advises that CMX Cinemas is restricting all nonessential travel. However, she advised that, "[i]f you have a reason to travel which you feel is critical, you must receive the approval of the VP or C-Suite in your reporting hierarchy." Thus, it appears that travel was possible.

Accordingly, the bankruptcy court erred in finding and concluding that the Khan Parties did not comply with Section 7.2(A) and Section 8.1(B).

The bankruptcy court also erred in concluding that the "Khan Parties did not provide Cinemex reasonable access to, and the right to inspect, their contracts prior to the purported closing date, March 26, 2020, and in doing so, the Khan Parties failed to satisfy a condition precedent to closing under Section 8.1(B) of the EPAs." (**DE 244, p.34, ¶127**).

The bankruptcy court referenced a single e-mail dated March 19, 2020, from Loretta Thomas, an employee of the Debtors, to Jason Ostrow, one of the Khan Parties' executives, requesting that the Khan Parties:

> provide 'copies of the contracts relating to their theater operations.' In response, Mr. Ostrow asserted that '[a]ll contracts are in the [data room].' Having not found copies of all contracts requested, on March 27, 2020, Ms. Thomas followed up with Mr. Ostrow, asking for a copy of five specific contracts because Cinemex 'checked the data room and could not find [them].' Mr. Ostrow replied *shortly* thereafter, attaching several contracts and calling out the contract with Vistar as one for which 'we are waiting on the copy from our rep.'

(**DE 244, p.34, ¶127**). Ostrow's reply shortly thereafter demonstrates the reasonableness of access.

The Debtors had access to the Data Room since January 2020. By the time the March 27, 2020, e-mail exchange occurred, the Debtors had enjoyed access to the Date Room and Khan Parties' employees for nearly 2 months. During Trial, Brail testified to the following:

Q.    Do you feel that you were responsive in responding to these additional requests for information by CMX?

A.    Yes. Our style is to try to be as informative as we can during the second round of a process to facilitate bidders' understanding of the asset so they can bid with confidence and bid the highest possible value. So while every single question may not be answered because sometimes clients don't actually have the answer, to the extent the information is available or can be provided to address bidders' concerns, that's what the process entails.

Q.    And during this timeframe, did you receive any complaints from CMX as to whether or not you were being responsive to their request for additional information?

A.    Not that I'm aware of.

**(TR2 306:13-25, TR2 307:1-5)**.

Finally, in the LOI, the Debtors represented stated "CMX (Cinemex) hereby acknowledges that it has had an opportunity to conduct due diligence regarding the Company prior to making this Offer and has completed the bulk of its due diligence efforts, with only a few areas pending, which are mainly confirmatory." (**DE 49-8).**

The bankruptcy court erred in finding and concluding that the Khan Parties failed to comply with Section 7.2(B) and Section 8.1(B).

**E.    The Court erred in concluding that the Khan Parties failed to comply with Section 7.4 of the EPAs.**

Section 7.4 of the EPAs provides that "[e]ach Party will use reasonable best efforts to cause the conditions to Buyer, the Companies' and the Equityholder's respective obligations to consummate the Closing to be satisfied." **(DE 66,67, Section 7.4).**

44

The bankruptcy court erred in concluding that "the Khan Parties did not use reasonable best efforts to cause the closing to occur." (**DE 244, p.39, ¶145**).  The bankruptcy court found that:

> Not only did the Khan Partis *not* meet all closing conditions . . ., they also demanded – and indeed, threatened – that Cinemex close prematurely, to meet a closing deadline of Mr. Khan's unilateral choosing, one that was not even mentioned in the EPAs." . . . The only justification Mr. Khan offered for his behavior was that he was entitled to a March 31 closing because it was his 'God-given right to do so.'. . . Mr. Khan's behavior was driven entirely on his feelings.

(**DE 244, p.39, ¶145-47**).

Khan's statement that a closing by March 31, 2020, was his "God-given right" was an excerpt from Khan's deposition taken out of context. When properly referenced, Khan testified in response to questioning about a closing by March 31, 2020. Khan actually testified as follows:

> Prior to CMX ever signing that agreement [EPAs], PJ Solomon was instructed as well as all the buyers that were involved or bidders or anybody that was involved in this transaction that ever took a look or in any way, shape, or form, the very get-go, the part of the requirement or – was my time from [referencing March 31] of when I desired to close, and which as a seller, in my belief, is my right.  And so I wanted to close before the end of March so I could use the proceeds to invest in other things that I was hoping to invest in.  I had that right [meaning the right to close by March 31].

