UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-23675-CIV-ALTMAN-REID

DISTRICT THEATERS, INC., *et al.*,

      Appellants.

v.

CINEMEX HOLDINGS USA, INC., *et al.*,

      Appellees.

_____/

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA – MIAMI DIVISION

*In re: Cinemex Holdings USA, Inc.*
*Case No. 20-14696-LMI*

**RESPONSE BRIEF OF THE APPELLEES**

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
Juan P. Morillo (FBN 135933)
Gabriel F. Soledad (admitted *pro hac vice*)
Valerie Ramos (*pro hac vice* forthcoming)
1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: 202-538-8000
Facsimile: 202-538-8100
juanmorillo@quinnemanuel.com
gabrielsoledad@quinnemanuel.com
valerieramos@quinnemanuel.com

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
Patricia B. Tomasco (admitted *pro hac vice*)
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
pattytomasco@quinnemanuel.com

BAST AMRON LLP
Jeffrey P. Bast (FBN 996343)
One Southeast Third Ave., Suite 1400
Miami, Florida 33131
Telephone: 305-379-7904
Facsimile: 305-379-7905
jbast@bastamron.com

*Attorneys for Appellees*

## LIST OF INTERESTED PARTIES

1. The GUC Trust

2. Wine and Roses, S.A. de C.V.

3. Cinemex Holdings USA, Inc.

4. Cinemex USA Real Estate Holdings, Inc.

5. CB Theater Experience, LLC

6. Cinemex USA Enterprises, LLC

7. Cinemex MD, LLC

8. Cinemex AD, LLC

9. Omar Khan

10. S.C.G.C INC.

11. SCGM INC.

12. SCG-B INC.

13. SCG-VP INC.

14. District Theaters, Inc.

15. SCG-WR LLC

16. SCG-CS INC.

17. SCGK INC.

18. SCG-SW INC.

19. SCG-WL INC.

20. SCG-N INC.

21. Counsel for all parties involved in this litigation.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1(a) of the Federal Rules of Civil Procedure, Appellees Cinemex Holdings USA, Inc., and Cinemex Real Estate Holding, Inc. (together, the "Appellees") state that Cinemex Holdings USA, Inc. is owned 100% by Wine and Roses, S.A. de C.V. and Cinemex USA Real Estate Holdings, Inc. is 100% owned by Cinemex Holdings USA, Inc., which in turn owns 100% of CB Theater Experience LLC.[1]

By: */s/ Juan Morillo*
     Juan P. Morillo (FBN 135933)
     *Counsel for Appellees*

---

[1] Although CB Theater Experience LLC was named as an appellee in the above-styled case, it is not properly a party because it was not a party to the underlying judgment being appealed, DE 244 at 1–2, due to it not having been party to the underlying transaction, DE 50-5, DE 50-6.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................................1

STATEMENT OF ISSUES PRESENTED...............................................................1

STATEMENT OF THE CASE ...............................................................................1

FACTUAL BACKGROUND ..................................................................................2

I.     The Khan Parties Enticed Cinemex to Make a Non-Binding
Offer To Acquire A So-Called "Upscale Dine-In Theatre
Circuit" And Pushed Cinemex To Increase Its Binding Offer
Despite Receiving No Other Bids .........................................................2

II.    The Parties Entered Into The EPAs, Which Required Certain
Conditions Be Satisfied Before Closing And Provided Ample
Time To Do So ......................................................................................6

III.   Despite Failing To Satisfy All Closing Conditions In The
EPAs, The Khan Parties Demanded That Cinemex Close The
Transaction Prematurely ......................................................................9

IV.   The Khan Parties Terminated the EPAs Prematurely Because
Mr. Khan Was "Going Through An Emotional Roller Coaster"........10

APPLICABLE STANDARD OF APPELLATE REVIEW ....................................13

SUMMARY OF ARGUMENT ..............................................................................14

ARGUMENT ........................................................................................................18

I.     Cinemex Did Not Breach the Illinois EPA By Refusing To
Close on March 26 Because the Illinois EPA Forbade a Closing
Prior to April 10 ................................................................................18

II.    Cinemex Did Not Breach the EPAs By Refusing to Close on
March 26 Because the Khan Parties Failed to Satisfy All
Conditions Precedent...........................................................................22

        A.    The Khan Parties Did Not Satisfy Section 8.1(D)
Because They  Did Not and Could Not Provide an
Executed Escrow Agreement Before Closing .........................22

      B.    The Khan Parties Did Not Satisfy Section 8.1(B) Because They Did Not Satisfy at Least Five Covenants in Article 7 of the EPAs ..................................................................27

          1)    The Khan Parties Did Not Provide Reasonable Access to and the Right to Inspect All Premises and Contracts as Required by Section 7.2 ......................27

              a)    The Khan Parties Did Not Provide Cinemex Reasonable Access to, and the Right to Inspect, All Contracts ...........................................28

              b)    The Khan Parties Did Not Provided Cinemex Reasonable Access to, and the Right to Inspect the Premises ...............................31

          2)    The Khan Parties Did Not Conduct Business in the Ordinary Course, as Required by Section 7.1(A)(a) ......34

          3)    The Khan Parties Did Not Keep Available the Services of Their Respective Directors, Officers, and Employees, as Required By Section 7.1(A)(d) ........42

          4)    The Khan Parties Did Not Provide Cinemex with Reasonable Access to Each Corporate Employee, as Required By Section 7.9 .............................................43

          5)    The Khan Parties Did Not Use Reasonable Best Efforts to Cause The Closing to Occur, As Required By Section 7.4 .................................................45

   III.    The Khan Parties Breached the EPAs by Wrongly Declaring a Repudiation by Cinemex and Filing the Texas Action ......................49

CONCLUSION ....................................................................52

CERTIFICATE OF COMPLIANCE WITH RULE 8015 .......................................54

CERTIFICATE OF SERVICE .................................................................55

iv

# TABLE OF AUTHORITIES

**Pages**

## <u>CASES</u>

*AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*,
   CV 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020).......*passim*

*Chase & Sanborn Corp.*,
   904 F.2d 588 (11th Cir. 1990) ....................................................................13

*ECB USA, Inc. v. Savencia, S.A.*,
   2021 WL 3187495 (D. Del. 2021)................................................................29

*Fredericks v. C.I.R.*,
   126 F.3d 433 (3d Cir. 1997) .......................................................................13

*Frontier Oil v. Holly Corp.*,
   No. CIV.A. 20502, 2005 WL 1039027 (Del. Ch. Apr. 29, 2005)................52

*In re Broadstripe*,
   LLC, 435 B.R. 245 (Bankr. D. Del. 2010) ..................................................51

*In re Karfakis*,
   162 B.R. 719 (Bankr. E.D. Pa. 1993) ....................................................20, 21

*In re Kellogg*,
   197 F.3d 1116 (11th Cir. 1999) ...................................................................13

*In re Maritas*,
   2008 WL 7801998 S.D. Fla. Nov. 24, 2008) ..............................................13

*In re Philip Services (Delaware), Inc.*,
   284 B.R. 541 (Bankr. D. Del. 2002)............................................................20

*P. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*,
   693 F.3d 417 (3d Cir. 2012) ....................................................20, 21, 37, 42

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
   117 F. Supp. 3d 613 (D. Del. 2015) ............................................................18

*Rockwell Int'l Corp. v. United States*,
   549 U.S. 457 (2007)......................................................................................26

*Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*,
   2021 WL 1714202 (Del. Ch. 2021)..............................................................35

*Stewart Title Guar. Co. v. Roberts-Dude*
   497 B.R. 143 (S.D. Fla. 2013)........................................................23, 28, 32

*Tendyne Holdings, Inc. Securityholders' Representative Comm. On Behalf of Tendyne Holdings, Inc. Securityholders v. Abbott Vascular, Inc.*,
No. 18-CV-1070-CFC, 2019 WL 2717857
(D. Del. June 29, 2019)....................................................................24, 34, 49

*Tolz v. Gawlick (In re Forex Fidelity Int'l)*,
222 Fed. Appx. 806 (11th Cir. 2007) ...........................................................13

*Veloric v. J.G. Wentworth, Inc.*,
No. CIV.A. 9051-CB, 2014 WL 4639217 (Del. Ch. Sept. 18, 2014)...........50

*Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Discount II, Inc.)*,
443 F.3d 767 (11th Cir. 2005) .....................................................................13

## **RULES**

Fed. R. Civ. P. 15(b)(2)...............................................................................26

## STATEMENT REGARDING ORAL ARGUMENT

Appellees Cinemex Holdings USA, Inc. and Cinemex Real Estate Holdings, Inc. (together "Cinemex") respectfully request that this Honorable Court grant oral argument.

## STATEMENT OF ISSUES PRESENTED

1.  Whether the Bankruptcy Court properly found that Cinemex did not breach the Illinois EPA by refusing to close the Texas EPA on March 26, 2020, because the Illinois EPA contained a clause that forbade closing prior to April 10, 2020 and was divisible from the Texas EPA.

2.  Whether the Bankruptcy Court properly found that Cinemex did not breach the EPAs for refusing to close on March 26, 2020, because the Khan Parties had failed to satisfy all conditions precedent to closing.

3.  Whether the Bankruptcy Court properly found that the Khan Parties breached the EPAs, because Cinemex did not repudiate by refusing to close the EPAs on March 26, 2020 and because the Khan Parties filed the Texas Action before the expiration of the time for closing under the EPAs.

