UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-23675-CIV-ALTMAN-Reid

DISTRICT THEATERS, INC., *et al.,*

      Appellants,

v.

CINEMEX HOLDINGS USA, INC., *et al.,*

      Appellees.

_____/

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA – MIAMI DIVISION

*In re:  Cinemex Holdings USA, Inc.*
*Case No. 20-14696-LMI*

**REPLY BRIEF OF THE APPELLANTS**

Michael D. Seese, Esq.
Florida Bar No. 997323
mseese@seeselaw.com
101 N.E. 3rd Avenue, Suite 1270
Fort Lauderdale, Florida 33301
Telephone No. (954) 745-5897

*Counsel for the Appellants*

# TABLE OF CONTENTS

**Page**

BACKGROUND ……………………...................................................................1

DISPUTED STATEMENT OF FACTS ………………………………...1

ARGUMENTS AND REPLIES

I.    The Appellees Maintain They Did Not Breach the Illinois EPA Because the Illinois EPA Forbade a Closing Prior to Closing ……………………………………………………6

II.    Cinemex Alleges It Did Not Breach the EPAs By Refusing to Close on March 26 Because the Khan Parties Failed to Satisfy All Conditions Precedent …………………………9

    A.    Cinemex Alleges the Khan Parties Did Not Satisfy Section 8.1(D) Because They Could Not Provide an Executed Escrow Agreement Before Closing …….10

    B.    The Appellees Assert the Khan Parties Did Not Satisfy Section 8.1(B) Because They Did Not Satisfy At Least Five Covenants in Article 7 of The EPAs ………………………………………….14

        1.    The Khan Parties Did Not Provide Reasonable Access to and Right to Inspect All Premises and Contracts Required By Section 7.2 …….14

        2.    The Appellees Allege that the Khan Parties Did Not Provide Cinemex Reasonable Access to, and the Right to Inspect the Premises …...16

        3.    The Khan Parties Did Not Conduct Business in the Ordinary Course, as Required By Section 7.1(A)(a) …………………………………….18

i

**Page**

       4.     The Khan Parties Did Not Use Reasonable Best Efforts to Cause the Closing to Occur, as Required By Section 7.4 …………………….23

..

  II.     The Khan Parties Breached the EPAs by Wrongly Declaring a Repudiation By Cinemex and Filing the Texas Action …23

CONCLUSION ……………………………………………………27

CERTIFICATE OF COMPLIANCE…………………………………28

CERTIFICATE OF SERVICE…………………………………….29

# TABLE OF AUTHORITIES

**Page**

## Cases

*Cineplex Inc. and Cineworld Group PLC and*
*1232743 B.C. Ltd.,* 2021 ONSC 8016 ……………………………22, 23

*AB Stable VIII LLC v. Maps Hotels and Resorts One, LLC,*
2020 WL 7024929, at *71 (Del. Ch. 2020) ………………………..22, 23

*AB Stable VIII LLC v. Maps Hotels and Resorts One, LLC,*
2021 Del. LEXIS 386, at *29 (Del., Dec. 8, 2021) ……………….....…20

*Estate of Osborn v. Kemp,* 991 A.2d 1153 (Del. 2010) ……..………..22

*Kuhn Const., Inc. v. NBC Universal*, 990 A.2d 392 (Del. 2010) ……...22

## Rules

Fed.R.Bankr.P. 8015(a) …………………………………………………28

## Other

MERRIAM-WEBSTER.COM
(https://www.merriam-webster.com/dictionary/furlough)....................21

## BACKGROUND

On October 18, 2021, the Appellants filed their *Notice of Appeal* of the

*Memorandum Opinion on Objection to the Khan Parties' Claims (ECF #1153)* [DE

244][1] (the "Opinion") entered by the United States Bankruptcy Court (the

"Bankruptcy Court").

On January 14, 2022, the Appellants filed their *Initial Brief of Appellants*

[Doc. #31] (the "Brief"). On February 25, 2022, the Appellees filed their *Response*

*Brief of Appellees* [Doc. #35] (the "Response Brief").

## DISPUTED
## STATEMENTS OF FACT

This Reply is filed, in part, to address certain inaccurate or misleading

statements of fact included in the Response Brief.

1.    In addressing tours that occurred on February 5 and 6, 2020 (the

"Tours"), the Appellees state they "understood from the Khan Parties that they [the

tours] were solely for marketing purposes, as is common in theater acquisitions."

[Doc. #35, p.3] (citing TR3 490:06-11). The Appellees reference testimony provided

---

[1] In this Reply, (a) "DE" references electronic docket entries in Case No. 20-14695-LMI or Case No. 20-14696; all references to DE are to Case No. 20-14696 unless *695 is denoted, in which case the reference is to Case No. 20-14695; a reference to DE 100-10 is to DE 100, which has multiple exhibits attached; (b) "Doc.#" references the electronic docket entries in this appeal, Case No. 21-23675; and (c) "TR" references the trial transcripts of the proceedings conducted by the Court on May 20, 2021 ("TR1"), June 18, 2021 ("TR2"), and July 9, 2021 ("TR3"); a reference to "TR2 285:2-3" would mean the Transcript from June 18, 2021, page 285, lines 2-3.

by Jose Marti ("Marti") during the trial held on May 21, 2020, June 18, 2021, and July 9, 2021 (collectively, the "Trial"). Marti did not testify that his understanding came from the Khan Parties; rather, Marti testified as to his own understanding of the tours. [TR3 490:6-11].