(**DE 55-13, P.432, L10-24**). Khan further testified:

> Well, those are the – those – those are the reasons. I mean, I wanted to spend time with my family. I wanted to invest in a real estate project. I wanted to sell my company. I wanted the money. Whatever those reasons were, those were my God-given rights to do so, in my opinion.

(**DE 55-13, P439, L5-14**).

During Trial, Brail also testified:

Yeah, we were very transparent with all the bidders that Omar Khan had a real estate deal that he needed to fund at the end of March. . . . [W]e told the parties the end of March to ensure that we could, in fact, have the proceeds, and everybody knew it. It was – it was the basis on which we chose CMX. . .. So March 31st was absolutely integral to these conversations around this transaction, valuation, timing, speed, certainty and value were all integral.

(**TR2 326:2-14**).

The Final Process Letter provided that "[i]t is Star's expectation that each Offer would be able to close the acquisition no later than March 31, 2020." (**DE 104-7**). A March 12, 2020, email from the Debtors' vice president of human resources, on which Marti was copied, announced, "I am very excited to tell you we have reached a successful agreement for the acquisition of Star Cinema Grill based in Houston, TX. The closing date for nine existing theaters and one under construction (The Woodlands) will be 3.31.20, meaning we take possession on 4.1.20." (**DE 91**). Accordingly, there was ample justification for a March 31, 2020, closing.

Additionally, after the Debtors refused to close following the March 24 Email, Khan made substantial efforts to facilitate a closing, including: (a) sending a private plane to pick up representatives of the Debtors; (b) postponing the closing date; and (c) using a third party to conduct any inspections the Debtors desired. (**TR1 143:7-20**). During Trial, Marti acknowledged that Khan had offered the following: (a) a

discounted price; (b) a private plane; (c) a virtual inspection; and (d) third party inspectors. (**TR3 529:9-25, TR3 530-531, TR3 532:1-7**).

The Khan Parties used reasonable best efforts to close and, therefore, the bankruptcy court erred in finding and concluding that the Khan Parties and, specifically, Khan, had not done so. On the other hand, the Debtors rejected every alternative to close the transaction. As Brail testified during Trial, "it became very clear, especially on [March] 25th, that they [Cinemex] had no intention of closing[.]" (**TR2 330:23-25).**

Finally, the bankruptcy court erred in finding that "on March 28, 2020, Cinemex offered to postpone the closing and provide Khan with a $20 million-dollar interest free loan, but proposed terms that Khan testified were not acceptable to him." (**DE 244, p.16, ¶68**). The terms of the March 28, 2020, offer included: (a) the EPAs would be **_terminated_**; (b) Khan's shares in certain of the Companies would be deposited into escrow to secure a right of first refusal; and (c) the Debtors would have a call option to purchase Star Cinema Grill. _See_ (**DE 50-2**). The Debtors did not offer to "postpone closing" but, instead, proposed terminating the EPAs.

The bankruptcy court erred in concluding that the Khan Parties failed to use reasonable best efforts to cause the closing to occur.

**F.     The bankruptcy court erred in concluding that the Debtors did not breach the EPAs.**

The bankruptcy court erred in concluding the Debtors did not breach the EPAs based on the Khan Parties failure to satisfy the following conditions precedents to closing: (a) Section 8.1(D)(5) for failing to deliver an escrow agreement executed by the Khan Parties and the escrow agent; and (b) Section 8.1(B) for failing to comply with Sections 7.1(A)(a), Section 7.1(A)(d), Section 7.2, and Section 7.9(A).

For the reasons stated *supra*, (a) the Debtors cannot rely upon any failure of condition under Section 8.1(D)(5) and Section 8.3, since the Debtors caused the failure of such condition; and (b) the Khan Parties complied with Section 7.1(A)(a), Section 7.1(A)(d), Section 7.2, and Section 7.9. Alternatively, (a) the Khan Parties' compliance with Section 7.1(A)(a) and Section 7.1(A)(d) fell under the exceptions of Section 7.1(A)(i) or Section 7.1(A)(ii), and (b) the Debtors caused the failure of condition under Section 8.1(B) and 7.2. Therefore, the Debtors cannot rely upon any failure of the condition under Section 8.3. Finally, the Khan Parties complied with Section 7.4 and used reasonable best efforts to cause the closing to occur.