## STATEMENT OF THE CASE

This matter came before the United States Bankruptcy Court for the Southern District of Florida Miami Division (the "Bankruptcy Court") for evidentiary hearings on May 20, June 18, and July 9, 2021 during which documents and testimony from the Parties were presented (collectively "Trial").  Following Trial

and the Parties' submissions of their respective Proposed Findings of Fact and Conclusions of Law and their respective Responses thereto (the "Parties' Submissions"), on October 4, 2021, the Bankruptcy Court entered a *Memorandum Opinion on Objection to the Khan Parties' Claims (ECF #1153)* (the "Bankruptcy Court's Order"), in which the Bankruptcy Court granted Cinemex's Amended Objections to the Khan Parties' Proofs of Claims and disallowed the Khan Parties' Proofs of Claims in their entirety.  DE 244.[2]

## FACTUAL BACKGROUND

I.    **The Khan Parties Enticed Cinemex to Make a Non-Binding Offer To Acquire A So-Called "Upscale Dine-In Theatre Circuit" And Pushed Cinemex To Increase Its Binding Offer Despite Receiving No Other Bids**

In December 2019, the Khan Parties, through their investment banker Rich Brail from PJ Solomon, contacted José Martí, then President and CEO of Cinemex Holdings USA, Inc. and Cinemex Real Estate Holdings, Inc. (together "Cinemex"), to inquire as to whether Cinemex would be interested in acquiring "an upscale dine-in movie theatre circuit offering scratch-made food and plush recliners."  DE 49. Mr. Brail touted the potential acquisition as an "opportunity that . . . fits [Cinemex's] acquisition criteria perfectly."  *Id*.  At this time, the Khan Parties also marketed the

---

[2]  For this Court's convenience, Appellees' exhibit citations conform with Appellants' Opening Brief ("Br."), i.e., only citing to the Bankruptcy Docket. For the avoidance of doubt, "DE" refers to electronic docket entries in Case No. 20-14695-LMI and Case No. 20-14696, ; and "TR" refers to the trial transcripts of the proceedings conducted by the Court on May 20, 2021 ("TR1"), June 18, 2021 ("TR2"), and July 9, 2021 ("TR3").

SCG Theatres to the public,[3] including on their website, as "upscale dine-in movie theatres" that provided their customers a "luxury feel" and the "perfect date night experience" with "better services and operations than any other cinema" and "expanded food and beverage" options with "high value products," "tasty food," and "comfortable chairs." *See* TR1 189:09–196:22; TR2 364:16–365:01, *id*. at 371:19–372:15; TR3 499:17–23, *id*. at 520:20–521:02.

Based on the above description and a confidential information memorandum ("CIM") provided by PJ Solomon, on January 14, 2020, Cinemex made a non-binding offer of ███████████ for the equity purchase of the SCG Theatres. *See* DE 51-7 (CIM); DE 49-5 (Non-Binding Offer); TR1 199:15–18; TR3 486:16–20.

The next day, January 15, 2020, PJ Solomon invited Cinemex to participate in the second phase of the bidding process (the "Second Phase Invitation"), where the SCG Theatres would host "[m]anagement meetings and tours" to present on "some positive developments" in the theatres. DE 49-1; TR3 488:01–07. Cinemex understood from the Khan Parties that they were solely for marketing purposes, as is common in theatre acquisitions. *See* TR3 490:06–11.

---

[3]  The term "SCG Theatres" refers to the ten theatres in Texas and the one theatre in Illinois each owned by one of the Appellants, *see* DE 55-12 (Khan Deposition Tr. 130:21–131:10), the shares of which were being sold pursuant to the EPAs. *See* DE 50-5 (Texas EPA); DE 50-6 (Illinois EPA).

3

On February 5 and 6, six Cinemex employees travelled to Houston for the management meeting and tours of the Houston theatres (the "Marketing Tours"). DE 177 (Joint Stip. ¶ 10); *see* TR1 200:19–201:11; TR3 487:22–25. The Cinemex representatives who attended the management meeting were limited to senior management members. *See* TR3 489:04–12; *see* DE 44-21, TR1 84:19–85:07. Likewise, only a limited group of SCG representatives was present at the management meeting: Mr. Khan (CEO), Jason Ostrow (VP of Operations), John Walsh, (CFO), and Michael Pawlowski (culinary director). *See* TR3 580:21–24; DE 44-21. Rich Brail and Adam Jaffe attended from PJ Solomon. *See* TR3 488:23–489:01. As anticipated, during the management meeting, the Khan Parties presented on positive developments since the CIM was distributed. *See* TR3 488:01–07.

After the management meeting, Mr. Khan and Mr. Ostrow led the tours, which were guided walk-throughs of the Houston theatres. *See* TR3 490:23–491:04; TR1 201:04–11. Because the SCG Theatres ranged from 22,000 to 55,000 square feet in size, averaging around one acre, the group spent an average of "two to three minutes tops" in each space of every theatre visited. *See* DE 51-7 (CIM); TR1 201:24–202:11; TR3 491:29–492:16.

After the Marketing Tours, PJ Solomon sent Cinemex a Phase II Process Letter providing Cinemex the fundamental "terms and conditions" governing Cinemex's submission of a binding offer. DE 177, Joint Stip. ¶ 11; DE 49-2 ("Phase

II Process Letter"). The Phase II Process Letter expressly stated that "[i]nspections are expected to occur after signing of an Agreement." DE 49-2.

Based on the Khan Parties' assurances that Cinemex would have a right to inspect the theatres after signing, on March 3, 2020, Cinemex submitted a formal binding offer of ███████ to purchase the SCG Theatres. DE 177 (Joint Stip. ¶ 12); DE 49-8 (Binding Offer from Cinemex); *see* TR3 507:22–508:03; *id*. at 505:15–18; *id*. at 506:04–07; *id*. at 508:25–509:05.

Cinemex's offer was the only binding offer the Khan Parties received. TR1 255:21–23. Yet, immediately after receiving it, Mr. Khan "instructed Mr. Brail to advise Cinemex that their bid was too low," and to inform Cinemex that he was "seeking more than ███████" for the equity sale of the SCG Theatres. *See* TR1 255:10–17.

Mr. Khan and Mr. Brail contacted Mr. Martí on several occasions to try and persuade him to increase Cinemex's offer, including by representing to Mr. Martí that the then-developing COVID-19 situation was not expected to be a long-term issue. *See* TR2 367:23–369:23; TR3 513:01–514:03. Following those discussions, Cinemex increased its binding offer to ███████, still with the expectation that it would be able to conduct its inspections after signing. *See* TR1 256:10–16; DE 50-8.

## II.   The Parties Entered Into The EPAs, Which Required Certain Conditions Be Satisfied Before Closing And Provided Ample Time To Do So

On March 10, 2020, the Parties entered into two equity purchase agreements (the "EPAs").  Under the Texas EPA, the Parties had until April 30, 2020 ("Texas Closing Date") to close the transaction for the ten Texas theatres.  DE 50-5, § 9.1(F). Under the Illinois EPA, the Parties had until May 31, 2020 ("Illinois Closing Date") to close the transaction for the one Illinois theatre.  Further, the Illinois EPA provided that the Parties could not close prior to April 10.  DE 50-6, § 9.1(F).

Within two days of signing the EPAs, consistent with their express terms, Cinemex began coordinating inspections of the SCG Theatres.   DE 53-7; TR1 210:06-09; TR3 518:02–18; *see* DE 52-17.  The next day, on March 13, Cinemex confirmed to the Khan Parties that its operations and HR teams would travel to Houston on March 17 to inspect the Houston-area SCG Theatres.  *See* DE 53-7 at 1. That same day, Mr. Khan confirmed his agreement with that plan.  DE 47-20.

During the planned trip to Houston, Cinemex intended to conduct a full multi-day physical inspection of the SCG Theatres during the theatres' operating hours, including in the following areas: operations, culinary, projection and sound, maintenance, HR, and IT, as well as meeting with SCG employees and commencing other transition tasks.  *See* TR3 494:05–19; *id*. at 519:11–521:02.   Cinemex considered the physical inspection of the theatres it acquired to be "fundamental" to the closing of any theatre acquisition.  TR3 303:22–304:14.  In fact, Cinemex has

6

acquired over 200 theatres in multiple transactions over recent years and never closed any of those acquisitions without a physical inspection of each and every theatre.  *See* TR3 504:23–505:10.

Between March 15 and 16, Cinemex informed the Khan Parties that Cinemex would postpone its planned March 17 inspection of the Houston theatres to learn more about the risks of the then-escalating COVID-19 pandemic before asking their employees to travel.  *See* DE 55-13 (Khan Dep. Tr. 407:16–25); TR3 523:17–20; DE 45-4.  Immediately thereafter, on March 16, Cinemex began coordinating the rescheduling of the physical inspections of the Houston theatres for the following week.  *See* DE 45-4; TR3 522:14–523:20.

On the evening of March 16, 2020, the local governments of the City of Houston and Harris County (which includes Houston and its surrounding areas) ordered that, as of midnight that day, all bars and nightclubs had to close and restaurants could only offer delivery, take-out or drive-through services.  DE 45-5. Significantly, the Khan Parties did not believe that the order applied to movie theatres.   DE 47-25.   Nevertheless, on March 17, the Khan Parties publicly announced that they would temporarily close all Star Cinema Grill Texas locations and District Theatres.[4]  *See* TR1 217:21–218:5; DE 45-7; DE 47-24.

---

[4]  On March 19, the Khan Parties also closed their Illinois location.  DE 47-31.

On March 19, the Khan Parties represented to Cinemex that the SCG Theatres would be closed "just for a short period." DE 47-19. Based on that assurance, and given that there remained more than a month before the Texas Closing Date and, more than two months before the Illinois Closing Date, Cinemex believed it was reasonable to wait to conduct the physical inspection until it was safe to do so and the SCG Theatres were operating. *See* TR3 524:11–14; *id*. at 525:07–15.

Despite the closure of the SCG Theatres and postponement of the physical inspection, Cinemex continued to prepare to close the EPAs. On March 19, 2020, a Cinemex employee, Loretta Thomas, emailed several executives of the SCG Theatres requesting that they provide "copies of the contracts relating to theatre operations." DE 50-1. In response, Mr. Ostrow, an SCG executive, asserted that "[a]ll contracts are in the [data room]." However, as discussed below, this representation ended up being false, despite the Khan Parties being required under the EPAs to make available to Cinemex all contracts. *Id*. Further undermining Cinemex's efforts towards closing, within ten days of shutting down the Texas theatres, the Khan Parties furloughed 100% of the SCG Theatre employees. TR1 219:18–220:1. As discussed below, the Khan Parties did so despite having covenanted in the EPAs to retain all employees and make them available to Cinemex between the signing and closing of the EPAs. *See* DE 50-5 §§ 7.1, 7.9; DE 50-6 §§ 7.1, 7.9.