2.    The Appellees state "[o]n February 5 and 6, six Cinemex employees travelled to Houston for the management meeting and tours of the Houston theaters . . .." [Doc. #35, p.4]. The "employees" were the Appellees' chief executive officer, chief operating officer, chief financial officer, general counsel, head of construction, and chief development officer. [DE 61; DE 85, 18:3-12, 29:2-21, Doc. #31, p.6].

3.    During the Tours, the Appellees state "the group spent an average of 'two to three minutes tops' in each space of **every theater** visited." [Doc. #35, p.4] (quoting TR3, 492:16) (emphasis added). The Appellees reference Marti's Trial testimony, but Marti testified he "only went to four tours or visits." [TR3 570:15-19]. Marti toured less than one-half of the theaters toured on February 5 and 6, 2020.

4.    The Appellees state "[u]nder the Texas EPA, the Parties had until (a) April 30, 2020 ("Texas Closing Date") to close the transaction for the ten Texas theaters[,]" [Doc. #35, p.6], and (b) "[u]nder the Illinois EPA, the Parties had until May 31, 2020 ("Illinois Closing Date") *Id.*  "Closing Date" is defined in Sections 3.1 of the Texas EPA and Illinois EPA (collectively, the "EPAs"), which provide, in part, "[t]he closing of the transfer of the Equity Interests to Buyer (the "**Closing**")

2

shall take place at 10:00 a.m., Central time, on a date to be specified by the Parties, which shall be ***no later than the second Business Day*** after satisfaction (or waiver) of the conditions set forth in <u>ARTICLE 8</u>." [DE 66, p.19; DE 67, p.18] (emphasis added). The "closing dates" referenced by the Appellees are <u>not</u> the Closing Dates but, rather, the dates appearing in Sections 9.1(F) of the EPAs, which govern termination of the EPAs by either of the parties if the transaction had not closed on or before April 30, 2020, or May 31, 2020, respectively. *Id.* at Section 9.1(F).  If Section 9.1(F) governed the "Closing Date," then Section 3.1 of the Texas EPA and Illinois EPA would be illusory.

5.     In referencing a trip planned to Houston, the Appellees state, "Cinemex intended to conduct a full multi-day physical inspection of the SCG Theaters during the theaters' operation hours." [Doc. # 35, p.6]. Other than Marti's self-serving Trial testimony, the only other evidence consisted of an e-mail dated March 13, 2020, in which the Debtor's chief operating officer stated that the Debtors' operations team and personnel from human resources would be traveling to Houston on Tuesday, March 17, 2020. [DE 73]. The Debtors' chief operating officer stated, "we would like to meet at one location somewhat close to the airport around 1pm. We will bring a Presentation about CMX and embrace the opportunity to meet some of the Star Cinema Team-Members." *Id.* There was no mention of any inspections, let alone "multi-day" inspections.

6.     The Appellees state "Cinemex would postpone its planned March 17 inspection of the Houston theaters to learn more about the risks of the then-escalating COVID-19 pandemic before asking their employees to travel." [Doc. #35, p.7]. As evidence in support of the alleged postponement, during Marti's Trial testimony, the Appellees introduced a March 16, 2020, e-mail from Jason Ostrow ("Ostrow"), an executive with the Appellants, to the Appellants' outside IT group, in which Ostrow states, "field support [may be needed] next week as they [Appellees] start installing some of their software and infrastructure." [DE 45-4]. There is no mention of any inspection; instead, something else is suggested, namely that the Appellees may start "installing their software and infrastructure." *Id.*

7.     The Appellees state that the Khan Parties were "required under the EPAs to make available to Cinemex all contracts." [Doc. # 35, p.8]. The statement is contrary to the provisions of Sections 5.10, 6.7(A), and 7.2 of the EPAs, as discussed more fully herein, *infra*.

8.     The Appellees state "within ten days of shutting down the Texas theaters, the Khan Parties furloughed 100% of the SCG Theater employees." Doc. #35, p.8. During Trial, Khan testified as follows:

> Q:     No more than 10 days after your theaters closed, you furloughed a hundred percent of the employees, is that right?

> A:     That is not correct.

[TR1 219:18-21].

4

In disagreeing with Appellee's counsel's characterization of deposition testimony, Khan testified:

> So, during my deposition, as I clearly stated in the deposition, that I wasn't exactly sure how long after that was, it says that in the deposition. That actually didn't happen until – I believe until almost March – April 1st, or after the month was over, after the breach had occurred. So, to clarify that, yes, people were furloughed, but they were furloughed after the month of March, and as well as it was after the breach that occurred, or in my opinion the breach had occurred.

[TR1 222:9-18].