The bankruptcy court also erred in concluding the Debtors "did not breach the Illinois EPA because, based on its plain language, the Illinois EPA could not close prior to April 10, 2020[.]" (**DE 244, p.20, ¶81).** The bankruptcy court also erred in concluding the Debtors "did not breach the Illinois and Texas EPAs because (a) the Khan Parties did not satisfy all of the closing conditions as required by Section 3.1

48

of the EPAs[,]" and (b) the Khan Parties "eliminated Cinemex's obligations under both EPAs by wrongly claiming a repudiation and refusing to perform." *Id.*

Although the EPAs were essentially identical (other than the stated Enterprise Value and Closing Dates), the EPAs were not divisible agreements. In considering whether agreements are indivisible, "[u]nder general contract law, the parties' intentions determine whether two separately executed EPAs are in reality one agreement." *Philip Services, Inc. v. Luntz (In re Philip Services, Inc.),* 248 B.R. 541, 546 (Bankr. D. Del. 2002). Similarly, in *In re Karfakis,* 162 B.R. 719 (Bankr. E.D. Pa. 1993), the bankruptcy court had found, in part, that "two contracts which are essentially inseparable can be, and should be, viewed as a single indivisible agreement between the parties." *Id.* at 725. The *Karfakis* court held "whether the parties assented to all of the promises as a single whole, so that there would have been no agreement whatever [sic] if any promise or set of promises were struck out." *Id.* The *Karfakis* court held that "'the primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable.'" *Id.* (*quoting Heilwood Fuel Co., Inc. v. Manor Real Estate Co.*, 405 Pa. 319, 327 (1961)). The *Karfakis* court also eld that, "[i]f the language of the parties' written agreement does not make their intention clear, the court should seek other aids; for example, the court can use

practical interpretation and consider the parties' construction of the agreement as evidenced by their conduct." *Id. (quoting Heilwood Fuel*, 405 Pa. at 327).

There is no evidence suggesting that Khan would have sold the Texas theaters without selling the Illinois theater, or that the Debtors would have purchased the Texas theaters without purchasing the Illinois theater. To the contrary, in the Bid (**DE 49-8**), the Debtors offered to acquire ***all*** of Khan's ownership interests in the Companies. The Bid was originally in the amount of $75,000,000.00 for ***all*** of the equity and membership interests. Specifically, the Debtors stated that, "Cinemex Holdings USA, Inc. . . . is pleased to submit this bid . . . to acquire the stock of ***all*** Star Cinema Grill entities (together, "<u>Star</u>" or the "<u>Company</u>") on the terms set forth in the revised Equity Purchase Agreement (attached hereto as <u>Annex I</u>, the "<u>Equity Purchase Agreement</u>")." (**DE 49-8)** (emphasis added). In the Equity Purchase Agreement attached to the Bid, "Company" was defined to include ***all*** of the Companies, including the owner/operator of the theater in Naperville, Illinois that was the subject of the Illinois EPA.

In a February 19, 2020, e-mail to the Khan Parties' counsel, the Debtors' counsel stated, in part, "[w]e have connected with our client and they are amenable to the ***deferred closing structure and*** timeline you proposed (March 3rd signing/March 26 closing)." (**DE 140)** (emphasis added). The "deferred closing

structure" referenced the different closing dates under the Texas EPA and Illinois EPA.

Khan testified during Trial that the different closing dates were tax driven. Khan testified that, "[t]hrough tax advisory, through the Honigman Miller tax advisor firm, there is a qualification of a tax credit for capital gain called a QSBS qualification, and the Naperville, Illinois would qualify for that – for that particular tax credit after the date of April 30 or so, if I remember correctly. So the strategy of closing that transaction at a later date was purely in a tax benefit manner." (**TR1 95:6-14**).

Accordingly, when the Debtors breached the Texas EPA, they breached the Illinois EPA as well and, therefore, the bankruptcy court erred in its conclusion.

### G.   The bankruptcy court erred in concluding that the Khan Parties repudiated the EPAs.

The bankruptcy court erred in concluding "Mr. Khan's March 24 Email, insisting on a closing within two days, was premature, and the filing of the [the Texas Litigation] on April 1, 2020, was clearly a repudiation by the Khan Parties of the EPAs." (**DE 244, p.22, ¶85**).