### III.    Despite Failing To Satisfy All Closing Conditions In The EPAs, The Khan Parties Demanded That Cinemex Close The Transaction Prematurely

Beginning on March 20, the day after the Khan Parties shutdown all of the SCG Theatres—despite there being more than a month before the Texas Closing Date and more than two months before the Illinois Closing Date—Mr. Khan began frantically pressuring Cinemex to close by March 31.  *See, e.g.*, DE 51-1; DE 45-1.

On March 20, 2020, Mr. Khan emailed Mr. Martí, stating "I hope you are on track to close on 31st?? can please call me or provide a[n] update asap."  DE 51-1. Half an hour later, Mr. Khan emailed Mr. Martí asking whether Cinemex "accept[ed] the discount??"  *See* DE 45-1.  In response to Mr. Martí indicating that a decision had not yet been made, Mr. Khan responded that he "need[ed] to know ASAP."  *Id.*

Mr. Khan followed up the very next day (a Saturday) stating, "I'm willing to work with you on the price like I said.  So please take this very serious[sic], it could turn in the very bad situation and neither one of us want that.  Good luck!!"  DE 44-25.  Mr. Martí took this email as a threat.  *See* TR3 535:12–536:14

That Monday, March 23, Mr. Khan again followed up, asking Mr. Martí to call him because he had "lots of decisions to make."  DE 46-1.  Mr. Martí understood that to be a threat of a lawsuit.  *See* TR3 535:12–536:14.  Mr. Khan continued to follow up, while making similar threatening remarks.  DE 51-6; DE 45-26.

Significantly, Mr. Khan has since admitted that his urgency to close on March 31 was driven by nothing more than his belief that it was his "God-given right to do so." TR1 249:13–16; DE 55-13 (Khan Dep. Tr. 439:12–14).

## IV. The Khan Parties Terminated the EPAs Prematurely Because Mr. Khan Was "Going Through An Emotional Roller Coaster"

In his effort to pressure Cinemex to close first by March 31 and then by March 26, Mr. Khan demanded that Cinemex forfeit its right under the EPAs to a physical inspection of the SCG Theatres and access to SCG Theatre employees. As evidenced by above-referenced communications, Mr. Khan sought to compensate for that deficiency by offering Cinemex a price discount. *See* DE 45-1; TR1 227:02–228:10; TR3 528:03–529:23. Alternatively, Mr. Khan proposed ways that he purportedly thought Cinemex could complete an inspection of the theatres without risking its employees safety, namely: (1) chartering a private plane; (2) a virtual inspection; and (3) an inspection by a third-party. *See* TR3 528:3–532:20; TR1 227:02–05, *id*. at 227:21–23, DE 55-13 (Khan Dep. Tr. 419:17–420:16); *see also* TR3 534:17–535:02. As discussed *infra*, however, none of these suggestions addressed Cinemex's expressed concerns at the time, nor were they adequate substitutes for Cinemex's rights under the EPAs, which Cinemex was not willing to waive simply to accommodate Mr. Khan's preferred closing date.

Relatedly, Mr. Khan also knew as of March 24, that the Khan Parties would not be able to deliver an executed escrow agreement on March 26, as they were required to do under the EPAs. *See* DE 75.

Notwithstanding, on March 24, Mr. Khan directed his counsel to send Cinemex's counsel an email claiming that Cinemex was required to close in two business days—i.e., by March 26—because the Khan Parties had satisfied all of their conditions for closing. DE 54-3; *see* TR1 237:08–12.

Mr. Khan did so despite the fact that Cinemex was, even as of that morning, continuing to seek information relevant to and require for closing from the Khan Parties. *See, e.g.*, DE 45-2. Mr. Khan was well aware of Cinemex's efforts. In fact, on the morning of March 24, just hours before the email was sent to Cinemex, Mr. Khan acknowledged that Cinemex was "still communicating with [the SCG] team asking for things." *Id*.; *see also* TR1 226:05–08; TR2 393:13–21; TR3 546:14–18.

Cinemex's counsel responded to the March 24 email that same day, informing the Khan Parties that they ***had not*** met all the closing conditions at that time. DE 49-12. Cinemex's counsel further informed the Khan Parties in their response that Cinemex was not obligated to close under the circumstances but that the parties were in communication to try to resolve the situation. *See id*.

In complete disregard of Cinemex's response, on March 25, Mr. Khan instructed his counsel to serve Cinemex with a breach letter, asserting that Cinemex

was in breach of the EPAs.   TR1 247:16–21; DE 54-9 (Breach Notice).   That following day, Cinemex responded, explaining "Cinemex is not required to close the transaction *at this time*" because the Khan Parties had not met all closing conditions. DE 50 (emphasis added).

Notably, even after the Khan Parties accused Cinemex of breaching the EPAs, Cinemex continued its efforts to close.   For example, on March 27, 2020, Cinemex again requested from the Khan Parties copies of the contracts they had previously represented to be in the data room.   DE 50-1.   Confirming that the contracts were not, in fact, in the data room, the Khan Parties provided certain of the requested contracts later that evening, and notified Cinemex that they were "waiting on a copy [of a remaining contract] from our rep."   *Id.*   In other words, the Khan Parties effectively confirmed that their prior representations about the completeness of the data room were false.

Notwithstanding, Mr. Khan filed a lawsuit against Cinemex in the U.S. District Court for the Southern District of Texas (the "Texas Action").   DE 45-19. As of that date, the Parties still had 29 days to close the Houston EPA and 60 days to close the Illinois EPA.

The sole justification Mr. Khan has provided filing the Texas Action on April 1, instead of waiting for the outside closing date provided for by the EPAs, is that he was "frustrated," "going through an emotional roller coaster," and as he explained

12

it, "when someone's upset and they're angry and frustrated and they're emotional, [they] take action when [they] feel like taking it." DE 55-13 (Khan Dep. Tr. 527:25–528:19).

## APPLICABLE STANDARD OF APPELLATE REVIEW

This Court reviews the Bankruptcy Court's factual findings under a clearly erroneous standard and its conclusions of law *de novo*. *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999). "When district courts review the factual findings of a bankruptcy court, the burden is on the appellant to show that the bankruptcy court's findings are clearly erroneous." *In re Maritas*, 2008 WL 7801998 at *2 (S.D. Fla. Nov. 24, 2008). And "[t]he bankruptcy court's findings of fact are not clearly erroneous unless, in light of all of the evidence [this Court is] left with the definite and firm conviction that a mistake has been made." *Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Discount II, Inc.)*, 443 F.3d 767, 770 (11th Cir. 2005). That is because "Clear error is a highly deferential standard of review." *Tolz v. Gawlick (In re Forex Fidelity Int'l)*, 222 Fed. Appx. 806, 808 (11th Cir. 2007) (internal quotation omitted). A bankruptcy court's conclusions of law, mixed issues of law and fact, and "ultimate facts" are all subject to *de novo* review. *Chase & Sanborn Corp.*, 904 F.2d 588,593 (11th Cir. 1990). But determinations that a party failed to establish its burden of proof are reviewed under the clearly erroneous standard. *Fredericks v. C.I.R.*, 126 F.3d 433, 436 (3d Cir. 1997).

## SUMMARY OF ARGUMENT

The Bankruptcy Court correctly held that Cinemex did not, as the Khan Parties allege, breach Section 3.1 of the EPAs by refusing to close on March 26, 2020 for at least three independent reasons:

*First*, Cinemex could not breach the Illinois EPA by refusing to close on March 26 because the Illinois EPA forbade the Parties from closing prior to April 10.  The Khan Parties do not deny that fact.  Instead, they claim that the plain language of the ***Illinois*** EPA prohibiting closing before April 10 should not be given effect because the ***Texas*** EPA does not include such language.  The Khan Parties contend that the Illinois EPA was so interrelated with the Texas EPA that a breach of the Texas EPA should amount to a breach of the Illinois EPA.  But that argument lacks support.  The plain language of both agreements make clear that the two EPAs are entirely separate and divisible.  In any event, even if the two EPAs were indivisible, the result would not be that the express prohibition in the Illinois EPA would be disregarded, but rather that prohibition would extend to both EPAs, requiring that neither transaction close before April 10.

*Second*, Cinemex was not required to close on March 26 because the Khan Parties had not satisfied at least ***six*** independent conditions precedent to closing.

The Khan Parties did not satisfy Section 8.1(D), which required that the Khan Parties provide Cinemex with an executed escrow agreement by the closing date.

14

The Khan Parties did not and could not have provided Cinemex with an executed escrow agreement on March 26, which they knew on March 24, when they prematurely claimed to have satisfied all closing conditions.

The Khan Parties seek to justify their failure by claiming that Cinemex had not used commercially reasonable efforts to provide "Know Your Customer" ("KYC") information to the escrow agent in time to permit a *March 31* closing. But that claim is false and misleading. As a preliminary matter, Cinemex was not obligated to close by March 31. That date appears nowhere in the Texas and Illinois EPAs, and the express terms of the Illinois EPA prohibited closing on March 31. Moreover, the Khan Parties cite no evidence to support a finding that Cinemex failed to use commercially reasonable efforts to provide the Escrow Agent a completed KYC. On the contrary, the record shows that it was the Khan Parties that failed to use commercially reasonable efforts by insisting on a closing date that needlessly required Cinemex to complete a complex KYC involving multiple entities and a foreign parent in *a single day*.

The Khan Parties failed to satisfy Section 8.1(B), which required that the Khan Parties satisfy all covenants under Article 7. The Khan Parties failed to satisfy at least *five* independent obligations in Article 7.

The Khan Parties failed to satisfy Section 7.2, which required the Khan Parties to provide Cinemex with reasonable access to all premises and contracts. The Khan

Parties provided neither.  They prevented Cinemex from rescheduling its inspections of the SCG Theatres and never provided Cinemex with all contracts requested.

The Khan Parties failed to satisfy Section 7.1(A)(a), which required the Khan Parties to operate the SCG Theatres in the ordinary course of business, consistent with past practice.  The Khan Parties' closed the SCG Theatres and furloughed 100% of their employees (without a government mandate requiring either act), neither of which was in the ordinary course of business consistent with past practice.  The Khan Parties cannot not use COVID-19 to justify their actions because, among other reasons, the EPAs' Material Adverse Effect clause expressly carved out "pandemics."