9.    The Appellees state "Mr. Khan has since admitted that his urgency to close on March 31 was driven by nothing more than his belief that it was his 'God-given right to do so.'" [Doc. #35, p.10]. However, this excerpt – taken from Khan's deposition taken during the case – is taken out of context. As discussed in the Brief, Khan testified:

> Prior to CMX ever signing that agreement [EPAs], PJ Solomon was instructed as well as all the buyers that were involved or bidders or anybody that was involved in this transaction that ever took a look or in any way, shape, or form, the very get-go, the part of the requirement or – was my time from [referencing March 31] of when I desired to close, and which as a seller, in my belief, is my right. And so I wanted to close before the end of March so I could use the proceeds to invest in other things that I was hoping to invest in. I had that right [meaning the right to close by March 31].

[DE 55-13, P.432, L10-24]. Khan further testified:

> Well, those are the – those – those are the reasons. I mean, I wanted to spend time with my family. I wanted to invest in a real estate project. I

5

wanted to sell my company. I wanted the money. Whatever those reasons were, those were my God-given rights to do so, in my opinion.

[DE 55-13, P439, L5-14].

10.     The Appellees state "Mr. Khan demanded that Cinemex forfeit its right under the EPAs to a physical inspection of the SCG Theaters and access to SCG Theater employees. As evidenced by above-referenced communications, Mr. Khan sought to compensate for that deficiency by offering Cinemex a price discount." [Doc. #35, p.10].  At trial, Khan testified that he offered to send a private plane, to postpone closing, to discount the price, and to use a third party for purposes of bringing the Appellees to Houston, including for purposes of any inspections. [TR1 142:19-25, 143:1-25, 144:1-6]. The Appellees declined and refused to close.

## ARGUMENTS AND REPLIES

I.     **The Appellees Maintain They Did Not Breach the Illinois EPA Because the Illinois EPA Forbade a Closing Prior to April 10.**

The Appellees state they could not have breached the Illinois EPA by failing to close on March 26, 2020, since the Illinois EPA could not close prior to April 10, 2020. The Appellees failed to close the Illinois EPA, regardless of whether the closing date was March 26 or April 10.

6

The only difference between the EPAs was the "Enterprise Value" and the "Closing Date." Khan testified at Trial that the difference in Closing Dates was purely tax driven. [TR1, 95:6-14].

In the LOI provided by the Appellees on January 14, 2020, the Appellees offered to "*acquire 100% of the Business*" for the stated purchase price. DE 57 (emphasis added). "Business" was defined therein to include the *assets of all of the Companies*, including the Texas and Illinois theater operations. *Id.* Additionally, in the Bid provided by the Appellees on March 3, 2020, the Appellees offered to acquire "*the stock of all Star Cinema Grill entities* . . . on the terms set forth in the revised Equity Purchase Agreement [attached to the Bid as Annex I]." [DE 49-8] (emphasis added). The Equity Purchase Agreement attached to the Bid as Annex I was between the Appellees and the Appellants and included the Companies under the Texas EPA and the Illinois EPA; no separate agreement was provided. *Id.*

On February 19, 2020, the Appellees' counsel sent an e-mail to the Appellants' counsel and stated, "[w]e have connected with our client and they are amenable to the deferred closing structure and timeline you proposed (March 3 signing/March 26 closing)." The "deferred closing structure" referenced was the separate closing dates (March 26 and April 10).

The Appellees maintain that an "indivisible" agreement would result in "the language in the Illinois EPA prohibiting a closing prior to April 10 would extend to

7

both of the EPAs, such that *neither* could have closed prior to April 10." [*Response Brief*, p.21]. However, if the Texas EPA and Illinois EPA are interpreted as one integrated transaction, there is nothing prohibiting separate closing dates for separate theater assets. The Bid was for all of the equity interests, and the deferred closing structure was solely to accommodate Khan's desire for more favorable tax treatment. [DE 57].

The Appellees reference the integration clause of the Illinois EPA and point out that "'Entire Agreement'" as defined as "'[t]his Agreement, together with all Exhibits and Schedules hereto,'" and "'Agreement' is defined "exclusively as the equity purchase agreement of SCG-N Inc. (the Illinois theater)." [*Response Brief*, p.19]. The Appellees state that "despite that Illinois EPA's definition of 'Exhibits and Schedules' incorporates by reference schedules of the Texas EPA, it explicitly carves out disclosures related to the Texas entities as only belonging to the Texas EPA." *Id.*

The Illinois EPA actually provides, in part, that "[t]he parties hereto acknowledge and agree that (i) the 'Schedules' to the Texas Purchase Agreements will be treated as the Schedules for purposes of this Agreement [Illinois EPA]; and (ii) any disclosure related to each of [the Texas companies] . . . set forth in the Schedules will be treated as a disclosure to the representations and warranties set forth in the Texas Purchase Agreement." [DE 67, Section 12.10, p.63]. The notion

8

of any "carve out," as suggested by the Appellees, does not change the fact that the Illinois EPA incorporates the Schedules to the Texas EPA. *Id.*

The Illinois EPA also requires, as part of Khan's conditions precedent to closing the Illinois transaction, "[c]onfirmation that the transactions contemplated by the Texas Purchase Agreement have closed in accordance with the terms thereunder." [DE 67, Section 8.2(D)(3), p.45]. Accordingly, the parties agreed that closing the Texas EPA was a condition precedent to closing of the Illinois EPA.