The bankruptcy court held that, "if the two EPAs should be considered as one, as the Khan Parties suggest, then neither contract could close before April 10, 2020[,] unless Cinemex repudiated both contracts based on something <u>other</u> than the failure to close on March 26, 2020." (**DE 244, p.22, ¶87**). However, if the EPAs

51

were indivisible, that, alone, did not prevent the closings from occurring on separate dates. The bankruptcy court also held that "[i]f the two EPAs are <u>not</u> to be considered as one, then the Khan Parties must show that Cinemex repudiated or breached the Illinois EPA prior to April 1, 2020 and separately repudiated or breached the Texas EPA prior to April 1, 2020." (**DE 244, p.22-3, ¶87**). Finally, the bankruptcy court held that [t]he Khan Parties have not identified any 'clear and precise' statement or refusal to perform made by Cinemex, as required under Delaware law." (**DE 244, p.23, ¶88**) (quoting *In re Broadstripe, LLC*, 435 B.R. 245, 262 (Bankr. D. Del. 2010).

If the EPAs are indivisible, then, for the reasons stated *supra*, the Debtors breached the EPAs. When the Debtors refused to close on the Texas theaters, the Khan Parties were entitled to declare a breach of the EPAs and commence the Texas Litigation. The Debtors clearly stated that "in light of COVID-19-related fallout, Cinemex will not and is not obligated to close *this transaction*."(**DE 104-10**) (emphasis added). "Among other things, Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters." (**DE 104-10).** Counsel for the Debtors went on to state that "key personnel are located in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." (**DE 104-10**). There is no mention of the Illinois EPA or the April 10, 2020, closing date; rather, counsel states that the

Debtors are **"not obligated to close this transaction."** (**DE 104-10**) (emphasis added). Moreover, the statement of Debtors' counsel was clear and unequivocal that the Debtors would not close "this transaction." As Brail testified, "it became very clear, especially on . . . [March] 25th, that . . . [the Debtors] had no intention of closing." (**Tr.330:23-25**).

On March 26, 2020, while the Debtors stated they were "not required to close the transaction at the time[,]" (**DE 105-1**), the reasons provided were that (a) the closing must physically occur in Houston,[19] (b) the Debtors were entitled to perform a physical inspection of the theaters, and (c) the Debtors were excused from performing based on the doctrines of impossibility, impracticability, and frustration of purpose.[20] (**DE 105-1**). There was no mention of the Illinois EPA or the April 10, 2020, closing date, and the reasons stated were not valid. If the EPAs were indivisible, then the bankruptcy court erred in concluding the closing could not have taken place prior to April 10, 2020, which was the first date for closing under the

---

[19] As discussed *supra*, the Debtors could have traveled to Houston for inspections and closing but intentionally chose not to. A physical closing in Houston, Texas was not a condition precedent to closing, but even assuming that it was, the Debtors prevented satisfaction and, therefore, cannot rely upon any such failure under Section 8.3 of the EPAs.

[20] In the Opinion, the Court noted that, "[w]hile Cinemex appeared to rely on COVID-19, the doctrine of impossibility, and the Material Adverse Effect clause (the "MAE Clause") prior to Trial, it appears to have abandoned that approach in its Proposed Findings of Fact and Conclusions of Law." (**DE 244, p.25, n17**).

Illinois EPA. The bankruptcy court erred in its conclusions and, therefore, the

Debtors statements and actions amounted to a repudiation and breach.

## **CONCLUSION**

The Khan Parties respectfully request that this Honorable Court reverse the

Court's Opinion and remand to the Court for further proceedings on damages.

Respectfully submitted,

*/s/ Michael D. Seese*
Michael D. Seese, Esq. (FBN 997323)
SEESE, P.A.
101 N.E. 3rd Avenue, Suite 1270
Fort Lauderdale, Florida 33301
Telephone No. (954-745-5897
mseese@seeselaw.com

*Counsel for the Appellants*

## CERTIFICATE OF COMPLIANCE
## WITH RULE 8015(a)(7)(B)

**I HEREBY CERTIFY** that this Brief complies with the type-volume limitation of Rule 8015(a)(7)(B), Fed.R.Bankr.P., as this Brief contains 12,997 words, excluding those sections exempted under Rule 8015(a)(g).

*/s/ Michael D. Seese*
Michael D. Seese, Esq.
FBN 997323

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the *Initial Brief of the Appellants* has been filed and served electronically via the Court's CM/ECF system upon all parties registered to receive electronic notice in this case on this 14th day of January 2022.

*/s/ Michael D. Seese*

Michael D. Seese, Esq.