The Khan Parties failed to satisfy Section 7.1(A)(d), which required that the Khan Parties keep available the services of their respective directors, officers, and employees.  The Khan Parties now claim that they furloughed all their employees only after Cinemex repudiated the EPAs, but Mr. Khan testified that the opposite is true—that it was done prior to the Texas Action.  In any event, there is no dispute that the Khan Parties did not retain their culinary director, Michael Pawlowski, during the relevant time, which alone is a breach of this provision.

The Khan Parties failed to satisfy Section 7.9, which required that they provide Cinemex with reasonable access to each corporate employee, for all of the same reasons they failed to satisfy Section 7.1(A)(d).

16

The Khan Parties failed to satisfy Section 7.4, which required them to use reasonable best efforts to satisfy the closing conditions and obligations to consummate the closing. On March 24, the Khan Parties knowingly misrepresented that all closing conditions had been met when they knew they had not and could not provide an executed escrow agreement, an express condition precedent to closing. The Khan Parties also knew that they were denying Cinemex the ability to conduct inspections of the SCG Theatres and interviews with SCG Theatre employees. Significantly, at that time, the parties had over a month to close EPAs. The foregoing is even less reasonable considering that the only reason the Khan Parties did so was because Mr. Khan felt it was his "God-given right."

*Third*, the Khan Parties breached the EPAs by wrongly claiming that Cinemex repudiated. The Khan Parties claim that Cinemex's refusal to close on March 26 amounts to a refusal to close *ever*. However, Cinemex's refusal was limited to closing on the date unilaterally imposed by the Khan Parties when they had failed to meet all closing conditions. That is clear not only from the contemporaneous communications, but also from Cinemex's continued efforts to close during that time. As such, it was the Khan Parties, not Cinemex, that breached the EPAs by repudiating the EPAs and filing a lawsuit before the closing deadline in either EPA, and while the Illinois EPA forbade closing.

17

## ARGUMENT

I.   **Cinemex Did Not Breach the Illinois EPA By Refusing To Close on March 26 Because the Illinois EPA Forbade a Closing Prior to April 10**

The Bankruptcy Court correctly held that Cinemex did not breach the Illinois EPA by refusing to close on March 26 because "based on its plain language, the Illinois EPA could not close prior to April 10, 2020[.]"  DE 244 at 20.

The plain language of the Illinois EPA explicitly states that "***in no event*** shall Closing take place prior to April 10, 2020."  DE 50-6 § 3.1 (emphasis added).  The Khan Parties admit that fact.  *See* DE 45-19 n.6, 9 (Verified Complaint); DE 55-12 (Khan Dep. Tr. 238:08–20 ("[Q]. the Illinois deal provided that a closing couldn't happen prior to April 10th; is that right? A. That is correct.")).  That is dispositive. Absent ambiguity in a contract, courts "interpret[] the contract based on the plain meaning of the language on the face of the contract."  *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015) (citation omitted).  Neither Party has asserted that the Illinois EPA is ambiguous; thus, the Bankruptcy Court was correct to rely on the plain language of the contract.

The Khan Parties do not argue to the contrary.  Instead, they contend that the Illinois EPA is so interrelated with, or indivisible from, the Texas EPA that the plain language of the Illinois EPA forbidding closing before April 10 should not be given meaning because the Texas EPA does not include such language.  But the Khan Parties are wrong for at least two reasons.

18

*First*, the plain language of the EPAs makes clear that the Illinois EPA is, in fact, separate and divisible from the Texas EPA.  As the Bankruptcy Court correctly found, "a) Neither the Texas EPA nor the Illinois EPA referred to the consummation of the other agreement as a condition precedent or a condition subsequent to the other[;] b) The Illinois EPA contains a firm 'cannot close before' date; the Texas EPA does not[;] c) The Illinois EPA has a different Outside Closing Date."  DE 244 at 21–22.

Two additional points further confirm the Bankruptcy Court's conclusion. *One*, the integration clause of the Illinois EPA does not include the Texas EPA as part of the "Entire Agreement."  DE 50-6 § 12.4.  Instead, the integration clause defines "Entire Agreement" as "[t]his Agreement, together with all Exhibits and Schedules hereto,"  DE 50-6 § 12.4, and defines  "Agreement" exclusively as the equity purchase agreement of SCG-N Inc. (the Illinois theatre).  DE 50-6.  *Two*, despite that Illinois EPA's definition of "Exhibits and Schedules" incorporates by reference the Schedules of the Texas EPA, it explicitly carves out disclosures related to the Texas entities as only belonging to the Texas EPA.  DE 50-6 § 12.10 ("any disclosure related to each of [Texas entities] set forth in the Schedules will be treated as a disclosure to the representations and warranties set forth in the Texas Purchase Agreement.").  If the EPAs were indivisible, as the Khan Parties now maintain, such a carve out would be rendered meaningless, which violates established rules of

19

contractual interpretation. *See P. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012)   ("[A] cardinal rule of contractual interpretation [] counsels against rendering words or provisions meaningless.").

The Khan Parties cite no authority that would change the plain reading of the EPAs.  The Khan Parties rely on *In re Philip Services*, which held that a Promissory Note was indivisible from a Merger Agreement because the plain language of the Merger Agreement incorporated by reference all "Ancillary Agreements" as part of the definition of "Entire Agreement" and the Promissory Note fell under the definition of Ancillary Agreements.  *See In re Philip Services (Delaware), Inc.,* 284 B.R. 541, 546 (Bankr. D. Del. 2002), *aff'd*, 303 B.R. 574 (D. Del. 2003).  But, here, as explained above, the opposite is true:  the plain language of the Illinois EPA does ***not*** incorporate the Texas EPA into the "Entire Agreement," and excludes any disclosure related to the Texas theatres as only belonging to the Texas EPA.  Accordingly, the Bankruptcy Court's ruling that the Illinois EPA is divisible from the Texas EPA is entirely consistent with *In re Philip Services*.

The Khan Parties also cite *In re Karfakis* for the proposition that the Court should look outside of the four corners of the contract to determine the Parties' intentions.  162 B.R. 719, 725 (Bankr. E.D. Pa. 1993).  As a threshold matter, the court in *Karfakis* applies Pennsylvania law—not Delaware law, applicable here.  DE 50-5 § 12.7, DE 50-6 § 12.7.  In any event, the court in *Karfakis* does not endorse

deviation from the well-established contractual principals underpinning the Bankruptcy Court's ruling on this issue.  Instead, it makes clear that the divisibility of a contractual agreement must first be resolved by "whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable," providing only if the language is unclear, should the court seek other evidence.  *Id*.  Here, as discussed above, the Illinois EPA made clear the Parties' intentions, and expressly provided that its language "supersedes all other prior agreements and understandings, both written and oral."  DE 50-6 § 12.4.  Accordingly, the Bankruptcy Court's ruling that the Illinois EPA is divisible from the Texas EPA is also entirely consistent with *In re Karfakis*.

*Second*, and in any event, as the Bankruptcy Court also correctly noted, if the Illinois EPA were to be deemed indivisible from the Texas EPA, as the Khan Parties claim, the result would not be that the Illinois EPA's prohibition against closing prior to April 10 could be ignored.  That would fail to give meaning to the express language in the Illinois EPA, violating well-established principles of contractual interpretation.  *See P. Employers Ins. Co.*, 693 F.3d at 430..  Instead, the result would be that the language in the Illinois EPA prohibiting a closing prior to April 10 would extend to both of the EPAs, such that ***neither*** could have closed prior to April 10.  DE 244 at 22.

21

In light of the foregoing, Cinemex did not breach the Illinois EPA by refusing to close on March 26.

## II.   Cinemex Did Not Breach the EPAs By Refusing to Close on March 26 Because the Khan Parties Failed to Satisfy All Conditions Precedent

Section 3.1 of the EPAs required Cinemex to close "no later than the second Business Day *after satisfaction* (or waiver) of the conditions set forth in ARTICLE 8 . . ." DE 50-5, § 3.1; DE 50-6 § 3.1 (emphasis added). As explained below, the Khan Parties did not trigger a closing under Section 3.1 because, contrary to their claims, they did not satisfy at least *six* independent conditions precedent required by both Sections 8.1(B) and (D). DE 244 at 24. Accordingly, Cinemex was not required to close on March 26 and did not breach the EPAs by refusing to do so.

### A.   The Khan Parties Did Not Satisfy Section 8.1(D) Because They Did Not and Could Not Provide an Executed Escrow Agreement Before Closing

The Bankruptcy Court correctly held that the Khan Parties "did not satisfy Section 8.1(D)(5), a condition precedent that would obligate Cinemex to close. On that basis alone, the Court finds that the Khan Parties did not satisfy the closing conditions under Article 8 and therefore, that Cinemex did not breach the Texas EPA by not closing on March 26, 2020." DE 244 at 27.

Section 8.1(D) required that the Khan Parties provide Cinemex with an executed escrow agreement on the closing date. The Bankruptcy Court correctly found that "[t]here is no Escrow Agreement executed by the Khan Parties and Wells

Fargo in the record. . . [and] it was not possible for a signed Escrow Agreement to be provided at a March 26 closing."  DE 244 at 26.

This Court must accept this factual finding, unless the Khan Parties can prove that it is "clearly erroneous." *Stewart Title Guar. Co. v. Roberts-Dude* 497 B.R. 143, 150 (S.D. Fla. 2013).  But the Khan Parties failed to demonstrate such error.  Indeed, they do not contest the absence of a signed escrow agreement.

Instead, the Khan Parties merely argue that their failure to satisfy this closing condition should be excused because Cinemex did not use commercially reasonable efforts to complete the KYC process as of March 24 for a March 31 closing.  Br. 23 ("Even if the Debtors had provided the information on March 24, 2020, the Khan Parties and the Debtors could have closed on or before March 31, 2020 . . . .").  But that is not only wrong, it is also misleading.