Furthermore, the Texas EPA includes, as a condition to the Appellees' obligation to close the Texas transaction, that, on or prior to the Closing Date, Khan shall have delivered "[t]he Naperville Purchase Agreement, duly executed by the Equityholder and SGN-N Inc., a Texas corporation." [DE 66, Section 8.1(D)(6), p.46]. Finally, the proposed Escrow Agreement between the parties governed the escrow of "Texas Escrow Funds" and "Illinois Escrow Funds" following the closings under the Texas EPA and the Illinois EPA. [DE 52-10].

The EPAs were indivisible and part of an integrated transaction. When the Appellees breached the Texas EPA, they breached the Illinois EPA. Regardless of divisibility, the Appellants did not breach the Illinois EPA for the reasons stated herein, *infra.*

II.     **Cinemex Alleges It Did Not Breach the EPAs By Refusing to Close on March 26 Because the Khan Parties Failed to Satisfy All Conditions Precedent**

### A.    Cinemex Alleges The Khan Parties Did not Satisfy Section 8.1(D) Because They Could Not Provide an Executed Escrow Agreement  Before Closing

The Appellees state they were under no obligation to close on March 31, 2020, as "[t]he Texas EPA did not require closing until April 30; the Illinois EPA did not require closing until May 31 and precluded a closing before April 10." [*Response Brief*, p.23]. Therefore, the Appellees believe they were under no obligation to provide the KYC (know your customer) information in time to enable a March 31, 2020, closing. *Id.*  For the reasons set forth in the Brief and herein, *supra*, the Closing Dates are governed by Section 3.1 of the EPAs and not Section 9.1, which governs termination. [DE 66 and DE 67, Sections 3.1 and 9.1]. Section 3.1 of the EPAs provides the "Closing Date" shall occur not later than two business days following satisfaction (or waiver) of the conditions precedent to closing in Article 8. *Id*. at Sections 3.1. Section 7.4 of the EPAs provides, in part, "[e]ach Party will use reasonable best efforts to cause the conditions to Buyer, the Companies' and the Equityholder's respective obligations to consummate the Closing to be satisfied." [DE 66 and DE 67, Section 7.4].

Finally, Section 8.3 of the EPAs provides, in part, "[n]o Party may rely on the failure of any condition set forth in this ARTICLE 8 to be satisfied if such failure was caused by such Party's failure to use commercially reasonable efforts to cause

10

the Closing to occur, as required by <u>Section 7.4(A)</u>." [DE 66 and DE 67, Section 8.3].

The Appellees were obligated to use commercially reasonable efforts to provide the KYC information, so that the escrow agreement could be executed and delivered. The Appellees state that the Khan Parties cite no evidence to support a finding that the Appellees failed to use commercially reasonable efforts to provide the KYC information. [*Response Brief*, p.24]. However, if the Appellees had provided, or, for that matter, made any effort to provide, the KYC information, the Appellees surely would have argued same, and the Appellees silence is telling. Both the Bankruptcy Court and the Appellees reference a March 18, 2020, e-mail, in which the Khan Parties' counsel advised, "[i]n terms of lead time issues, the Escrow Agent will need Buyer's KYC information at least 5 business days prior to Closing (3/25). I've *reattached* those items for your convenience, we ask that your please *prioritize* these requests." [DE 75] (emphasis added). Five business days would have actually been March 24, as opposed to March 25, 2020. As noted, the Khan Parties' counsel "reattached" the items and requested that the Appellees prioritize the requests. *Id*.  One of the exhibits admitted into evidence at Trial was an e-mail chain between counsel for the parties, which included e-mails dated ***March 11 and 12, 2020***, in which reference is made to the attached KYC requirements of the escrow agent. [DE 53-2, p.5 of 7] (emphasis added); *see also* [DE 66 and DE 67] ("Escrow

11

Agent" is defined as Wells Fargo Bank, N.A. under the EPAs). Another exhibit in evidence was a "Closing Checklist" containing a comment providing, "Honigman [Khan Parties' counsel] sent KYC requirements to STB [Appellees' counsel] on 3/12/2020." [DE 53-3, p.2, item 4]. Finally, Debtors' Exhibit 146, which was a "Closing Checklist", denotes that the "KYC Requirements" were "circulated 3/12". [DE 53-18, p.6 of 17]. Accordingly, the Appellees had the KYC Requirements as early as *March 12, 2020*. As Marti testified at Trial, "[o]n March 12, 2020, the objective was to try to close on March 31st . . .." [TR3 626:1:25; TR3 627:1-5]. On March 18, 2020, the Khan Parties' counsel again requested that the Appellees prioritize the requests. [DE 75]. If the Appellees had made "commercially reasonable efforts" to provide the KYC information when requested, a closing could have taken place by March 26, 2020, and certainly by March 31, 2020. The Appellees cannot use any failure to provide an executed Escrow Agreement as a basis to avoid closing, as the Appellees prevented the satisfaction of the condition precedent, if not otherwise waived by the Appellees. If the Appellees' argument is correct, the Appellees could simply avoid or delay providing the KYC information and wait until the termination date under Section 9.1 of the EPAs, which is why Section 8.3 is included in the EPAs.