*First*, Cinemex was ***not*** obligated to close on March 31.  The Texas EPA did not require closing until April 30; the Illinois EPA did not require closing until May 31 and precluded a closing before April 10.  Both EPAs also included an integration clause indicating that each respective "Agreement, together with all Exhibits and Schedules . . . constitute the entire agreement among the Parties . . .and supersedes all other prior agreements and understandings, both written and oral, among the parties."  DE 50-5 § 12.4; DE 50-6 § 12.4.  And, per their terms, any modification to these agreements must have been "set forth in a writing executed by Buyer."  *See*

*id.* § 12.1.  No written modifications signed by the parties exist.  Accordingly, Cinemex was under no obligation to submit its KYC in time to enable a March 31 closing.

*Second*, the Khan Parties cite no evidence to support a finding that Cinemex failed to use commercially reasonable efforts to provide the Escrow Agent a completed KYC.  The Khan Parties' claim relies exclusively on Cinemex not completing the KYC process by March 24.  But the law does not operate based on tautology.  The mere fact that something did not occur on a specific date does not evidence a failure of commercial reasonable efforts.  *See Tendyne Holdings, Inc. Securityholders' Representative Comm. On Behalf of Tendyne Holdings, Inc. Securityholders v. Abbott Vascular, Inc.*, No. 18-CV-1070-CFC, 2019 WL 2717857 at *2–3 (D. Del. June 29, 2019) (dismissing breach of contract claim where the only allegation for failing to use "Commercially Reasonable Efforts" was not completing certain tasks on a specific date).

*Third*, the Khan Parties' conduct did not allow Cinemex a reasonable amount of time to complete the KYC.  On March 18, the Khan Parties informed Cinemex that for a ***March 31*** closing target, "the Escrow Agent will need Buyer's KYC information at least 5 business days prior to Closing (***3/25***)"[5] (the "March 18

---

[5]  In its Opening Brief, the Khan Parties assert that the Bankruptcy Court erroneously calculated five business days prior to March 31 as March 25, instead of March 24.  Br. at 23.  But the Bankruptcy Court did not perform a calculation, it simply read the Khan Parties' March 18 Email,

24

Email"). DE 75 (emphasis added). According to the March 18 Email, to have an executed Escrow Agreement in time for a March 26 closing (as opposed to the March 31 closing demanded in the email), Cinemex would have had to submit complete KYC information by March 19 (5 business days prior to March 26)—which would have been the day after receiving the Khan Parties' email instructing them to provide that information not by March 19, but by March 25. Given that Cinemex had multiple entities and an international parent, that would not have been possible, let alone reasonable. DE 55-11 Tr. 21:18–22:10. Indeed, Cinemex could not have even known of the need to submit by the March 19 deadline until March 24, when for the first time since signing the EPAs, the Khan Parties demanded a March 26 closing. Thus, the Khan Parties knew on March 24 (when they alleged that all closing conditions had been satisfied) that they did not have an executed escrow agreement and could not have an executed escrow agreement by March 26. The Khan Parties do not dispute any of that. Accordingly, there should be no dispute that Cinemex was not required to close on March 26—when the closing conditions had plainly not been satisfied.

The Khan Parties argue in the alternative that Cinemex waived the condition of an executed escrow agreement under Section 8.1(D) by not mentioning it by name

---

which expressly indicated that five business days prior to March 31 was March 25. DE 75. The Khan Parties cannot blame the Bankruptcy Court for the record they created.

in correspondence between the parties. Such an argument fails on at least four grounds. *First*, pursuant to the EPAs, Cinemex could only waive a condition to closing expressly "in a writing executed by the Buyer," DE 50-5 § 12.1; DE 50-6 § 12.1, and such a writing indisputably does not exist. *Second*, the Parties' Joint Pretrial Statement invokes Section 8.1 in its entirety as a condition precedent to Cinemex's obligation to close, this alone is sufficient to preserve the issue. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("[A] final pretrial order ... supersede[s] all prior pleadings and control[s] the subsequent course of the action."). *Third*, the Khan Parties can identify no prejudice, especially since they had the opportunity to, and in fact did, introduce and develop evidence on this precise point at trial. *See, e.g.*, TR2 415:09-416:07; TR3 580:4-20. *Finally*, Federal Rule Civil Procedure 15(b)(2) treats the issue as tried by implied consent and no waiver has occurred because the Khan Parties at all times bore the burden of proof that they had satisfied all conditions precedent. *MAPS*, 2020 WL 7024929, at *49 ("If a condition must be satisfied before a duty of performance arises (formerly known as a condition precedent), then the burden of proof rests with the party seeking to enforce the obligation."). Thus, even if necessary under these facts, Fed. R. Civ. P. 15(b)(2) treats the issue as tried by implied consent and no waiver has occurred.

**B. The Khan Parties Did Not Satisfy Section 8.1(B) Because They Did Not Satisfy at Least Five Covenants in Article 7 of the EPAs**

The Bankruptcy Court correctly held that the Khan Parties failed to satisfy Section 8.1(B) of the EPAs because they did not comply with at least *five* covenants in Article 7 of the EPAs prior to declaring all closing conditions satisfied and demanding on that basis that Cinemex close in two business days.  DE 244 at 27.

Section 8.1(B) of the EPAs required the Khan Parties to "have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed by the Company and the Equityholder."  DE 50-5 § 8.1(B);  DE 50-6 § 8.1(B).  Section 7 of the EPAs set forth covenants required to be performed by the Khan Parties.  As the Bankruptcy Court correctly ruled, the record demonstrates that the Khan Parties did not comply with the covenants in Sections 7.1(A)(a). 7.1(A)(d), 7.2, 7.4 and 7.9.  And each failure serves as an independent basis for determining that Cinemex was not required to Close on March 26.

> 1) The Khan Parties Did Not Provide Reasonable Access to and the Right to Inspect All Premises and Contracts as Required by Section 7.2

Section 7.2 of the EPAs required the Khan Parties to provide Cinemex "reasonable access to and the right to inspect all of the properties, . . . premises, . . . and [] contracts . . . related to the Company Group" from the signing of the EPAs to the closing date or termination of the EPAs.  DE 50-5 § 7.2; DE 50-6 § 7.2.

                      a) The Khan Parties Did Not Provide Cinemex Reasonable Access to, and the Right to Inspect, All Contracts

The Bankruptcy Court correctly held that the "Khan Parties did not provide Cinemex reasonable access to, and the right to inspect, their contracts prior to the purported closing date, March 26, 2020, and in doing so, the Khan Parties failed to satisfy a condition precedent to closing under Section 8.1(B) of the EPAs." DE 244 at 34.

The Bankruptcy Court correctly found that " despite the Khan Parties having represented that all contracts were provided to Cinemex, even as of March 27, three days *after* the Khan Parties claimed, 'the satisfaction (or waiver) of the closing conditions set forth in Article 8 of the EPA,' the Khan Parties had still not provided all contracts" DE 244 at 34 (emphasis in original). This Court must accept this factual finding, unless the Khan Parties can prove that it is "clearly erroneous." *Stewart Title Guar. Co. v. Roberts-Dude* 497 B.R. 143, 150 (S.D. Fla. 2013). The Khan Parties failed to demonstrate such error. Indeed, the Khan Parties do not dispute that as of March 24, they had not provided Cinemex access to all of their contracts, as they were required to do. That alone is dispositive.

Notwithstanding, in an attempt to excuse their failure to provide Cinemex with all contracts, the Khan Parties assert three unavailing arguments.

28

*First*, the Khan Parties claim that Cinemex had reasonable access to the contracts because the Khan Parties immediately provided some (but not all) of the relevant contracts when Cinemex requested them.  Br. 43.  But the EPA requires that "all" and not simply "some" contracts be made available.  And the Khan Parties do not dispute that they have never provided ***all*** of the relevant contracts, nor could they.  On March 27, an SCG Theatre executive wrote in response to a Cinemex employee's request for certain contracts attaching several contracts and indicating that one of the contracts requested was one for which "[the Khan Parties] are waiting on the copy from our rep."  *Id*.  The email exchange went on to say that "any other company not listed here is comparable to Conroe agreement."  *Id*.  To date, the Khan Parties have not provided Cinemex the contract with Vistar, nor that of "any other company not listed here."  That is sufficient to establish that reasonable access was not in fact given.  *See ECB USA, Inc. v. Savencia, S.A.*, 2021 WL 3187495, at *14 (D. Del. 2021) (concluding that, under Florida law, the failure to provide requested documents under a contract requiring "reasonable access to and the right to inspect all of the . . . books and records, contracts, agreements and other documents and data" amounts to breach).  Moreover, since even this incomplete set of contracts was sent ***after*** March 26, they cannot be a basis for the Khan Parties to claim that they satisfied this covenant ***on*** March 26.

29

*Second*, the Khan Parties argue that Cinemex had reasonable access to all contracts because Cinemex had access to the data room. But, the above referenced email in which Mr. Ostrow provides access to certain contracts (after March 26) and admits to not having all of the contracts, is proof that the data room did not include all contracts, and thus access to the data room was not equivalent to access to all contracts, which is what the EPAs required.

*Third*, the Khan Parties argue that the LOI contained language by which Cinemex "acknowledge[d] that it has had an opportunity to conduct due diligence regarding the Company prior to making this Offer and has completed the bulk of its due diligence efforts, with only a few areas pending, which are mainly confirmatory." Br. 44. But any and all understandings, including those in the LOI, were superseded by those in the EPAs. *See* DE 50-5 § 12.4; DE 50-6 § 12.4 ("[t]his Agreement, together with all Exhibits and Schedules hereto . . . supersedes all other prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof."). Thus, the language in the LOI is irrelevant, and does not change the Khan Parties' obligation to provide Cinemex reasonable access to all contracts.

          b) The Khan Parties Did Not Provided Cinemex Reasonable Access to, and the Right to Inspect the Premises

The Bankruptcy Court correctly held that the "Khan Parties did not provide reasonable access to the theaters by foreclosing Cinemex's ability to conduct the inspections—either by waiting to see if the theaters would open closer to the Outside Closing Date, or at least taking additional time to come to another resolution."  DE 244, at 35.