The Appellees state they did not waive the condition of an escrow agreement, since (a) they could "only waive a condition to closing expressly 'in a writing

executed by the Buyer'"[*Response Brief*, p.26]; and (b) the parties Joint Pretrial Statement invokes Section 8.1 in its entirety as a condition to close and, therefore, this alone was sufficient to preserve the issue. *Id.*

Notwithstanding the Appellee's reliance on the Joint Pretrial Statement (the agreed upon version of which was filed by the parties on June 17, 2021 - a non-final version was unilaterally filed by the Appellees on May 20, 2021 – the first day of Trial), the Bankruptcy Court noted (at the conclusion of day 1 of the Trial, "if there is something you don't agree with, it drops down to the disputed area, okay?" [TR1 273:5-7]. The Appellees' counsel requested clarification and stated, "for the disputed statements of fact and disputed statements of law, the idea is we kind of all put anything that's disputed, it's not that it's his sort of – Mr. Seese's version of the law I don't like, in other words, on those two. It's just, those are kind of like the, the grab bag of everything that's left that we can't agree on in the first place, is that right?" [TR 1 273:12-20].  In response, the Bankruptcy Court stated, in part, "That is correct[.]" [TR 1 273:21]. Under the "Issues of Law to be Litigated" appeared. "1. Whether the necessary conditions precedent to closing under the Agreement were **satisfied, waived, or excused**." [DE 177, p. 9 of 12] (emphasis added). Accordingly, any issue as to whether the condition to provide an executed Escrow Agreement was waived or excused was properly preserved.

**B.      The Appellees Assert the Khan Parties Did Not Satisfy Section 8.1(B) Because They Did Not Satisfy at Least Five Covenants in Article 7 of the EPAs**

**1.      The Khan Parties Did Not Provide Reasonable Access to and the Right to Inspect All Premises and Contracts as Required by Section   7.2**

Appellees state the Khan Parties failed to satisfy Section 8.1(B) of the EPAs, since the Khan Parties had "not provided all contracts." [*Response Brief*, p.28]. The Appellees do not reference any section of the EPAs obligating the Khan Parties to provide "all contracts" to the Appellees. On the other hand, Section 5.10 of the EPAs, includes Schedule 5.10(A), which obligated the Appellants to list all "material contracts," as defined therein. [DE 66 and DE 67, Sections 5.10]. Additionally, Section 7.2 of the EPAs provides that the Appellees shall have "***reasonable access*** to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company Group." *Id.* at Section 7.2 (emphasis added). In the Opinion, the Bankruptcy Court referenced a <u>single</u> e-mail, dated March 19, 2020, from an employee of the Appellees, to one of the Khan Parties' executives, requesting certain contracts. [DE 244, p.34, ¶127; DE 50-1]. On March 19, 2020, the Appellees' employee sent an e-mail requesting "copies of the contracts relating to theater operations." [DE 50-1]. On the same day, the Khan Parties' executive responded and stated that "[a]ll contracts are in the VDF [Data Room]. If you are looking for some[thing] specific, we can send directly to

14

you." *Id.* On March 27, 2020, the Appellees' employee sent another e-mail advising that another employee had checked the data room and could not locate five contracts and, if available, requested copies. *Id.* On the <u>same day</u>, the Khan Parties' executive responded and provided copies of contracts and advised that he was awaiting a copy from the vendor representative. *Id.* The Appellees do not allege that any of the contracts at issue were material contracts.

In the Bid, the Appellees provided, in part, "CMX hereby acknowledges that it has had an opportunity to conduct due diligence regarding the Company prior to making this Offer and has completed the bulk of its due diligence, with on a few areas pending, which are mainly confirmatory." [DE 38]. The Appellees submit that "any and all understandings, including those in the LOI [Bid], were superseded by those in the EPAs. [*Response Brief*, p.30]. However, in Section 6.7(A) of the EPAs (Appellees' representations and warranties) provides:

> Buyer and its representatives have … been provided with and . . . evaluated such documents and information as each of them have deemed necessary to enable them to make an informed decision with respect to the execution, delivery and performance of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereunder. Buyer and its representatives have received materials relating to the business of the Company Group and have been afforded the opportunity to obtain any additional information, in each case, that they deem necessary to make an informed decision with respect to the merits of the acquisition of the Equity Interest.  Buyer and its representatives have reviewed all of the documents, records, reports and other materials made available by (or on behalf of) the Company Group in the online data room created for

the transaction or identified in the Schedules and is familiar with the content thereof.

[DE 66 and DE 67, Sections 6.7(A)].

It is unlikely the Appellees would submit a binding offer in the amount provided without having been satisfied with the due diligence performed, as represented in the EPAs. The Appellees enjoyed access to the Data Room since approximately January 21, 2020 (DE 59), and, according to Marti's Trial testimony, "[t]here was no limitation on the communication between the SCG employees and Cinemex." [TR3 624:19-23; TR3 625:1-2].

### 2. The Appellees Allege that the Khan Parties Did Not Provide Cinemex Reasonable Access to, and the Right to Inspect the Premises

The Appellees believe the Bankruptcy Court correctly held that "'the Khan Parties did not provide reasonable access to the theater by foreclosing Cinemex's ability to conduct the inspections – either by waiting to see if the theaters would open closer to the Outside Closing Date, or at least taking additional time to come to another resolution.'" [*Response Brief*, p.31] (quoting DE 244, p.35).