Notwithstanding, the Khan Parties argue that they did provide Cinemex the right to inspect—during the Marketing Tours.  But the Marketing Tours are irrelevant.  The EPAs expressly obligated the Khan Parties to provide Cinemex with reasonable access to and the right to inspect the SCG Theatres starting "[f]rom the date [the EPA was signed]," i.e., March 10, 2020.  DE 50-5 § 7.2,  DE 50-6 § 7.2. The Marketing Tours happened well before the date the EPA was signed. Accordingly, any representation or understanding the Parties may have had about, or as of the date of, the Marketing Tours was expressly superseded by the those in the EPAs, making the Marketing Tours entirely irrelevant.  *See* DE 50-5 § 12.4, DE 50-6 § 12.4.

In any event, such a claim is contradicted by the Khan Parties' own admissions and the Bankruptcy Court's factual finding that "the Khan Parties['] . . position that the February Tours *were* the inspections . . . is completely unfounded," DE 244 at

25–36, which must be accepted by this Court unless proven clearly erroneous, *see*

*Stewart Title,* 497 B.R. at 150.

Far from being clearly erroneous, the Bankruptcy Court's finding is

unequivocally supported by the record.

- The Khan Parties admitted to representing in writing to Cinemex that "[i]nspections are expected to occur *after* signing of an Agreement," TR1 206:12–207:22; DE 49-2 (emphasis added), , which precluded the Marketing Tours from being inspections because they were *before* the signing of the EPAs.

- Mr. Brail, the Khan Parties' investment banker who organized the Marketing Tours, admitted that Cinemex was not permitted to inspect the SCG Theatres during the Marketing Tours.  *See* TR2 362:06-11 (Mr. Brail testified that "to the extent the parties wanted to have inspections, they could not occur prior to the signing of the agreement," which did not occur until after the Marketing Tours).

- The Khan Parties prohibited Cinemex from talking to SCG Theatre employees during the Marketing Tours to uncover potential defects or problems at the SCG Theatres.  *Id.* at 502:24–503:06.  Specifically, PJ Solomon instructed Cinemex to not engage with SCG Theatre employees during the Marketing Tours because the "GMs and theatre level people do not know about the process."  *See* TR2 345:11–21; DE 55-12 (Khan Dep. Tr. 197:07–12); TR3 492:17–493:25.  Also, PJ Solomon informed Cinemex that the Khan Parties would present Cinemex to the general managers and theatre-level employees at the SCG Theatres only as a "possible investor."  *Id.*

- The Khan Parties instructed Cinemex not to bring its IT team to the Marketing Tours, but instead have their IT questions answered over the phone.  *See* TR2 347:23–348:3; DE 44-21.

- Because the SCG Theatres ranged from 22,000 to 55,000 square feet in size, averaging around one acre, the group spent an average of only "two to three minutes tops" in each space—which was not nearly

enough time to do a full inspection.  *See* DE 51-7; TR1 201:24–202:11; TR3 491:29–492:16.

In addition, the Khan Parties argue that they never expressly denied Cinemex access to the SCG Theatres.  But that is beside the point.  As the Bankruptcy Court determined, the Khan Parties functionally denied Cinemex access to the SCG Theatres by denying Cinemex the opportunity to reschedule its physical inspections before the Khan Parties prematurely and falsely declared they had satisfied all conditions precedent on March 24.  The Khan Parties' refusal to allow Cinemex to reschedule their inspections is particularly egregious because there was no need to force closing at that time.  The Khan Parties believed and represented to Cinemex that the SCG Theatres would be closed "just for a short period.  DE 47-19.  And as of March 24, the Parties still had 37 days to close the Texas EPA and 68 days to close the Illinois EPA.

Finally, the Khan Parties argue that Cinemex cannot rely on the lack of an inspection of the SCG Theatres as a reason not to close the EPAs because any such failure was caused solely by Cinemex not using reasonable efforts, as required by Section 7.4.  Br. 42.  But the Khan Parties identify no evidence that establishes Cinemex's failure to use "commercially reasonable efforts" to inspect the premises. As explained above, the law does not support a tautological allegation, such that the mere fact that the inspection did not occur by Mr. Khan's preferred closing date

cannot be proof in and of itself that Cinemex did not act in a commercially reasonably manner.  *See Tendyne Holdings*, 2019 WL 2717857 at *2–3.

2) <u>The Khan Parties Did Not Conduct Business in the Ordinary Course, as Required by Section 7.1(A)(a)</u>

The Bankruptcy Court correctly held that the "Khan Parties had departed from their ordinary course of business prior to the purported closing date, and in doing so, breached their covenant under Section 7.1(A)(a) of the EPAs."  DE 244 at 32.

Section 7.1(A) of the EPAs required the Khan Parties to use "commercially reasonable efforts" to "conduct the Business in the Ordinary Course" and to "keep available the services of their respective directors, officers and employees" from the signing of EPAs (March 10) until the closing or termination of the EPAs.  DE 50-5 § 7.1(A)(a); DE 50-6 § 7.1(A)(a).  Under Delaware law, where an "ordinary course" provision includes the phrase "consistent with past practice," a court must examine how the specific seller company has "routinely operated" in the past.  *See AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, CV 2020-0310-JTL, 2020 WL 7024929, at *70 (Del. Ch. Nov. 30, 2020), *judgment entered*, (Del. Ch. 2021), and *aff'd*, 71, 2021, 2021 WL 5832875 (Del. Dec. 8, 2021).  The EPAs expressly defined "ordinary course" to mean consistent with ***past*** practice."  DE 50-5 § 1.1; DE 50-6 § 1.1 (emphasis added).  That was for good reason.  "[O]rdinary course" covenants "exist to 'help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing.'"  *Snow Phipps Grp., LLC v. Kcake*

34

*Acquisition, Inc*., 2021 WL 1714202, at *38 (Del. Ch. 2021) (quoting *Akorn*, 2018 WL 4719347, at *83).  There can be no dispute that, when the Khan Parties' attempted to force a closing, the SCG Theaters were ***not*** "essentially the same" as what Cinemex "decided to buy at signing."  Accordingly, the Khan Parties breached Section 7.1(A)(a).

The Khan Parties nonetheless argue that their actions were commercially reasonable and within the ordinary course of how other companies responded to the pandemic, and in any event excused under certain exceptions to Section 7.1(A) of the EPAs.  But both claims are baseless.

In support of their claim that they acted commercially reasonably and within the ordinary course, the Khan Parties assert that the analysis of their conduct should not be limited to a comparison against their own past practices, as Delaware law and the EPAs require, but rather compared to ***other*** companies' practices, and then limited to how those companies responded to the present COVID-19 pandemic.  In support, the Khan Parties claim that the Bankruptcy Court misapplied the holdings in *MAPS* when concluding that "[w]here the parties choose to define 'ordinary course' as being 'consistent with past practice,' as is the case here, 'the court cannot look to how other companies responded to the pandemic or operated under similar circumstances.'"  Br. 31.

35

The basis for the Khan Parties' assertion is their claim that the agreement that was interpreted in *MAPS* is distinguishable from the EPAs in two dispositive ways. *First*, the agreement interpreted in *MAPS* used the word "only" as a qualifier to "the ordinary course of business, consistent with past practice" and Section 7.1(A) of the EPAs does not qualify the ordinary course provision with the word "only." *Second*, the agreement in *MAPS* "did not include a 'commercially reasonable efforts' qualifier [to the ordinary course provision], as do the EPAs" Br. 33. But both are distinctions without a difference.

Regarding the first purported distinction, the Khan Parties attempt to imbue the word "only" with undue significance, claiming that it is the exclusive reason that the court in *MAPS* limited the application of "consistent with past practices" to the seller in that case, and no other party. But that is plainly not the case. *First*, the court in *MAPS* nowhere asserts that its decision to limit the comparison to that seller turned on the word "only," let alone that where the word "only" does not appear, the court may look to other entities. *MAPS*, 2020 WL 7024929, at *71. *Second*, making it still more inescapable that the *MAPS* ruling did not turn on the word "only," the Delaware authority that the court in *MAPS* relied upon when interpreting "consistent with past practice" as being limited to past practices of the seller did not include the word "only" in the relevant provisions. *Id.* (citing *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, No. CV 12201-CB, 2017 WL 2729860, at *32 (Del. Ch. June

36

26, 2017), *clarified on denial of reargument*, No. CV 12201-CB, 2017 WL 3863893 (Del. Ch. July 27, 2017)).   *Third*, the reading the Khan Parties propose is not consistent with established principles of contractual interpretation, as they concern the EPAs.   The EPAs define ordinary course to be "with respect to any Person, in the ordinary course of ***that*** Person's business consistent with past practice."   DE 50-5 § 1.1; DE 50-6 § 1.1.   "That" when used as an adjective is defined by the Merriam-Webster Dictionary as "being the person, thing, or idea specified, mentioned, or understood."   MERRIAM-WEBSTER.COM, "*That*," https://www.merriam-webster.com/dictionary/that.   Thus, the ordinary course provision limits "consistent with past practice" to the ordinary course of the specified Person—not *any* person.   To conclude otherwise, simply due to the absence of the word "only" would deprive the word "that" of meaning, which violates established principles of contractual interpretation.   *See P. Employers Ins. Co.*, 693 F.3d at 430.

In any event, even if this Court considered the ordinary course consistent with past practices of other companies, that would not enable this Court to look beyond the other companies' ordinary course practices and to consider their extraordinary course practices in responding to the unprecedented COVID-19 pandemic.   And the Khan Parties cite no authority to the contrary.   That serves as yet another basis to reject the their self-serving theory.

With the second supposed distinction, the Khan Parties attempt to suggest that their obligation to conduct business in the ordinary course is lower in the EPAs than in the agreements considered in *MAPS* because the agreement in *MAPS* "did not include a 'commercially reasonable efforts' qualifier [to the ordinary course provision], as do the EPAs."  Br. 33.  But that distinction is likewise irrelevant for purposes of this Court's analysis because under any standard, voluntarily furloughing all of their employees, particularly while representing to Cinemex that the SCG Theatres would be opening shortly, is not commercially reasonable, as the Bankruptcy Court correctly found.  This is especially commercially unreasonable here, where Cinemex was purchasing an ongoing business whose "amazing service" depended on having "the right people" who are "well-trained" and "motivated."  TR 502:5–11.  The Khan Parties effectively turned the SCG Theatres into a shell—with no operations and no employees.  The Khan Parties have identified nothing in record to the contrary.