Performing an inspection was not a condition precedent to closing. [DE 66 and DE 67, Section 8.1]. Regardless, there is no dispute the Khan Parties afforded the Appellees such access and the right to conduct an inspection. During Trial, Marti testified that "Star Cinemea Grill never denied us having

16

access to their theaters[,]" (TR3 625:3-9) in response to whether any of the Khan Parties "prevented, impeded or denied Cinemex or its representatives from conducting any physical inspections of the Star Cinema Grill Theaters" between "March 10th and March 24th [2020]". *Id.; see also* Brief, p.42.

Even if inspections were a condition precedent, the Appellees cannot prevent the satisfaction of such condition precedent. [DE 66 and DE 67, Sections 8.3]. As the Bankruptcy Court found and concluded, "[t]here is a dispute . . . as to whether an inspection of the SCG Theaters while they were closed would satisfy Section 7.2 of the EPAs . . . [,] Cinemex has not indicated where in the EPAs a physical inspection must take place while the theaters are operating". [DE 244, p.36, ¶133]. The Bankruptcy Court further noted that "Mr. Marti testified as to a variety of reasons why the inspections needed to occur while the theater was in operation, but other than timing delivery of food and the food to table experience, the other 'live experience' requests seemed to have occurred during the February Tours." *Id.* The Bankruptcy Court also found that "Cinemex *did* tour the theaters were operating during the February Tours." *Id.* (emphasis in original). During Trial, Marti attempted to differentiate the Marketing Tours from an inspection; however, during Marti's deposition given during the case, in response to questioning regarding inspections, Marti testified "[w]ell, I have not performed or been on one of

17

those visits, so I don't know exactly." "I've never been on one, so you would have to ask a technician or an operations person." [DE 85, L 9-15].

Finally, in their March 24 Response, the primary reason for not closing was because "key personnel are located in Mexico City and cannot get to Houston regardless because the US/Mexico border is closed." [DE 104-10]. The US/Mexico border was not closed. [DE 46-16].

### 3.   The Khan Parties Did Not Conduct Business in the Ordinary Course, as Required by Section 7.1(A)(a)

The Appellees state the Khan Parties violated Section 7.1(A)(a) of the EPAs due to their alleged failure to "conduct the Business in the Ordinary Course" and to "keep available the services of their respective directors, officers and employees[.]" [*Response Brief*, p.34].

In citing *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC,* CV 2020-0310-JTL, 2020 WL 7024929, at *70 (Del. Ch. Nov. 30, 2020), *aff'd* 2021 WL 5832875 (Del. Dec. 8, 2021) ("MAPs"), the Appellees contend that the MAPs decision should not be distinguished, as argued by the Khan Parties based on the MAPs court's use of the word "only" and the absence of a "commercially reasonable efforts" qualifier in the purchase agreement considered. [*Response Brief*, p.36]. The Appellees state "both are distinctions without a difference." *Id*. The Appellees further state "the court in MAPS nowhere asserts that its decision to limit the comparison to that seller turned on the word 'only,' and "the ordinary course

18

provision [in the EPAs] limits 'consistent with past practice' to the ordinary course of the specified Person – not *any* person." *Id.* The Appellants disagree for the reasons set forth in the Brief.

The Appellees also deem the absence of a "commercially reasonable efforts" qualifier in the MAPS case (the EPAs <u>include</u> such a qualifier) as "irrelevant for purposes of this Court's analysis because under any standard, voluntarily furloughing all of their employees [was] . . . not commercially reasonable, as the Bankruptcy Court found." [*Response Brief*, p.38].

The Bankruptcy Court found that "the Khan Parties used commercially reasonable efforts to *temporarily* suspend operations of the SCG Theaters[.]" [DE 244, p.28, ¶109] (emphasis added). Although the Bankruptcy Court found that closing the theaters was commercially reasonable, the Appellees maintain the Bankruptcy Court was correct in finding it was *not* commercially reasonable to furlough the Khan Parties' employees, despite the Bankruptcy Court having found that "[i]t appears there was no reason for the furloughs other than to save costs." [DE 244, p.33, ¶123]. In the EPAs, the "commercially reasonable efforts" qualifier applies to conducting the Business in the Ordinary Course *and* keeping available the services of their respective directors, officers, and employees. [DE 66 and DE 67, Sections 7.1(A)].

Furloughing employees to save costs was commercially reasonable if, as the Bankruptcy Court found, closing the theaters was commercially reasonable. Theater closures impacted revenues and, therefore, it could only have been commercially reasonable to furlough employees to avoid employees working without pay.