Finally, the Khan Parties maintain that because the Bankruptcy Court ruled that "the Khan Parties used commercially reasonable efforts to temporarily suspend operations of the SCG Theaters," "[i]t then follows that the Khan Parties used commercially reasonable efforts to operate the business in the ordinary course."  Br. 33.  But such a reading misrepresents the Bankruptcy Court's ruling, which with respect to the operation of the business, was based on the temporary shutdown orders

and CDC guidance in place at the time.  It found to the contrary with respect to the furloughing of employees or release of executives, however, explaining that "[e]ven if the covenant requirements of the EPAs had excused the temporary shutdown of the theaters for purposes of forcing a closing, nothing in the shutdown orders or CDC guidelines required the Khan Parties to furlough employees or release executives." DE 244 at 32.

The Khan Parties argue that any such departure from the ordinary course of business was excused under two exceptions to Section 7.1(A); both of which fail. The first exception is Section 7.1(A)(i), which requires the Khan Parties to conduct their business in the ordinary course, "except (i) as otherwise expressly provided in this Agreement."  Br. 25.  The Khan Parties assert that MAE clause "express[ly]" permits the Khan Parties to not conduct business in the ordinary course during a pandemic because the MAE clause "clearly and unambiguously allocated the risk of a pandemic (COVID-19) to the Debtors."  Br. 26.  But, the Khan Parties point to no support for such a proposition, and the plain language of that the MAE Carveout outright contradicts it.

Under the MAE Carveout, pandemics "(or results thereof) shall [not] be taken into account, either alone or in combination, in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur."  DE 50-5 § 1.1; DE 50-6 § 1.1.  Nothing in the MAE Carveout limits its application to Cinemex.

As such, the MAE Carveout applies as much to the Khan Parties as it does to Cinemex.  Accordingly, just as Cinemex cannot cite to the pandemic as a reason not to close under Section 8.1(E), the Khan Parties also cannot cite to the pandemic as the reason for not complying with their obligations under Section 7.1(A).

In an attempt to avoid the express language of the MAE Carveout, the Khan Parties rely on *Cineplex Inc.*, a Canadian opinion, for the proposition that the MAE Carveout could not have applied to the Khan Parties.  Br. 27–29 (citing *Cineplex Inc. and Cineworld Group PLC and 1232743 B.C. Ltd*., 2021 ONSC 8016).  As a preliminary matter, it is telling that the Khan Parties' only authority is not from a U.S. court, let alone binding on this Court, and even that does not support their conclusion.  The Ontario opinion actually supports Cinemex's interpretation of the MAE Clause, not that of the Khan Parties.  In explaining why Cineplex acted reasonably when closing its theatres, the Ontario court stressed that Cineplex's closures were due to government mandates, which it contrasted with the *MAPS* case. *Id*.  The Ontario court found that the circumstances in *Cineplex* were distinguishable from *MAPS* because in *MAPS*, the seller "clos[ed] (not in response to government mandates) two of its hotels" and "la[id] off or furlough[ed] 5200 full time employees." *Cineplex* at 21. The Ontario court noted that *MAPS* was distinguishable from its case because the seller in *MAPS* "had not preserved the business; rather, the seller had "gutted it."  *Id*. at 27.  Because the Khan Parties' closure occurred **prior**

to any government mandates requiring such actions, and because the Khan Parties' furloughing all of their employees was ***never*** mandated by the government and was a "radical[]" departure "from the normal and routine operation," *see id.*, intended only to "save costs," Br. 41, the Ontario court's reasoning is entirely consistent with that of the Bankruptcy Court here. *See id.*

The second exception the Khan Parties cite is Section 7.1(A)(ii), which provides that the Khan Parties are obligated to conduct their business in the ordinary course "except (ii) as described on Schedule 7.1(A)." Br.29. The Khan Parties claim that Supplement No. 1 on Schedule 7.1(A), falls under this exception and relieves them of their obligations under Section 7.1(A). But, Schedule 7.1(A) in Supplement No. 1 was expressly "delivered pursuant to <u>Section 7.5</u>" of the EPAs. *See* DE 53-19. And Section 7.5 provides that any such supplement "be given effect ***solely*** for the purposes of determining whether there has been a breach of a representation or warranty for purposes of determining the fulfilling of the condition set forth in Section 8.1(A)." *See* DE 50-5 § 7.5; DE 50-6 § 7.5 (emphasis added). Here, however, Cinemex is not asserting that the Khan Parties failed to fulfill a condition set forth in Section 8.1(A), but rather that they failed to fulfill a condition set forth in Section 8.1(B). And that is not a meaningless distinction. Section 8.1(A) concerns the provision of accurate information; the parties wanted to encourage the exchange of that information, which would be susceptible to changes and updates.

41

That is different to what the Parties sought to do with 8.1(B), which concerns ongoing covenants that the Parties would expect not to change.

Recognizing that Supplement No. 1 expressly limits its application to Section 7.5, the Khan Parties argue that interpreting Supplement No. 1 as being limited only to representations and warranties would "render Section 7.1(A)(ii) a nullity." Br. 30. However, Section 7.1(A)(ii) is not null, the parties simply agreed to limit it. Had the Parties wanted to do otherwise and have Supplement No. 1 affect the Khan Parties' covenants, the Parties need only to exclude the "pursuant to <u>Section 7.5</u>" language in Supplement No. 1. As such, the Court must give effect to the plain language as written. *See P. Employers Ins. Co.*, 693 F.3d at 430.

3) <u>The Khan Parties Did Not Keep Available the Services of Their Respective Directors, Officers, and Employees, as Required By Section 7.1(A)(d)</u>

The Bankruptcy Court correctly held that by furloughing employees and releasing executives "the Khan Parties failed to satisfy the covenant to keep available the services of their respective directors, officers and employees, as required under Section 7.1(A)(d) of the EPAs." DE 244 at 32–33.

The Khan Parties' arguments on this point are identical to those concerning Section 7.1(A)(a), i.e., claiming that furloughing all of their employees was commercially reasonable and excused under the two exceptions to Section 7.1(A), except in this section, the Khan Parties do not dispute that such furloughing

occurred.  In the interest of efficiency, Cinemex incorporates its responses to the relevant arguments here.

> 4) The Khan Parties Did Not Provide Cinemex with Reasonable Access to Each Corporate Employee, as Required By Section 7.9

The Bankruptcy Court correctly held that:

> the Khan Parties' furloughing of one hundred percent of its employees necessarily restricted reasonable access to Corporate Employees because, the Corporate Employees that were employed at the time of signing were no longer under the custody and control of the Khan Parties during a time when Cinemex was still actively seeking inspection of the theaters and access to the associated employees.

DE 244 at 38.

The Khan Parties take issue with the Bankruptcy Court's factual premise:  that the Khan Parties furloughing of its employees happened "during a time when Cinemex was still actively seeking inspection of the theaters and access to the associated employees"  DE 244 at 38.  But they are not able to meet the clearly erroneous standard necessary to establish that the Bankruptcy Court's factual findings were wrong.  The Khan Parties rely on Mr. Khan's self-serving testimony at trial "[t]hat [the furloughs] actually did not happen until– I believe until almost March – April 1st, or after the month was over, after the breach had occurred" and assert that such testimony was "uncontroverted and, therefore, . . . demonstrated that any furloughs did not occur until following the Debtors' breach"  Br. 36.  But the fact is that that testimony is controverted—by Mr. Khan, himself.  At his deposition,

the transcript from which is part of the record at trial (DE 55-12, DE 55-13), Mr. Khan testified that he had furloughed all of his employees no more than 10 days after closing down the SCG Theatres, i.e., no later than March 27.  *See* DE 55-13 (Khan Tr. 345:23–346:11).  That is before the Khan Parties filed the Texas Action, and while the Parties were still in ongoing discussions about closing.  Despite it being their burden to prove they satisfied this condition, *see MAPS*, 2020 WL 7024929, at *49 ("If a condition must be satisfied before a duty of performance arises (formerly known as a condition precedent), then the burden of proof rests with the party seeking to enforce the obligation."), the Khan Parties did not present any documentary evidence, e.g., pay stubs, accounting records, demonstrating that they did not furlough any of their employees during the relevant period.  That conspicuous failure combined with Mr. Khan's conflicting testimony precludes the Khan Parties from now claiming that the Bankruptcy Court's finding was clearly erroneous.

In any event, there is no dispute—and the Bankruptcy Court correctly found—that the Khan Parties removed the SCG Theatres' culinary director, Michael Pawlowski, prior to March 24 with no intention of replacing his role due to COVID-19.  DE 55-12 (Khan Dep. Tr. 183:20–184:18); DE 244 at 38.  Such acts denied Cinemex their right to interview theatre-employees, as well as the culinary director

of a dine-in movie theatre, where the "scratch-made food" was a critical selling point.  DE 49.  Therefore, the Khan Parties did not satisfy Section 7.9 of the EPAs.

     5) <u>The Khan Parties Did Not Use Reasonable Best Efforts to Cause The Closing to Occur, As Required By Section 7.4</u>

  The Bankruptcy Court correctly held that "the Khan Parties did not use reasonable best efforts to cause the closing to occur."  DE 244 at 39.

  In addition failing to satisfy all of its closing conditions, the Khan Parties, attempted to force a premature closing and prohibit Cinemex from exercising its contractual rights.  *See* DE 44-25 (email from Mr. Khan to Mr. Marti stating, "[P]lease take this very serious, it could turn in [sic] the very bad situation and neither of us want that."); TR3 535:12–20; *id.* at 535:09–536:14.

  The Khan Parties nonetheless argue that their demand to close on March 26—35 days before the outside closing date of the Texas EPA and 66 days before the outside closing date of the Illinois EPA—was commercially reasonable because the Khan Parties offered Cinemex alternatives to a full-fledged physical inspection.  The fact that Khan was offering alternatives confirms the Khan Parties' recognition of their own breach.  Moreover, each of these proposed alternatives was insufficient.