Despite the Appellees' position that use of the commercially reasonable efforts qualifier in the EPAs was "irrelevant," the Supreme Court of Delaware, in considering an appeal of the MAPs decision, held that (in analyzing the agreement at issue in MAPs), "the covenant [ordinary course of business] is absolute – it does not have a reasonableness qualifier. The parties included commercially reasonable efforts qualifiers elsewhere in the contract, even in the same sentence – making the absence in the relevant party of the covenant [ordinary course] all the more conspicuous. Looking to the actions of other hotels in the industry to judge pandemic response is more analogous to a commercially reasonable efforts provision." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2021 Del. LEXIS 386, at *29 (Del., Dec. 8, 2021). In a sworn declaration submitted on behalf of Marti in the Bankruptcy Court, he stated that the Appellees "entire operations" "ground to a halt." [DE 45-9, p.4, ¶12]. Marti further stated, "[a]ll 41 theaters . . . shut down, all but approximately 30 of Cinemex's 2,500 employees [were] . . . laid off, and Cinemex . . . [had] not received any revenues from movie sales since on or around March 20, 2020." *Id.* The Appellees closed their theaters and actually laid off (as

opposed to furloughing) approximately 99% of their employees. In the Response Brief, the Appellees cite to the Merriam-Webster dictionary. So, too, the Khan Parties reference Merriam-Webster for a definition of "furlough" defined, in part, as "a temporary leave from work that is not paid and is often for a set period of time". MERRIAM-WEBSTER.COM,         "*Furlough,*"         https://www.merriam-webster.com/dictionary/furlough. If the Appellees had closed the transaction, they could have likely brought back the "temporarily" furloughed employees, even if furloughed prior to April 1, 2020.

Finally, the Appellees argue that removal of the Khan Parties culinary director "denied Cinemex their right to interview theater-employees" (*Response Brief*, p.44); however, Marti testified at Trial that "[t]here was no limitation on the communication between the SCG employees and Cinemex" between March 10 and March 24, 2020. [TR3 623:16-25; TR3 624:19-25; TR3 625:1-2.] The Appellees, in referencing Khan's deposition testimony, state, "the Khan Parties removed the SCG Theaters' culinary director, Michael Pawlowski, prior to March 24 with no intention of replacing his role due to COVID-10." [*Response Brief*, p.44] (citing DE 55-12, 183:20-184:18). However, in response to a question as to whether the culinary director had left because he did not want to be involved in the company under new management or . . . the Khan Companies decision that he move on, Khan testified he thought "it was a combination of both." *Id.* at 184:9-16. Under Section 7.1(A)(d),

21

"resignations in the Ordinary Course" are excluded from the covenant. [DE 66 and DE 67, Sections 7.1].

Finally, the Appellees attempt to distinguish the Cineplex case (*Cineplex Inc. and Cineworld Group PLC and 1232743 B.C. Ltd.*, 2021 ONSC 8016). *Response Brief*, p.40. At the outset, Cineplex and MAPs may be the only published post-COVID opinions dealing with the subject matter before the Court.  In Cineplex, the agreement at issue contained a material adverse effect clause excluding "outbreak of illness" as a material adverse effect. *Cineplex Inc., 2021 ONSC,* at p.8. The Cineplex court held that it "must read the agreement as a whole and not interpret the clause in a way that negates any other provision of the . . . [agreement]." *Cineplex Inc., 2021 ONSC* at p.8; *see Estate of Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del. 2010)("We will read a contract as a whole and we will give each provision and term effect, so as not to render nay part of the contract mere surplusage.")(quoting *Kuhn Const., Inc. v. NBC Universal,* 990 A.2d 392 (Del. 2010)). The Cineplex court concluded that that "the Company Material Adverse Effect clause squarely addressed the risk of a pandemic and allocated that systemic risk to the buyer, Cineworld." *Id.* at 20. Although the MAPs court found the "material adverse effect" clause excluded pandemics, the court refused to excuse compliance from the ordinary course covenant, in part, since the material adverse effect clause was not tied to the ordinary course covenant. *AB Stables VIII LLC v. Maps Hotels and Resorts One LLC,* 2020

WL 7024929, at *181-185 (Del. Ch. 2020). Unlike the court in MAPs and the Bankruptcy Court, the Cineplex court held that the parties allocated the risk of a pandemic to the buyer and concluded that "Cineplex [seller] cannot be held in default of the Ordinary Course covenant when it was prevented from conducting its normal day-to-day operations by government mandate." *Id.* at 24. The actions "taken by Cineplex . . . were commercially reasonable efforts to maintain and preserve the business once the theaters were closed." *Id.* In the EPAs, the parties unequivocally allocated the risk of a pandemic to the Appellees and, therefore, the pandemic should not be a basis for declaring the Appellants in default of Sections 7.1(A) of the EPAs. [DE 66 and DE 67, p.9].

The Appellees also state that the exception appearing in Sections 7.1(A)(ii) should not excuse compliance with Sections 7.1(A)(a) and (A)(d) of the EPAs. [*Response Brief*, p.41]. For the reasons set forth in the Brief, the Appellees' interpretation would render Section 7.1(A)(ii) a nullity.

### 4. The Khan Parties Did Not Use Reasonable Best Efforts to Cause the Closing to Occur, as Required by Section 7.4

For the reasons stated in the Brief and this Reply, the Khan Parties believe they made every effort to cause the closing to occur.

### II. The Khan Parties Breached the EPAs by Wrongly Declaring a Repudiation by Cinemex and Filing the Texas Action

The Appellees maintain the Khan Parties repudiated the EPAs, since the March 24 Response was not an "'unequivocal statement'" that Cinemex intended to no longer perform its obligations under the EPAs." [*Response Brief*, p.50]. The Appellees further maintain that "[a]t no point did Cinemex ever indicate it would *never* close the transaction if, in contrast to the circumstances at the time, the closing conditions had been met." *Id*.