  The Khan Parties' proposal of a private plane was not a reasonable, or even a viable, alternative.  As a preliminary matter, whether this was a genuine proposal is not established in the record.  Mr. Khan admitted that he never took any steps to charter a private plane, including so much as finding how much it might cost or who

would pay.  TR1 227:17–20; *see also* DE 55-13 (Khan Dep. Tr. 414:25–415:08).  In any event, a private plane would still unnecessarily risk the health of Cinemex employees given the COVID-19 pandemic; deny Cinemex access to SCG Theatre-employees (as some if not all had already been furloughed, and regardless may not have been willing to come to the theatre); and refuse Cinemex an inspection of the theatres while in operation.  *See* TR3 529:24–530:12.; DE 46-13.  This proposal and the risks it entailed were especially unreasonable at the time given that just days prior, the Khan Parties had reassured Cinemex that the SCG Theatres would be re-opening soon, and there was more than a month left under the EPAs to close.  *See* DE 47-19

The Khan Parties' proposal of a virtual inspection was likewise not a reasonable or viable alternative.  In addition to denying Cinemex access to the SCG Theatre-employees and refusing Cinemex an inspection of the theatres while in operation, it also posed logistical concerns.  TR3 530:19–531.  In a virtual inspection, Cinemex would be limited by video resolution and internet connectivity to inspect theatres averaging an acre in size.  Moreover, Cinemex would have to trust that the individual holding the camera is being forthcoming in what they were or were not showing Cinemex.  It was simply not reasonable to expect Cinemex to invest ███████ in a going concern without its employees inspecting the operations in-person.

The Khan Parties' proposal of a third-party inspection was also not a reasonable or viable alternative for similar reasons.  In addition, Cinemex is not aware of anyone who provides such a service.  In any event, this would also have the additional problem of requiring Cinemex to rely on unaccountable inspectors with whom Cinemex was unfamiliar.  *See* TR3 531:18–532:04.

The Khan Parties' proposal of a discount on the purchase price was not a reasonable alternative either because there was no way to quantify the potential risk that could arise from a purchase without physical inspections, and thus no way to determine what a fair discount would be.  *See e.g.*, DE 44-25 (offering discount); TR3 529:09–23.

Lastly, the Khan Parties assert that they offered to postpone the closing.  Br. 46.  That assertion is, at best, misleading.  As an initial matter, the closing did not need to be postponed because the outside closing dates were more than a month out for the Texas EPA and more than two months out for the Illinois EPA.  The Khan Parties needed to do nothing more than refrain from attempting to force an early closing before they had met all closing conditions and obligations required under the EPAs.  Indeed, the Illinois EPA did not even permit a closing during the time that the Khan Parties' were purporting to be offering to postpone closing, which makes their offer all the more absurd.  In any event, the Khan Parties conspicuously avoid mention of the fact that their offer to postpone was conditioned on Cinemex paying

it $20 million, which was not required under the EPAs.  *See* DE 55-13 (Khan Dep. Ex. 428:02–25).

Against this backdrop, the Khan Parties' filing the Texas Action on April 1, 2020—over a month before the time for closing the EPAs would expire, and before the Illinois EPA even permitted a closing—was entirely unreasonable.  That is especially so given that the filing was motivated entirely by Mr. Khan's emotions.

Mr. Khan testified that he filed on April 1 because he "felt that they were playing games and they were not going to close" and that he "also felt that they were intentionally doing it to get the April 30th drop-dead date."  DE 55-13 (Khan Dep. Tr. 522:22–523:10).   Mr. Khan admitted that he had no reason to rush the filing of the lawsuit.  *Id.* at 524:15–24 ("I don't know what the rush was.").

Mr. Khan testified that he did not wait to file suit until April 30th, the date the Texas EPA provided for as the deadline for closing, because "I don't know why anyone or anyone thinks that they would have the right to make that decision for me.· I just felt like it was the right time."  *Id*. at 523:18-524:03.

Ultimately, Mr. Khan admitted that he was "frustrated," "going through an emotional roller coaster," and "when someone's upset and they're angry and frustrated and they're emotional, [they] take action when [they] feel like taking it.  *Id*. at 527:25–528:19.

The Khan Parties imply that Cinemex did not use commercially reasonable efforts to close on March 31 because, prior communications suggested "there was ample justification for a March 31, 2020, closing." Br. 46.  But that is irrelevant to whether Cinemex used commercially reasonable efforts.  Although Cinemex was willing to try and accommodate a March 31 closing, Cinemex was not willing to do so at the expense of its bargained-for rights.  Nor would requiring Cinemex to do so be commercially reasonable.  The Parties were not required to close by March 31 under the EPAs.  *See* DE 50-5; DE 50-6   Moreover, all understandings and representations made prior to entering the EPAs were superseded by the express language in the EPAs, *see* DE 50-5 § 12.4; DE 50-6 § 12.4, and any modification to the EPAs needed to be in writing, *see* DE 50-5 § 12.1; DE 50-6 § 12.1.  Accordingly, Cinemex did not need to use commercially reasonable efforts to close by March 31.

In any event, as discussed above, Cinemex at all times did use commercially reasonable efforts to close.  That Cinemex was not willing to give up its contractual rights to close on the arbitrary date and circumstances imposed by the Khan Parties, but not bargained for in the EPAs, does not evidence the contrary.  *See Tendyne Holdings*, 2019 WL 2717857 at *2–3.

## III.   The Khan Parties Breached the EPAs by Wrongly Declaring a Repudiation by Cinemex and Filing the Texas Action

The Bankruptcy Court correctly held that the Khan Parties wrongly concluded that Cinemex had repudiated the EPAs and themselves breached the EPAs by

refusing to perform their obligations, as "demonstrated by their filing of the Texas Action."  DE 244 at 42.

The Khan Parties argue that Cinemex repudiated the EPAs in a March 24 email from its counsel.  Br. 52.  But that is demonstrably false.  To constitute a repudiation, a party "must give an 'unequivocal statement' that is 'positive and unconditional' about its intent not to perform its contractual obligation."  *Veloric v. J.G. Wentworth, Inc.,* No. CIV.A. 9051-CB, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014) (citations omitted).  The March 24 email was far from an "unequivocal statement" that Cinemex intended to no longer perform its obligations under the EPAs.  On the contrary, the email was merely a response to an email the Khan Parties' counsel sent earlier that day, which claimed that all closing conditions had been satisfied and that Cinemex had to close the EPAs on March 26.  DE 49-12 (the March 24 email).  In the March 24 email in question, Cinemex disagreed that all of the closing conditions had been satisfied as of the email's date and asserted that it was therefore not obligated to close on March 26.  *Id.*  At no point did Cinemex ever indicate that it would *never* close the transaction if, in contrast to the circumstances at the time, the closing conditions had been met.  *See* TR3 544:20–22 (Mr. Martí testified at trial that "[Cinemex] didn't say we are not going to close anymore.  This [March 24 Email] has to be seen in its full context.").  Instead, in the March 24 email, Cinemex's counsel noted that conversations between the principals

to the transaction were ongoing, which was in fact the case—and there would be no reason to have such conversations if Cinemex was repudiating the transaction.

Cinemex's contemporaneous conduct and communications confirm that the March 24 email was not a repudiation. As of the morning of March 24 (prior to the March 24 email exchange), Cinemex was still actively seeking information from the Khan Parties in an effort to close. DE 45-2. At trial, Mr. Brail admitted that Cinemex was coordinating with the Khan Parties, including that "lease consents and other documents . . . were still travelling back and forth up until . . . the morning of [March] 25th"—i.e., the day after the purported repudiation. *See* TR2 393:13–21. The day after that exchange of information, on March 26, Cinemex's counsel reiterated to the Khan Parties' counsel that Cinemex was only refusing to close "at this time" because not all closing conditions were met under the EPAs. DE 50. And, as of March 27, Cinemex was still corresponding with the Khan Parties in an attempt to obtain copies of relevant vendor contracts not located in the data room. DE 50-1 (Email from Cinemex employee requesting that the Khan Parties send certain vendor contracts which were not available in the data room). It was only after all of the foregoing, on April 1, that the Khan Parties filed the Texas Action.

The Khan Parties cannot identify any clear statement demonstrating that Cinemex would no longer perform its obligations under the EPAs. *See In re Broadstripe*, LLC, 435 B.R. 245, 262 (Bankr. D. Del. 2010) (requiring repudiating

51

statements concerning nonperformance be "clear and precise").  As such, the Khan Parties' filing of the Texas Action and ceasing to close the transaction breached the EPAs.  *See Frontier Oil v. Holly Corp.,* No. CIV.A. 20502, 2005 WL 1039027, at *32 (Del. Ch. Apr. 29, 2005), *judgment entered sub nom. Frontier Oil Corp. v. Holly Corp.* (Del. Ch. 2005) (asserting that, under Delaware law, a party is liable for breach of contract where it wrongly concludes that its counterparty has repudiated the agreement and itself ceases to complete the transaction).

## CONCLUSION

For the foregoing reasons, this Court should affirm the Bankruptcy Court's Order.

Respectfully Submitted this 25th day of February 2022.

By:/s/ *Juan Morillo*

Juan P. Morillo (FBN 135933)
Gabriel F. Soledad (admitted *pro hac vice*)
Valerie Ramos (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: 202-538-8000
Facsimile: 202-538-8100
juanmorillo@quinnemanuel.com
gabrielsoledad@quinnemanuel.com
valerieramos@quinnemanuel.com

-and-

Patricia B. Tomasco (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
711 Louisiana, Suite 500
Houston, Texas 77002
Telephone: 713-221-7000
Facsimile: 713-221-7100
pattytomasco@quinnemanuel.com

-and-

Jeffrey P. Bast (FBN 996343)
BAST AMRON LLP
One Southeast Third Ave., Suite 1400
Miami, Florida 33131
Telephone: 305-379-7904
Facsimile: 305-379-7905
jbast@bastamron.com

*Attorneys for Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 8015

**I HEREBY CERTIFY** that this Brief complies with the type-volume limitation of Rule 8015(a)(7)(B), Fed.R.Bankr.P., as this Brief contains 12,870 words, excluding those sections exempted under Rule 8015(a)(g).

*/s/ Juan Morillo*
Juan P. Morillo (FBN 135933)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the *Response Brief of the Appellees* has been filed and served electronically via the Court's CM/ECF system upon all parties registered to receive electronic notice in this case on this 25th day of February 2022.

*/s/ Juan Morillo*
Juan P. Morillo (FBN 135933)