In the March 24 Response, the Appellees' counsel advised "in light of the COVID-19-related fallout, Cinemex will not and is not obligated to close *this transaction*. [DE 104-11]. Among other things, Cinemex's operations and finance teams lack pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters[,]" and "key personnel are located in Mexico City and cannot get to Houston because the US/Mexico border is closed." [DE 104-11] (emphasis added). For the reasons stated in the Brief and this Reply, *supra*, the Appellees did not lack access to the Star Cinema theaters or the Corporate Employees managing the theaters, as was confirmed by Marti during Trial. [TR3 625:1-2; TR3 623:8-15; TR3 623:16-25; and TR3 624:19-25]. And while the border was closed to land travel, those restrictions did not apply to air travel or persons conducting business in the United States [DE 46-16].

Marti testified at Trial that "[Cinemex] didn't say that we are not going to close anymore." [TR3 544:20-27]. If true, however, Cinemex could have simply

accepted Khan's offer to postpone closing. The Bankruptcy Court held that, "on March 28, 2020, Cinemex offered to postpone the closing and provide Khan with a $20 million-dollar interest free loan, but proposed terms that Khan testified were not acceptable to him." [DE 244, p.16, ¶68]. Despite the Bankruptcy Court's findings, a term of the offer provided that the EPAs would be *terminated*, which is not the same thing as postponing the closing. [DE 50-4].

While the Appellees maintain that the Khan Parties "cannot identify any clear statement demonstrating that Cinemex would no longer perform its obligations under the EPAs[,]" (*Response Brief*, p.51), the March 24 Response, together with the Appellees' rejection of the alternatives offered by Khan (all of which were offered prior to commencing the Texas Litigation), amounted to a clear and unequivocal statement that the Appellees had no intention of closing the transaction. Richard Brail, the Khan Parties' investment banker, testified at Trial that "it became very clear, especially on the 25th [March], that they [Debtors] had no intention of closing . . .." [TR2 330:21-25].

The Appellees state, as the Bankruptcy Court found, that the Khan Parties breached the EPAs by (a) wrongfully declaring that the closing conditions had been satisfied, and (b) commencing the Texas Litigation prior to April 10, 2020. [*Response Brief*, p.51]. For the reasons stated in the Brief and this Reply, the conditions precedent to closing were either satisfied, waived and/or excused, and the

commencement of the Texas Litigation, prior to April 10, 2020, was not a breach of the Illinois EPA. Moreover, on April 1, 2020, the Khan Parties filed a verified original complaint against the Appellees before the United States District Court for the Southern District of Texas (the "Complaint"). [DE 45-19]. In Paragraph 24 of the Complaint, the Khan Parties alleged "[t]hat email [the March 24 Email] also served to notify Cinemex that Khan had satisfied all of the Closing Conditions as of that date and, pursuant to the Agreement, that Closing must take place within two business days – *i.e.*, **by March 26 (or April 10 as to SCG-N)**." [DE 45-19, p.14, ¶44] (emphasis added). Moreover, under Count I of the Complaint, the Khan Parties alleged, in part, "the Agreement required Cinemex to close the *initial* Transaction by March 26 (and on April 10 with respect to Cinemex's acquisition of SCG-N)." *Id.* at p.19, ¶66 (emphasis added). The Khan Parties alleged the conditions precedent were satisfied, and "the Agreement required Cinemex to close the *initial* Transaction by March 26 (and on April 10 with respect to Cinemex's acquisition of SCG-N)." *Complaint,* p.19, ¶66 (emphasis added). Accordingly, the Khan Parties were not requesting that the Illinois EPA close prior to April 10, 2020, and, therefore, did not repudiate or breach the EPAs.

Finally, the Appellees never raised any breach of the Illinois EPA by the Khan Parties, prior to commencement of the Texas Litigation. The Appellees also did not allege any such breach in the March 24 Response (DE 104-10), the March 26

26

Response (DE 105-1), the *Motion to Dismiss Plaintiffs' Verified Original Complaint* filed in the Texas Litigation (DE 45-24), or the Amended Objection (DE 756).

## **CONCLUSION**

The Khan Parties respectfully request that this Honorable Court reverse the Court's Opinion and remand for further proceedings.

Respectfully submitted,

*/s/ Michael D. Seese*
Michael D. Seese, Esq. (FBN 997323)
SEESE, P.A.
101 N.E. 3rd Avenue, Suite 1270
Fort Lauderdale, Florida 33301
Telephone No. (954-745-5897
mseese@seeselaw.com

*Counsel for the Appellants*

27

## <u>CERTIFICATE OF COMPLIANCE</u><br><u>WITH RULE 8015(a)(7)(B)</u>

**I HEREBY CERTIFY** that this Reply complies with the type-volume

limitation of Rule 8015(a)(7)(B), Fed.R.Bankr.P., as this Reply contains 6,492

words, excluding those sections exempted under Rule 8015(a)(g).

*/s/ Michael D. Seese*
Michael D. Seese, Esq.
FBN 997323

28

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the *Reply Brief of the Appellants* has been filed and served electronically via the Court's CM/ECF system upon all parties registered to receive electronic notice in this case on this 15th day of March 2022.

*/s/ Michael D. Seese*

Michael D. Seese, Esq.

29