UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-cv-23675-ALTMAN/Reid

**DISTRICT THEATERS, INC.**, *et al.*,

    *Appellants,*

*v.*

**CINEMEX HOLDINGS USA, INC.**, *et al.*,

    *Appellees.*

_____/

## ORDER AFFIRMING BANKRUPTCY COURT

The Khan Parties[1] appeal the Bankruptcy Court's final decision, disallowing their claims against the Debtors.[2] *See In re: Cinemex Holdings USA, Inc.*, Case No. 20-14696-LMI (the "Bankruptcy Case") [Bankr. ECF No. 244].[3] Having carefully examined the briefs and the record—and for the reasons outlined below—we **DENY** the appeal and **AFFIRM** the Bankruptcy Court's Order in full.[4]

---

[1] What we call the Khan Parties are actually the following group of individuals and entities: Omar Khan; S.C.G.C. Inc.; SCGM Inc.; SCG-B Inc.; SCG-VP Inc.; District Theaters Inc.; SCGWR LLC; SCG-CS Inc.; SCGK Inc.; SCG-SW Inc.; SCG-WL Inc.; and SCG-N Inc.

[2] The Debtors (or "Cinemex," as we'll sometimes refer to them) are Cinemex Holdings USA, Inc.; Cinemex USA Real Estate Holdings, Inc.; and CB Theater Experience LLC.

[3] We'll be referring to two bankruptcy dockets: Case No. 20-14696-LMI, the lead case, in which Cinemex Holdings USA, Inc., and Cinemex Real Estate Holdings, Inc., are the debtors; and Case No. 20-14695-LMI, an associated case, in which Cinemex USA Real Estate Holdings, Inc., is the only debtor. We'll refer to docket entries in Case No. 20-14696-LMI as "Bankr. ECF No." and docket entries in Case No. 20-14695-LMI as "Assoc. Bankr. ECF No."

[4] Pursuant to Federal Rule of Bankruptcy Procedure 8019(b)(3), we find that the parties have adequately presented the facts and legal arguments in their papers—and that, as such, oral argument is unnecessary. This appeal, in short, is ripe for resolution.

## THE FACTS[5]

As often happens in bankruptcy, this appeal comes to us after a deal went sideways. Omar Khan "is the sole owner of" the Khan entities. Appellant's Initial Brief ("Initial Br.") [ECF No. 31] at 2. Each of those entities owns a Star Cinema Grill—a "dine-in theater" that also "offers food and beverage[s] to go." *Ibid.* The Khan Parties operate "10 theater locations in Texas" and "one theater in Naperville, Illinois." Bankruptcy Court's Memorandum Opinion on Objection to the Khan Parties' Claims ("Mem. Op.") [ECF No. 1-1] ¶ 2.

In December 2019, Mr. Khan "engaged PJ Solomon, an investment banking firm, to assist" in selling his ownership interest in the Khan Parties. Appellees' Response Brief ("Resp. Br.") [ECF No. 35] at 3; *see also* Engagement Letter [ECF No. 28-34]. To prepare for the sale, PJ Solomon created an electronic data room. *See* June 18, 2021, Hearing Transcript ("June 18 Hr'g Tr.") [ECF No. 28-77] at 298:14–18 ("PJ Solomon prepare[d] and . . . worked with the company and the company's counsel to populate the data room."). This data room included commercial information about the Khan Parties, such as outstanding vendor contracts, lease agreements, documents pertaining to concessions, financial information about each theater, information about the employees and their benefits and compensation, and extensive information about the properties themselves. *See id.* at 298:19–299:9. PJ Solomon then circulated a letter to potential bidders, including Cinemex, informing them of Khan's interest in selling his stake and inviting them to submit "preliminary proposals" by January 14, 2020. Initial Process Letter [ECF No. 27-6] at 160.

---

[5] The facts are taken from the bankruptcy record. *See* Bankruptcy Transmittal of Designated Record to District Court ("Bankr. R.") [ECF No. 27]; Supplement [ECF No. 28]. The agreements governing this dispute—the Texas Equity Purchase Agreement ("Tex. EPA") and the Illinois Equity Purchase Agreement ("Ill. EPA")—can be found at Bankr. R. [ECF No. 27-4] at 25–103 & 104–177, respectively. Since we cite them so often (and because they're included in the record in separate places), we'll refer to them by their original pagination—*i.e.*, we'll refer to the first page of the Texas EPA as Tex. EPA at 1, rather than Bankr. R. at 110.

Cinemex is the U.S. subsidiary of Grupo Cinemex S.A. de C.V., a Mexican theater company. *See* Corp. Ownership Statement [Bankr. ECF No. 3] at 1. Interested in "acquiring an upscale dine-in movie theatre circuit offering scratch-made food and plush recliners," Resp. Br. at 2, Cinemex submitted a non-binding, initial bid of approximately $87.5 million for Khan's ownership stake, *see* Non-Binding Offer Letter [ECF No. 28-8] at 2. After receiving this bid, PJ Solomon granted Cinemex access to the data room. *See* January 15, 2020, Email Exchange [ECF No. 28-9] at 2 ("[W]e would like to invite you into the second round for Star Cinema Grill . . . . Data Room will open tomorrow."); *see also* January 21, 2020, Email Exchange [ECF No. 28-10] at 3 ("For parties invited to participate in the second round, the data room will open immediately thereafter[.]"). After gaining access, Cinemex requested that the Khan Parties "further populate the data room" and asked "specific" questions about the existing documents. June 18 Hr'g Tr. at 305:22–25. The parties then had several "conference calls set up to cover various specific topics" relating to the transaction. *Id.* at 306:1–3. "On February 5–6, 2020, representatives of Cinemex traveled to Houston for management meetings and tours of all of the Texas theaters." Joint Pretrial Stipulation [Bankr. ECF No. 177] ¶ 10. The tours covered each theater's "lobby, box office, concession area, auditoriums, kitchens, bathrooms, and projection rooms." Mem. Op. ¶ 17. The tours did not cover any HVAC or roof inspections. *See* June 18 H'rg Tr. at 311:24–312:1 ("Q: . . . [W]ere there any inspections of the roofs or HVACs? A: No[.]"). And none of Cinemex's IT representatives attended the tours. *See* Initial Br. at 8 (noting the IT representatives' "absence from the Tours").

After the tours, PJ Solomon sent Cinemex a process letter providing the "guidelines . . . to submit a final, binding offer[.]" Final Process Letter [Bankr. ECF No. 104-7] at 2. This letter made clear that "the deadline for submission of final proposals is . . . March 3, 2020," *id.* at 2; that the Khan Parties expected "that each Offer would be able to close the acquisition no later than March 31, 2020," *id.* at 4; and that "[i]nspections [were] expected to occur after signing of an Agreement," *ibid.* In

compliance with the process letter, Cinemex submitted a binding offer of $75 million on March 3, 2020. *See* Final Offer Letter [ECF No. 28-1] at 30 ("CMX is prepared to pay a purchase price of $75,000,000[.]"). After some negotiation, Cinemex increased its bid to $83 million. *See* Exclusivity Letter [ECF No. 28-2] at 175–77 (quoting "a purchase price . . . of US$83 million"); *see also* May 20, 2021, Hearing Transcript ("May 20 Hr'g Tr.") at 256:5–13 ("Q: . . . [D]id you at any point ask Cinemex to increase their binding offer? A: I believe so, yes."); Resp. Br. at 5 ("Following those discussions, Cinemex increased its binding offer[.]").

On March 10, 2020, the parties "entered into two equity purchase agreements[.]" Joint Pretrial Stipulation ¶ 14. The first Equity Purchase Agreement ("EPA") concerned the Texas theaters, and the second involved the Illinois theater. *See* Initial Br. at 14 (defining the first agreement as the "Texas EPA" and the second as the "Illinois EPA"). The Texas EPA provided an "outside closing date" of April 30, 2020, while the Illinois EPA gave an "outside closing date" of May 31, 2020.[6] *See* Tex. EPA at 49; Ill. EPA at 46. The Illinois EPA also provided that the parties *could not* close the Illinois transaction before April 10, 2020. *See* Ill. EPA at 18 ("[I]n no event shall Closing take place prior to April 10, 2020[.]"). Within those confines, both EPAs stipulated that closing "shall be no later than the second Business Day after satisfaction . . . of the conditions set forth in ARTICLE 8." Tex. EPA at 19; Ill. EPA at 18 (same).

---

[6] The "outside closing date" was the date after which either party could terminate the EPA if the deal had not closed. *See* Tex. EPA at 49 ("This Agreement may be terminated at any time prior to the Closing . . . by Buyer or Equityholder, if on or after 5:00 p.m. Eastern Time on April 30, 2020; provided that . . . the failure of such Party to perform or comply with any of its obligations under this Agreement has [not] been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date."); Ill. EPA at 46 ("This Agreement may be terminated at any time prior to the Closing . . . by Buyer or Equityholder, if on or after 5:00 p.m. Eastern Time on May 31, 2020; provided that . . . the failure of such Party to perform or comply with any of its obligations under this Agreement has [not] been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date.").

Once the EPAs were executed, Cinemex and the Khan Parties agreed that Cinemex would come to Houston on March 17, 2020, to inspect the theaters there. *See* Resp. Br. at 13 ("[O]n March 13, Cinemex confirmed to the Khan Parties that its operations and HR teams would travel to Houston on March 17 to inspect the Houston-area SCG Theatres."); *see also* March 13, 2020, Email Exchange [ECF No. 28-5] at 31–34 ("I can confirm the Operations team . . . will travel on Tuesday to Houston."). It was important to Cinemex to "inspect a functioning theater." July 9, 2021, Hearing Transcript ("July 9 Hr'g Tr.") [ECF No. 28-78] at 524:16–19. But a day or two before the inspections were supposed to take place, Cinemex told the Khan Parties that it needed to postpone the trip until Cinemex could learn more about the escalating COVID-19 pandemic. *See id.* at 521:17–23 ("Q: Why did you postpone [the inspection]? A: . . . [W]e were worried about the health of . . . our people."); *see also* November 12, 2020, Deposition of Omar Khan ("Khan Dep. Tr. 2") [ECF No. 28-7] at 407:16–23 ("I think March 16th . . . I learned that the trip was canceled."). Cinemex's caution proved prescient: On March 16, 2020, Houston's city and county governments ordered that all restaurants close, except for those offering "pickup, delivery, or drive-thru services[.]" KHOU 11 Coronavirus Updates [ECF No. 27-5] at 678.[7] In response, on March 17, 2020, the Khan Parties announced that they would

---

[7] It wasn't immediately clear to the Khan Parties that this order "cover[ed] movie theaters." March 16, 2020, Email [ECF No. 27-5] at 2151. By March 19, 2020, however, Texas's Governor Greg Abbott had issued an executive order prohibiting "gatherings of 10 or more people[.]" March 19, 2020, Email [ECF No. 27-5] at 2149; *see also* OFF. OF THE TEXAS GOVERNOR, TEXAS EXEC. ORDER NO. GA-08 (Mar. 19, 2020), https://gov.texas.gov/uploads/files/press/EO-GA_08_COVID-19_preparedness_and_mitigation_FINAL_03-19-2020_1.pdf ("[E]very person in Texas shall avoid social gatherings in groups of more than 10 people."). And, on March 24, 2020, the City of Houston, Harris County, and Fort Bend County issued stay-at-home orders, requiring all but essential businesses to close. *See* KHOU 11 Stay at Home Order Summary [ECF No. 27-5] at 646; *see also* March 24, 2020, Stay Home, Work Safe Order [ECF No. 27-5] at 628–9 ("All businesses operating within Harris County, except Essential Businesses. . . are required to cease all activities . . . . [M]ovie theaters . . . shall close."). That said, the Khan Parties now maintain on appeal that, because the SCG Theaters served food, they qualified as an "essential business" and weren't required to close. *See* Initial Br. at 48 (arguing that, "[a]s an Essential Business," the theaters "were, technically, authorized to operate, since they were able to provide food and beverage for takeout"). Put a pin in this because it will become important later.

"temporarily close[ ] [their] 10 theaters in Texas and Illinois." Houston Chronicle Article [ECF No. 27-5] at 688; *see also* March 17, 2020, Email [ECF No. 27-5] at 2150 ("[A]ll Star Cinema Grill Locations and District Theatres are temporarily closed due to COVID-19 as of Monday, March 16th[.]"). At some point after the theater closures, "a hundred percent of the [hourly and salaried employees] were furloughed[.]" Khan Dep. Tr. 2 at 345:15–17.[8] So, Cinemex decided to "postpone" its inspection of the theaters until it was "safe and the theaters [were] operating." July 9 Hr'g Tr. at 525:13–526:2.

Despite this postponement, the parties tried to work towards closing the EPAs. *See* March 18, 2020, Email [ECF No. 28-2] at 8 ("To continue moving forward with the Closing, the following are the main points of contact from CMX in each department."); March 19, 2020, Email Exchange ("March 19 Email Exchange") [ECF No. 28-2] at 5 (providing a list of items Cinemex would need to complete the Closing, with responses from the Khan Parties). On March 20, 2020, however, things began to sour. Mr. Khan emailed Cinemex's president and CEO, Jose Martí, saying: "I hope you are on track to close on [March] 31ˢᵗ ?? can please call me or provide an update asap." March 20, 2020, Email [ECF No. 28-3] at 2 (errors in original). Mr. Khan followed up several times over the next three days—and even included, in one of these communications, a warning that this "could turn [into a] very bad situation and neither one of us want that. Good luck!!" March 21, 2020, Email [ECF No. 27-5] at 652.

---

[8] The parties dispute the exact timing of the furloughs. Mr. Khan testified at trial that the furloughs didn't occur "until almost March—April 1st, or after the month was over, after the breach had occurred." May 20, 2021, Hearing Transcript ("May 20 Hr'g Tr.") at 222:13–14. But this self-serving testimony was contradicted by Mr. Khan's own deposition, where Mr. Khan said that the furloughs occurred either "a few days after . . . all the theaters closed on March 17th," Khan Dep. Tr. 2 at 345:14–15, or "probably a week or ten days later," *id.* at 346:8. At the latest, then, this testimony places the furloughs on March 27, 2020. Either way, "it is undisputed that Mr. Khan furloughed one hundred percent of his employees by April 1, 2020," Mem. Op. ¶ 140—well before *either* of the outside closing dates.

On March 24, 2020, the Khan Parties' counsel emailed Cinemex's counsel to advise that the Khan Parties had satisfied "each of the . . . closing conditions set forth in Section 8.1 of the EPA." March 24, 2020, Email Exchange ("March 24 Email Exchange I") [ECF No. 28-1] at 386–387. The Khan Parties thus deemed March 26, 2020—two business days after March 24—as the closing date. *See id.* at 386. Cinemex's counsel responded that "Cinemex will not and is not obligated to close this transaction" because, "among other things," it "lack[s] pre-Closing access to Star Cinema theaters and the Corporate Employees managing those theaters." *Ibid.* The following day, the Khan Parties' counsel sent Cinemex a letter, asserting that—as of March 24—the parties "[had] satisfied all remaining Closing conditions." March 25, 2020, Letter (the "March 25 Letter") [ECF No. 28-6] at 26. According to the Khan Parties, by "refus[ing] to close in the [two-business-day] timeframe required by the [EPAs]," Cinemex was in "breach." *Ibid.* If Cinemex didn't go through with the closing, the Khan Parties were prepared "to ask a judge to force them to close." *Id.* at 28.

Cinemex responded that it was "not required to close the transaction at this time" because (i) the parties were "contractual[ly] require[d]" to close in Houston (a destination Cinemex's personnel couldn't travel to because of the pandemic), March 26, 2020, Letter ("March 26 Letter") [ECF No. 28-2] at 1; (ii) Cinemex lacked "full physical access" (and had not yet exercised "its contractual right to conduct a physical inspection") of the theaters, *id.* at 2; and (iii) the spiraling COVID-19 pandemic would likely excuse Cinemex from any obligations to close the EPAs, *see id.* at 3. Attempting to cure these issues—and in exchange for a "good-faith deposit," Khan Dep. Tr. 2 at 427:23—Mr. Khan "offered to provide a private plane" to bring Cinemex's representatives to Houston for the closing, May 20 Hr'g Tr. at 227:6–7; to hold "a virtual closing," *id.* at 227:21–23; to "use a third party" to conduct inspections, *id.* at 143:19–20; to discount the purchase price, *see id.* at 228:2–4; and to "extend the closing date," *id.* at 143:14–15. Cinemex rejected each of these offers. *See* November 11, 2020, Deposition of Omar Khan ("Khan Dep. Tr.") [ECF No. 28-7] at 143:7–21 ("Q. And—in response to

what you had offered to Cinemex, did they ever agree to any of those offers? A. No, sir."). Cinemex did, however, continue working to close the deal. *See* March 24, 2020, Email Exchange ("March 24 Email Exchange II") [ECF No. 27-5] at 673 ("They are still communicating with our team asking for things"). Cinemex also noted that—despite earlier assurances to the contrary, *see* March 19 Email Exchange at 5 ("All contracts are in the [virtual data room].")—the Khan Parties had still failed to upload copies of all operational contracts to the data room, *see* March 27, 2020, Email Exchange ("March 27 Email Exchange") [ECF No. 28-2] at 4 ("[A Cinemex employee] checked the data room and could not find the following contracts."). Confirming that there were contracts missing from the data room, the Khan Parties uploaded several more on March 27, 2020, but also told Cinemex that there was at least one contract still missing. *See ibid.* ("Vistar we are waiting on the copy from our rep.").

On April 1, 2020, the Khan Parties sued Cinemex in the Southern District of Texas, asserting causes of action for breach of contract and specific performance. *See Omar Khan et al. v. Cinemex Holdings USA, Inc.*, Case No. 4:20-cv-01178 (the "Texas Complaint") [ECF No. 27-5] at 39. On April 25, 2020, Cinemex filed for Chapter 11 bankruptcy in the Southern District of Florida, where a federal bankruptcy judge stayed the Texas action. *See* Chapter 11 Voluntary Petition [Bankr. ECF No. 1]. In July 2020, the Khan Parties filed general unsecured claims against the bankruptcy estate. *See* Proofs of Claim [ECF No. 28-5] at 31–610. Cinemex objected to the Khan Parties' claims in October 2020, *see* Amended Objection to Claims [Bankr. ECF No. 153], and the Khan Parties responded to those objections in November 2020, *see* Response to Amended Objection to Claims [Assoc. Bankr. ECF No. 816].

About a year later, the Bankruptcy Court held a trial on the Khan Parties' claims and Cinemex's objections. *See* Mem. Op. at 1.[9] At the end of that trial, the Bankruptcy Court issued its order disallowing the Khan Parties' claims. *See generally* Mem. Op. In brief, the Bankruptcy Court concluded that Cinemex hadn't breached the EPAs by refusing to close on March 26, 2020, because "the Khan Parties had not, in fact, satisfied all closing conditions." *Id.* ¶ 156. Cinemex was therefore "not required to close" by that date. *See ibid.* And, because Cinemex had not breached, "both the threat of filing suit and the Texas Action itself qualify as the Khan Parties' repudiation of the EPAs, which precludes the Khan Parties from claiming the benefit of the agreement." *Id.* ¶ 160. Based on these findings, the Bankruptcy Court sustained Cinemex's objections and disallowed the Khan Parties' claims. *See id.* ¶¶ 164–65. The Khan Parties timely appealed the Bankruptcy Court's order. *See* Initial Br. at 28. And this Order follows.

## THE LAW

District courts have "jurisdiction to hear appeals from final judgments, orders, and decrees . . . of bankruptcy judges." *In re Charter Co.*, 778 F.2d 617, 621 (11th Cir. 1985) (quoting 28 U.S.C. § 158(a)). "In reviewing bankruptcy court judgments, a district court functions as an appellate court. It reviews the bankruptcy court's legal conclusions *de novo*, but must accept the bankruptcy court's factual findings unless they are clearly erroneous." *In re JLJ Inc.*, 988 F.2d 1112, 1116 (11th Cir. 1993). "*De novo* review requires the court to make a judgment independent of the bankruptcy court's, without deference to that court's analysis and conclusions." *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1295 (11th Cir. 2001). And "[t]he bankruptcy court's findings of fact are not clearly erroneous unless, in light of

---

[9] U.S. Bankruptcy Judge Isicoff held a "trial" on the Khan Parties' claims over three days: May 20, 2021, June 18, 2021, and July 9, 2021. *See* May 20, 2021, Hearing Transcript ("May 20 Hr'g Tr.") [ECF No. 28-76]; June 18, 2021, Hearing Transcript ("June 18 Hr'g Tr.") [ECF No. 28-77]; July 9, 2021, Hearing Transcript ("July 9 Hr'g Tr.") [ECF No. 28-78].

all the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Int'l Pharm. & Disc. II, Inc.*, 443 F.3d 767, 770 (11th Cir. 2005).

### ANALYSIS

This case is about the answer to one question: Who breached the EPAs—the Khan Parties or Cinemex? Under the express terms of both EPAs, Delaware law governs this question. *See* Tex. EPA at 66 ("All issues concerning the Transaction Documents . . . will be governed by and construed in accordance with the laws of the State of Delaware[.]"); Ill. EPA at 61–62 (same). To prove a breach of contract under Delaware law, a party must show, "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the [party asserting breach]." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The Bankruptcy Court disallowed the Khan Parties' claims because (it found) the Khan Parties—not Cinemex—had breached the EPAs. And we agree.

I.  **The Bankruptcy Court Correctly Found that Cinemex Didn't Breach the EPAs by Refusing to Close on March 26, 2020.**

The Bankruptcy Court offered two reasons for its view that Cinemex was not in breach of either EPA when it refused to close on March 26, 2020. *First*, it said, the Illinois EPA *couldn't be closed* before April 10, 2020. *Second*, Cinemex wasn't obligated to close *either* transaction because the Khan Parties had failed to satisfy several of the EPAs' conditions precedent. We think the Bankruptcy Court got it right on both counts.

A.  **The Parties Couldn't Close the Illinois EPA before April 10, 2020.**

The parties *couldn't* close on the Illinois EPA until April 10, 2020. *See* Ill. EPA at 18 ("[I]n no event shall Closing take place prior to April 10, 2020."). And, "[w]hen the language of a contract is

10

clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented." *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (citing *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)). Since no part of the Illinois EPA even purports to introduce some ambiguity to the phrase "*in no event* shall Closing take place prior to April 10, 2020," Cinemex couldn't have breached that EPA by refusing to close in March.

And, indeed, the Khan Parties never even suggest that the April 10th provision is ambiguous. Instead, they contend that the Illinois EPA is so interrelated with the Texas EPA that the two are "indivisible[.]" Initial Br. at 49. And—the Khan Parties claim—of the two indivisible agreements, the Texas EPA should govern the contracts' material terms. *See id.* at 51 ("[W]hen the Debtors breached the Texas EPA, they breached the Illinois EPA as well[.]"). We disagree.

To begin with, the EPAs are *not* indivisible. "Under general contract law, the parties' intentions determine whether two separately executed documents are in reality one agreement." *In re Philip Servs., Inc.*, 284 B.R. 541, 546 (Bankr. D. Del. 2002), *aff'd*, 303 B.R. 574 (D. Del. 2003). And "a court must determine the intent of the parties from the language of the contract." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014). In our case, the plain language of the EPAs makes clear that the Illinois and Texas EPAs are separate and divisible. So, for instance, neither EPA incorporates the requirements of the other. *See generally* Ill. EPA; Tex. EPA. In fact, the Illinois EPA's integration clause is unequivocal that the Illinois EPA, *its* Exhibits, and *its* Schedules constitute the *entire* agreement covering the Illinois theater. *See* Ill. EPA at 61 ("This Agreement, together with all Exhibits and Schedules hereto[,] . . . constitute[s] the entire agreement among the Parties[.]"); *see also id.* at 1 (defining "this Agreement" exclusively as the EPA between SCG-N Inc. (the Illinois theater), Cinemex, and Mr. Khan). Conspicuously omitted from this integration clause is *any* mention of the Texas EPA.

It's true that the closing conditions of the Illinois EPA require "confirmation" that the Texas EPA had closed. *See* Ill. EPA at 45 ("On or prior to the Closing Date, Buyer will have delivered to the Equityholder all of the following[:] . . . Confirmation that the transactions contemplated by the Texas Purchase Agreement have closed in accordance with the terms thereunder."). And the closing conditions of the Texas EPA require delivery of the executed Illinois EPA. *See* Tex. EPA at 46 ("On or prior to the Closing Date, the Equityholder will have delivered . . . to Buyer all of the following[:] . . . The Naperville Purchase Agreement, duly executed by the Equityholder and SCG-N Inc., a Texas Corporation."); *id.* at 47 ("On or prior to the Closing Date, Buyer will have delivered . . . to the Equityholder all of the following[:] . . . The Naperville Purchase Agreement, duly executed by the Buyer."). But this doesn't mean the agreements are interchangeable. Indeed, to hold otherwise would be to ignore the many material differences between the two—differences that would, if the EPAs were read as one document, render the resultant contract internally inconsistent. The Texas EPA, for example, sets an outside closing date of April 30, 2020. *See id.* at 49. The Illinois EPA, by contrast, sets an outside closing date of May 31, 2020. *See* Ill. EPA at 46. And, significantly, the Illinois EPA *never* says that the closing dates of the Texas EPA are in any way relevant to the Illinois EPA. We can't, in other words, accept the EPAs as indivisible and still give meaning to both sets of contract terms. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored.").

Relying on a single bankruptcy case—decided under Pennsylvania law—the Khan Parties insist that we look *beyond* the EPAs for evidence that those EPAs are indivisible because (they say), "[i]f the language of the parties' written agreement does not make their intention clear, the court should seek other aids[.]" Initial Br. at 49 (quoting *In re Karfakis*, 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993)). In the Khan Parties' view, "the court can use practical interpretation and consider the parties'

construction of the agreement as evidenced by their conduct." *Id.* at 49–50 (quoting *In re Karfakis*, 162 B.R. at 725). But, as we've said, the language of the EPAs makes perfectly clear that these are two separate agreements. And—as the Khan Parties themselves acknowledge—"the primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract of the parties be entire or severable." *Ibid.* That's really the end of that.

But here's the thing: *Even if* the EPAs were indivisible, the Khan Parties would still be subject to the April 10th limitation for two reasons. *One*, recall the specific admonishment in the Illinois EPA: "[I]n no event shall Closing take place prior to April 10, 2020." Ill. EPA at 18. The Texas EPA, by contrast, provides no such *terminus post quem* for closing. *See* Tex. EPA at 19 (making no mention of a date before which the Texas EPA couldn't close). So, the more specific term in the Illinois EPA controls over the more general phrasing of the Texas EPA. *See, e.g., DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."); *see also* SCALIA & GARDNER at 183 ("If there is a conflict between a general provision and a specific provision, the specific provision prevails (*generalia specialibus non derogant*)."). *Two*, upholding the April 10th limitation is the only way to give meaning to both EPAs' express terms—which, of course, is what Delaware law requires us to do. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (emphasizing that courts should interpret contracts to "giv[e] meaning to each term and avoid[ ] an interpretation that would render any term mere surplusage" (cleaned up)). In other words, we *could* subject the Texas EPA to an April 10th limitation *without* stripping its essential terms of any meaning. The Illinois EPA, by contrast, could *never* be relieved of the April 10th limitation unless we ignore the plain import of one of its express terms. This we cannot—and will not—do.

Because the EPAs are thus not indivisible, Cinemex didn't breach the Illinois EPA by refusing to close in March. *That* EPA, after all, explicitly forbade a March closing. And, even if we were to accept the Khan Parties' argument that the EPAs are indivisible, the April 10th limitation would then govern both transactions—meaning that the parties couldn't have closed *either* EPA before April 10, 2020. Either way, the result is the same: Cinemex didn't breach the EPAs by refusing to close in March.

### B.  The Khan Parties Failed to Satisfy Several Conditions Precedent.

Nor did Cinemex have to close in April 2020. Cinemex, as we've hinted, was only obligated to close the EPAs *once* the Khan Parties satisfied several conditions precedent. *See* Tex. EPA at 45 ("The obligation of Buyer to consummate the purchase of the Equity Interests is subject to the satisfaction (or waiver by Buyer) of the following conditions as of the time of the Closing[.]"); Ill. EPA at 43 (same). The Khan Parties' satisfaction of these conditions would've then triggered the two-business-day deadline for Cinemex to close the EPAs. *See* Tex. EPA at 19 ("[T]he Closing shall take place . . . on a date to be specified by the Parties, which shall be no later than the second Business Day after satisfaction (or waiver) of the conditions set forth in <u>ARTICLE 8</u>[.]"); Ill. EPA at 18 (same). But, for two reasons, the Khan Parties failed to live up to the EPAs' conditions—which means that Cinemex's obligation to close was *never* triggered.

### i.  Breach of Section 8.1(D): Failure to Deliver the Escrow Agreement.

Section 8.1(D) of the EPAs required the Khan Parties to give Cinemex an executed escrow agreement by the closing date. *See* Tex. EPA at 46 ("On or prior to the Closing Date, the [Khan Parties] will have delivered . . . to the Buyer . . . [t]he Escrow Agreement, duly executed[.]"); Ill. EPA at 44 (same). But the Khan Parties *never* delivered an executed escrow agreement to Cinemex. *See* Mem. Op. ¶ 100 ("There is no Escrow Agreement executed by the Khan Parties and Wells Fargo in the

record. The only Escrow Agreement in the record is unexecuted."). Nor could they have done so by March 26—the arbitrary closing date they tried to impose on Cinemex. Here's why.

On March 18, 2020, the Khan Parties' counsel told Cinemex that "the Escrow Agent will need [Cinemex's] KYC[10] information at least five days prior to Closing (3/25)." March 18, 2020, Email ("March 18 Email") [ECF No. 28-24] at 2.[11] And Cinemex hadn't yet provided its KYC information when the Khan Parties' counsel sent the March 24 email demanding a March 26 closure. *See* Initial Br. at 23 ("[Cinemex] did not provide the KYC information on March 24, 2020."). So, if the Khan Parties hadn't delivered an escrow agreement on March 24—and given that they needed at least five business days to prepare an escrow agreement *after* Cinemex provided its KYC information (which Cinemex hadn't yet done)—then it would've been impossible for the Khan Parties to deliver an executed escrow agreement by March 26. In short, because the Khan Parties (i) hadn't delivered an executed escrow agreement and (ii) couldn't have done so by March 26, we agree with the Bankruptcy Court that they failed to satisfy all conditions precedent—meaning that Cinemex wasn't obligated to close by March 26. *See* Mem. Op. ¶ 102 ("[T]he Court finds that the Khan Parties did not satisfy Section 8.1(D)(5) . . . . On that basis alone, the Court finds that the Khan Parties did not satisfy the closing conditions under Article 8 and therefore, that Cinemex did not breach the Texas EPA[.]").

Trying to parry this straightforward result, the Khan Parties offer two arguments—both unavailing. *First*, they contend that "[a]ny failure of condition under Section 8.1(D)(5) would have been caused by [Cinemex], as [Cinemex] failed to provide the KYC information." Initial Br. at 23. But this argument "assum[es] a March 31, 2020 closing date." *Id.* at 23. And—while we acknowledge that

---

[10] "KYC" means "know your customer" and refers to certain identifying information financial institutions must obtain from a potential customer before doing business with that customer. *See* FINRA Rule 2090 (Know Your Customer), available at: https://www.finra.org/rules-guidance/rulebooks/finra-rules/2090#the-rule.

[11] This email from the Khan Parties' counsel acknowledged that "all parties are on the same page and pushing to close on March 31st." March 18 Email at 2.

the Khan Parties really *wanted* to close on March 31, 2020, *see id.* at 8 ("Khan's expectation was that the closing would occur no later than March 31, 2020.")—the clear terms of the Texas and Illinois EPAs set outside closing dates of April 30, 2020, and May 31, 2020, respectively. *See* Tex. EPA at 49; Ill. EPA at 46. And we're not at liberty to set aside the unambiguous terms the parties negotiated. *See Lowry v. Irish*, 2020 WL 5587390, at *5 (Del. Ch. Sept. 18, 2020) ("Where a contract's plain meaning is clear, the provisions of the contract themselves govern[.]"); *see also GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."). So, putting aside the Khan Parties' subjective aspirations, Cinemex wasn't obligated to close on March 31 and—as a result—wasn't required to provide its KYC information in time for any such March 31 closing.

*Second*, the Khan Parties insist that Cinemex "waived the condition of an escrow agreement under Section 8.1(D)(5)." Initial Br. at 24. This argument fails for two reasons. *One*, the EPAs are clear that Cinemex could waive a condition precedent *only* if the waiver is "set forth in a writing executed by [Cinemex]." Tex. EPA at 63; Ill. EPA at 59. The Khan Parties don't identify any writing that meets this requirement. They maintain, instead, that Cinemex's failure to mention the escrow agreement in several letters, emails, and pleadings suffices to waive the issue. *See* Initial Br. at 24. But (it almost goes without saying) this supposed implicit waiver isn't nearly the same as an affirmative *written* waiver—which is what the EPAs required. *Two*, the Pretrial Stipulation the parties filed in the Bankruptcy Court makes plain that Cinemex very much preserved this unexecuted-escrow argument. In the "Disputed Facts to be Litigated" Section, the parties *disputed* "whether any or all of the conditions precedent to closing were satisfied, waived, or excused." Joint Pretrial Stipulation ¶ 11; *see also id.* ¶ 5 ("Whether any of the conditions precedent to closing under Section 8.1 of the Agreement were excused and/or waived."). Because the Pretrial Stipulation supersedes all prior pleadings and "control[s] the course of

the trial," S.D. FLA. L.R. 16.1(g), Cinemex unambiguously preserved its contention that the Khan Parties had failed to satisfy all closing conditions, *see State Fed. Sav. & Loan Ass'n of Lubbock v. Campbell*, 848 F.2d 1186, 1189 (11th Cir. 1988) ("The pre-trial stipulation and pre-trial orders control the course of the trial.").

To summarize, then, the Khan Parties hadn't delivered an executed escrow agreement by March 24, 2020. And—based on the Khan Parties' own statements—it would have been impossible for them to deliver that executed escrow agreement by March 26, 2020, because Cinemex hadn't provided its KYC information five days earlier. That Cinemex hadn't yet delivered its KYC information was also not commercially unreasonable because Cinemex had until late April to do so. And Cinemex didn't waive its challenge to the Khan Parties' failure to submit an executed escrow agreement before closing. As a result, the Khan Parties didn't satisfy all conditions precedent—and so, Cinemex had *no* obligation to close on March 26.

### ii.    Breach of Section 8.1(B): Failure to Comply with Covenants.

Both EPAs also require that—as a condition precedent to closing—the Khan Parties and Cinemex "will have performed and complied . . . with all of the covenants and agreements required to be performed[.]" Tex. EPA at 46; Ill. EPA at 43. Article 7 of the EPAs lays out the parties' covenants. *See* Tex. EPA at 40–45; Ill. EPA at 39–43. The Bankruptcy Court found that the Khan Parties had failed to comply with *five* of these covenants. *See* Mem. Op. ¶¶ 104–48. And we agree.

### a.    The Covenant to Conduct Business in the Ordinary Course.

Section 7.1(A)(a) of the EPAs require the Khan Parties to "use commercially reasonable efforts to . . . conduct the Business in the Ordinary Course[.]" Tex. EPA at 40; Ill. EPA at 39. The EPAs define "Ordinary Course" to mean, "with respect to any Person, in the ordinary course of that Person's business consistent with past practice." Tex. EPA at 10; Ill. EPA at 9. And, while the EPAs don't define "commercially reasonable efforts," Delaware law does: Covenants to use commercially

reasonable efforts "impose obligations to take all reasonable steps to solve problems and consummate the transaction." *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017).

"Where an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase," the court evaluates compliance by looking at "how the specific seller company has operated." *Snow Phipps Grp., LLC v. KCAKE Acquisition, Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021). By asking us to compare how a company operated before (and after) it entered into a given sales agreement, ordinary-course provisions "help ensure that the business the buyer is paying for at closing is essentially the same as the one it decided to buy at signing." *Ibid.*

The Bankruptcy Court concluded that "[t]he SCG Theaters were not essentially the same as what Cinemex decided to buy at signing." Mem. Op. ¶ 113 (cleaned up). There was, the court thought, "no question that the Khan Parties departed from the normal and ordinary routine of conducting the SCG Theaters' business[.]" *Ibid.* Although the "theater closures were outside of the Khan Parties' control"—and while "it would not have been commercially reasonable for the theaters to operate in violation of applicable law"—the court felt that the Khan Parties' decision to furlough *all* their employees was not a "commercially reasonable" effort to conduct business in the ordinary course. *Id.* ¶ 113–14. We agree. The Khan Parties' past practices had never included furloughing *one-hundred percent* of their employees—and the pandemic didn't render that decision commercially reasonable for a business that was in the midst of a potential sale.

Delaware law supports the Bankruptcy Court's conclusion. Take, for instance, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, where the relevant covenant required that "the business of the Company and its Subsidiaries shall be conducted only in the ordinary course of business consistent with past practice in all material respects[.]" 2020 WL 7024929, at *65 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). Trying to respond to the COVID-19 pandemic, the seller in *Maps* "severely" curtailed its business operations and "slashed employee headcount, with over 5,200 . . . employees

laid-off or furloughed." *Id.* at \*75–76. When the deal fell apart, the seller sued for "specific performance" of the acquisition, *id.* at \*1, arguing that, because the pandemic warranted these extraordinary business changes, "its actions fell within an exception to the Ordinary Course covenant," *see id.* at \*52. The court agreed that the seller's business decisions were "reasonable responses to the pandemic." *Ibid.* But (it added) "acting in the ordinary course of business" doesn't mean "doing what was ordinary during the pandemic." *Ibid.* Instead, "under extant Delaware law, the Ordinary Course Covenant required [the] Seller to maintain the *normal* and *ordinary* routine of business." *Ibid.* (emphases added). And, because the parties incorporated the phrase "consistent with past practice" into the covenant, the court "[could not] look to how other companies responded to the pandemic or operated under similar circumstances." *Id.* at \*71. The seller's actions thus violated the ordinary-course covenant. *Ibid.*

Like the seller in *Maps*, the Khan Parties severely limited their business operations and furloughed their employees. Both actions were "wholly inconsistent with past practices." *Id.* at \*76. Still, as the Bankruptcy Court noted, the Khan Parties' decision to close their theaters *was* commercially reasonable because to do otherwise would have been illegal. *See* KHOU 11 Coronavirus Updates at 678 (noting that, on March 16, 2020, Houston's city and county governments ordered all restaurants to close, except for those offering "pickup, delivery, or drive-thru services"); March 19, 2020, Email [ECF No. 27-5] at 2149 (noting that, on March 19, 2020, Texas's Governor Greg Abbott issued an executive order prohibiting "gatherings of 10 or more people"); KHOU 11 Stay at Home Order Summary [ECF No. 27-5] at 646 (noting that, on March 24, 2020, the City of Houston, Harris County, and Fort Bend County issued stay-at-home orders requiring all but essential businesses to close); March 24, 2020, Stay Home, Work Safe Order [ECF No. 27-5] at 628–29 ("All businesses operating within Harris County, except Essential Businesses. . . are required to cease all activities . . . . [M]ovie theaters . . . shall close."). So, as the Bankruptcy Court correctly found, the *closures* didn't result in a

breach of the covenants. *See* Mem. Op. ¶ 109 ("[T]he Court finds that the Khan Parties used commercially reasonable efforts in temporarily suspending operations of the SCG Theaters[.]").

The furloughs, on the other hand, were *not* commercially reasonable. Unlike the closures, the furloughs weren't legally mandated, and they certainly weren't a reasonable way of "consummat[ing] the transaction." Moreover, as we've said, we don't really care whether some *other* company might've responded to the pandemic in the same way. Under the terms of the EPAs' ordinary-course covenants, we ask only whether the Khan Parties had *ever* furloughed all their employees *at some point* in the past. Since they hadn't, their decision to furlough them all in March of 2020 wasn't commercially reasonable.

Unfazed by all this, the Khan Parties insist that their actions *were* commercially reasonable and within the ordinary course of their business practices. *See* Initial Br. at 25 ("The bankruptcy court erred in concluding that the 'Khan Parties had departed from their ordinary course of business prior to the purported closing date[.]'"). According to the Khan Parties, "[t]he bankruptcy court erred both in concluding that it was confined to considering the Khan Parties [sic] past practices and in its interpretation of the *MAPS* decision." *Id.* at 32–33. And, they add, two "exceptions" to Section 7.1(A) excused both the closures and the furloughs. *Id.* at 25. We'll consider—and reject—each of these three points in turn.

*First*, the Khan Parties insist that the Bankruptcy Court erred by holding that, "where the parties choose to define 'ordinary course' as being 'consistent with past practice,' . . . 'the court cannot look to how other companies responded to the pandemic or operated under similar circumstances.'" *Id.* at 31 (quoting Mem. Op. ¶ 119). But this argument flies in the face of *both* Delaware law *and* basic tenets of contract interpretation. As we've seen, Delaware courts overwhelmingly hold that, "[w]here an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase[,] . . . the court evaluates [how the specific seller has operated] only." *Snow Phipps*, 2021 WL 1714202, at *38; *see also Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *24 (Del. Ch. Mar. 1, 2022)

20

("[W]hen an ordinary course provision includes the phrase consistent with past practice . . . the court evaluates [how the company has operated in the past] only."); *Maps*, 2020 WL 7024929, at \*71 ("When determining whether a party has acted 'consistent with past practice,' the court must evaluate the company's operations 'before and after entering into' the transaction agreement to determine whether those operations are 'consistent.' . . . Because of the standard that the parties chose, the court cannot look to how other companies responded to the pandemic or operated under similar circumstances." (cleaned up)).

As if that weren't bad enough, the Khan Parties' reading of the ordinary-course covenant ignores the EPAs' plain language. *See GMG Cap.*, 36 A.3d at 780 ("The Court will interpret clear and unambiguous terms according to their ordinary meaning."). As we've explained, the EPAs define "ordinary course" to mean, "with respect to any Person, in the ordinary course of *that* Person's business consistent with past practice." Tex. EPA at 10 (emphasis added); Ill. EPA at 9 (same). "That," when used as an adjective, means "the person, thing, or idea specified, mentioned, or understood." *That*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/that (last visited Apr. 4, 2023). The EPA thus defines what's "in the ordinary course" for a specific person by reference to *the specified (or mentioned)* person's own business. And, in Section 7.1(A), "that Person" refers to "the Companies." The ordinary-course covenant, in sum, circumscribes our analysis to *the Khan Parties'* past practices only.

*Second*, the Khan Parties try to distinguish *Maps* in two ways: (1) because the ordinary-course covenant in *Maps* included the word "only" (whereas ours doesn't); and (2) because the contract in *Maps* didn't have a "commercially reasonable efforts" qualifier. *See* Initial Br. at 39–40. Both are distinctions without a difference.

We'll start with the word *only*. In the Khan Parties' view, the *Maps* holding—that the court "cannot look to how other companies operated in the past" when considering the seller's compliance

with the ordinary-course covenant—"was predicated, in part, on the parties' use of the term 'only.'" *Id.* at 32. The *Maps* Court (it's true) referenced the covenant's use of the term "only" in its discussion. *See Maps*, 2020 WL 7024929, at *71 ("By including the adverb 'only' and the phrase 'consistent with past practice,' the parties created a standard that looks exclusively to how the business has operated in the past."). Two problems with this. *One*, in finding that its review was limited to the seller's past practices, *Maps* relied heavily on an earlier Delaware decision—which, like our case, omitted the word *only*. *See ibid.* (citing *Mrs. Fields Brand, Inc. v. Interbake Foods LLC*, 2017 WL 2729860, at *32 (Del. Ch. June 26, 2017)). *Two*—as we've seen, *see supra* pp. 17–18—under Delaware law, "[w]here an ordinary course provision includes the phrase 'consistent with past practice' or a similar phrase . . . the court evaluates [how the specific seller has operated] only." *Snow Phipps*, 2021 WL 1714202, at *38. The phrase "consistent with past practice" therefore requires us to look *solely* to the past practices of the *specific* seller—whether the covenant deploys the word "only" or not.

And we agree with the Bankruptcy Court that the absence (from *Maps*) of a "commercially reasonable efforts" clause is totally irrelevant. *Cf. Maps*, 2020 WL 7024929, at *72 ("The Ordinary Course Covenant imposes an overarching obligation that is flat, absolute, and unqualified by any efforts language."). That's because the Bankruptcy Court's decision wasn't based on *Maps* alone: The court also (separately) found that the Khan Parties' actions failed the "commercially reasonable efforts" test. In so holding, the court explained that, "although . . . the Khan Parties used commercially reasonable efforts in temporarily suspending operations of the SCG Theaters, . . . they did not do so with respect to keeping available the services of their [employees]." Mem. Op. ¶ 109. That clause thus gave the Bankruptcy Court an *independent* reason for rejecting the Khan Parties' claims. For our purposes, though, it's sufficient to note that *nothing* about the "commercially reasonable efforts" clause changes the meaning of the phrase "consistent with past practice"—which (again) requires us to look *only* to the Khan Parties' past practices.

*Third*, the Khan Parties claim that, even if we find that they failed to comply with Section 7.1(A)(a), their failure to conduct their business in the ordinary course "fell under the exceptions of Section 7.1(A)(i) or Section 7.1(A)(ii)" and was, therefore, excused. Initial Br. at 48. But, unfortunately for the Khan Parties, neither exception absolves them of their contractual obligations.

We'll start with Section 7.1(A)(i). The Khan Parties contend that, because Section 7.1(A)(i) required them to conduct their business in the ordinary course, "except . . . as otherwise expressly provided in this Agreement," Tex. EPA at 40; Ill. EPA at 39, the Material Adverse Effect ("MAE") clause of the EPA excused their actions, *see* Initial Br. at 29 ("[A]ny actions taken by the Khan Parties in response to COVID-19 could not result in a breach of the covenants under Section 7.1(A)(a) . . . based on the MAE Carveouts."). But neither this exception nor the MAE clause excuses the Khan Parties' failure to conduct their business in the ordinary course.

Again, the plain text of the EPAs compels this result. As we've said, the Khan Parties were required to perform under the contracts "except . . . as otherwise *expressly* provided in" the EPAs. And the MAE clause doesn't expressly provide otherwise. All it says is that "pandemics" (or the "results thereof") are one of several circumstances that "shall [*not*] be taken into account . . . in determining whether a Material Adverse Effect has occurred[.]" Tex. EPA at 9 (emphasis added); Ill. EPA at 8–9. Under the plain language of the MAE clause, then, the COVID-19 pandemic (most expressly) did *not* excuse the Khan Parties' performance.

Attempting to avoid this clear language, the Khan Parties contend that the MAE clause "clearly and unambiguously allocated the risk of a pandemic (COVID-19) to [Cinemex]." Initial Br. at 26. But the clause does no such thing. It's true that the clause absolves only "the ability of the Equityholder"— *i.e.*, not Cinemex—"or any member of the Company Group to consummate the transactions[.]" Tex. EPA at 9; EPA at 8–9 (same). This, of course, means that there are circumstances in which the Khan Parties *won't* have to perform. The problem, though, is that, under the plain text of the MAE clause, a

"pandemic" is *expressly* not one of them. The MAE clause thus says precisely the *opposite* of what the Khan Parties cite it for.

Undeterred, the Khan Parties offer us *Cineplex Inc. and Cineworld Group PLC and 1232743 B.C. Ltd.*, 2021 ONSC 8016—a Canadian decision that, needless to say, doesn't bind us, *see* Initial Br. 27–29 (citing *Cineplex*). Even this case, though, undermines the Khan Parties' position. As the Khan Parties point out, the Ontario court stressed that "[the seller] cannot be held in default of the Ordinary Course covenant when it was prevented from conducting its normal day-to-day operations by government mandate." Initial Br. at 28 (quoting *Cineplex*, 2021 ONSC 8016 ¶ 122). As we've said, however, no government ever mandated the furloughs the Khan Parties implemented. *See generally* Record Part V [ECF No. 27-5] at 1912–41; *see also* KHOU 11 Coronavirus Updates at 678; KHOU 11 Stay at Home Order Summary at 646; March 24, 2020, Stay Home, Work Safe Order at 626.[12] Indeed, *Cineplex* distinguished *Maps* on precisely this basis: The seller in *Maps*, the Ontario court explained, in "closing (not in response to government mandates) two of its hotels" and "furloughing 5200 full time employees," *Cineplex*, 2021 ONSC 8016 ¶ 112, "had not preserved the business; rather, the seller had 'gutted it,'" *id.* ¶ 129. That's exactly what we have here—a seller who "(not in response to government mandates) . . . gutted its business." *Cineplex* thus fully supports our position here.

The second exception the Khan Parties rely on—Section 7.1(A)(ii)—required them to conduct their business in the ordinary course "except . . . as described on Schedule 7.1(A)[.]" Tex. EPA at 40; Ill. EPA at 39. Here, the Khan Parties point to the COVID-19 Supplement to Schedule 7.1(A), which provides as follows:

> As a result of state and local requirements banning large public gatherings in response to COVID-19, as well as the declaration of a national state of emergency and the public guidance issued by the Center for Disease Control and Prevention with respect

---

[12] That's, again, in contradistinction to the theater closures, which (the Bankruptcy Court found) *were* mandated and, thus, commercially reasonable. *See* Mem. Op. ¶ 114 ("[I]t would not have been commercially reasonable for the theaters to operate in violation of applicable law[.]").

thereto, the Company Group, as well as SCG-N, have taken a number of actions and adjusted their business operations accordingly in order to comply with such requirements, including temporarily closing all theaters (including all attached restaurants and dining areas) and suspending all operations while such restrictions remain in effect, which has been consistent with the industry-wide practice (collectively, the "COVID-19 Response").

Schedule Supplement No. 1 (the "Supplement") [ECF No. 28-5] at 109, 116. But the Supplement was "delivered pursuant to Section 7.5 of [the EPAs.]" *Id.* at 105. And Section 7.5 expressly (and narrowly) circumscribes the Supplement's effect: "[A]ny such [supplement]," that section says, "shall be given effect solely for the purposes of determining whether there has been a breach of a representation or warranty for purposes of . . . Section 8.1(A)[.]" Tex. EPA at 43; Ill. EPA at 41–42. Section 8.1(A), in turn, mandates only that—as a closing condition—all representations and warranties be "true and correct." Tex. EPA at 45; Ill. EPA at 43. And (of course) the furloughs had nothing to do with Section 8.1(A). By furloughing its employees, therefore, the Khan Parties violated one of Article 7's covenants—compliance with which was a closing condition under *Section 8.1(B)*. *See* Tex. EPA at 46 ("The Companies and the Equityholder will have performed and complied (or shall have cured any non-performance or non-compliance) with all of the covenants and agreements required to be performed . . . at or prior to the Closing[.]"); Ill. EPA at 43 (same). Because Schedule 7.1(A) applies to representations and warranties *only*, nothing in that Schedule excused the Khan Parties' breach of their covenant to avoid drastic business changes—like furloughing *all* their employees.

Elsewhere in their briefing, the Khan Parties maintain that they were an "essential business"— and that, as such, they weren't required to close their theaters. *See* Initial Br. at 48 (arguing that, "[a]s an Essential Business," the theaters "were, technically, authorized to operate, since they were able to provide food and beverage for takeout"). This suggestion, though, hurts the Khan Parties more than they seem to recognize. In a nutshell, we agree that it's not entirely clear whether the Khan Parties *had* to close the SCG theaters on March 17, 2020. But there's no doubt that the movie theaters *were*

required to close by March 19, 2020.[13] So, we tend to agree with the Bankruptcy Court that the closures were commercially reasonable. But, if we assume that the Khan Parties are right and that the Star Cinema Grills *were* essential businesses (and thus weren't legally required to close), that would only mean that the Khan parties breached the ordinary-course covenant in *two* ways: by furloughing all their employees (when they didn't have to) and by closing their theaters (when they weren't legally required to do so). This argument, in short, doesn't help the Khan Parties at all.

To summarize, then, the Khan Parties breached the ordinary-course covenant by furloughing one-hundred percent of their workforce. And none of the EPAs' various exceptions excused this breach. Since that ordinary-course covenant was a condition precedent to closing, the Khan Parties' violation relieved Cinemex of any obligation to close by March 26.

### b.  The Covenant to Keep Available the Services of Directors, Officers, and Employees.

The Khan Parties' decision to furlough all their employees *also* breached their covenant to use commercially reasonable efforts to "keep available the services of their . . . directors, officers and employees," as required by Section 7.1(A)(d). Tex. EPA at 40; Ill. EPA at 39. For two reasons, the Khan Parties' furlough of one-hundred percent of their labor force was *not* commercially reasonable.

---

[13] As we've highlighted, on March 16, 2020, Houston's city and county governments ordered that all restaurants close, except for those offering "pickup, delivery, or drive-thru services[.]" KHOU 11 Coronavirus Updates at 678. It wasn't immediately clear that this rule applied to the SCG Theaters. But, by March 19, 2020, Texas's Governor had issued an executive order prohibiting all "gatherings of 10 or more people[.]" March 19, 2020, Email at 2149; *see also* Texas Executive Order No. GA-08, available at: https://gov.texas.gov/ uploads/files/press/EO-GA_08_COVID-19_preparedness _and_ mitigation_FINAL_03-19-2020_1.pdf ("[E]very person in Texas shall avoid social gatherings in groups of more than 10 people."). And, on March 24, 2020, the City of Houston, Harris County, and Fort Bend County issued stay-at-home orders that required all but essential businesses (including movie theaters) to close. *See* KHOU 11 Stay at Home Order Summary at 646; *see also* March 24, 2020, Stay Home, Work Safe Order at 626 ("All businesses operating within Harris County, except Essential Businesses. . . are required to cease all activities . . .[M]ovie theaters . . . shall close.").

*First*, nothing in the COVID-19 executive orders or CDC guidelines required the Khan Parties to furlough *any* of their employees—let alone *all* of them. *See* May 20 Hr'g Tr. at 263:16–18 ("Q: It's true that the government didn't require you to furlough your employees, is that right? A: That is correct."); *see generally* Record Part V [ECF No. 27-5] at 1912–41; *see also* KHOU 11 Coronavirus Updates at 678; Texas Executive Order No. GA-08, available at: https://gov.texas.gov/ uploads/files/press/EO-GA_08_COVID-19_preparedness     _and_     mitigation_FINAL_03-19- 2020_1.pdf; KHOU 11 Stay at Home Order Summary at 646; March 24, 2020, Stay Home, Work Safe Order at 626. On appeal, the Khan Parties argue that, "[i]f the temporary closures were 'commercially reasonable,' then it was also commercially reasonable to furlough employees while the theaters were temporarily closed in an effort to save costs and preserve the Business." Initial Br. at 34. But this doesn't necessarily follow. As the Bankruptcy Court held, the theater closures didn't breach Section 7.1(A)(a) because "it would not have been commercially reasonable for the theaters to operate in violation of applicable law, or, for that matter, CDC recommendations[.]" Mem. Op. ¶ 114. "[N]othing in the shutdown orders," though, "or CDC guidelines required the Khan Parties to furlough employees or release executives." *Id.* ¶ 122. So, while it may have been reasonable for the Khan Parties to lay off *some* of their employees, without the compulsion of a government mandate, we cannot agree that their decision to furlough *all* their employees qualified as "keep[ing] available the services of their . . . directors, officers and employees[.]"

*Second*, the furloughs weren't reasonably calculated to consummate the transaction. *See Williams Cos.*, 159 A.3d at 272 ("[C]ovenants like the ones involved here impose obligations to take all reasonable steps to solve problems and consummate the transaction."). The Bankruptcy Court found that "there was no reason for the furloughs other than to save costs," Mem. Op. ¶ 123—a point the Khan Parties concede, *see* Initial Br. at 34 ("[I]t was also commercially reasonable to furlough the employees . . . in an effort to save costs and preserve the Business."). At the time of the furloughs, as

we'll see, Cinemex hadn't inspected *any* of the theaters. *See infra* Section I.B.ii.c.2. And the Khan Parties understood that, to Cinemex, it was "fundamental" to "conduct an inspection of the SCG Theaters during operating hours[.]" July 9 Hr'g Tr. at 505:14–18; *see also* Initial Br. at 10 ("According to Marti, an inspection prior to closing was fundamental."). Mr. Martí, in fact, testified that "see[ing] the operations" is the "most important part" of an inspection. July 9 Hr'g Tr. at 494:7–8. "[V]ery importantly," Cinemex "need[ed] to see the people and . . . see that all of the people are trained, that it's the right people, and that they're giving the service that [Cinemex is] looking for." *Id.* at 494:15–19. It's almost tautological to say that, for Cinemex to have observed these things, the Khan Parties needed to have *some* of their employees working. Dismissing *all of them*, in other words, all but ensured that Cinemex *wouldn't* be able to conduct its inspections as planned.

Because the Khan Parties failed to satisfy this additional condition precedent to closing, Cinemex didn't breach the EPAs by refusing to close on March 26.

### c.  The Covenant to Provide Reasonable Access to, and Inspection of, Contracts and Premises.

Section 7.2(A) of the EPAs required the Khan Parties to give Cinemex "reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the [Khan Parties]," from the signature date through the closing. Tex. EPA at 41; Ill. EPA at 40. The Bankruptcy Court found that the Khan Parties breached this covenant in two ways: *first*, by failing to provide "reasonable access to, and the right to inspect, their contracts prior to the purported closing date, March 26, 2020," Mem. Op. ¶ 128; and *second*, by "not providing reasonable access to the [premises] by foreclosing Cinemex's ability to conduct the inspections" of the theaters, *id.* ¶ 130. We agree on both counts.

28

### 1.   The Contracts.

On March 19, 2020, the Khan Parties declared that "all contracts" were in the data room PJ Solomon had created. *See* March 19 Email Exchange at 5 ("All contracts are in the [virtual data room]."). But this statement proved to be untrue: On March 27, Cinemex alerted the Khan Parties that an employee had "checked the data room and could not find the following contracts." March 27 Email Exchange at 4. In response, the Khan Parties sent over at least five more contracts and told Cinemex that they were "waiting on the copy from our rep" of their contract with Vistar. *See ibid.* Significantly, these late additions came after *both* March 24 (the date on which the Khan Parties claimed that all conditions precedent has been satisfied) *and* March 26 (the Khan Parties' self-imposed closing date). And it's not clear that Cinemex *ever* received the final (Vistar) contract: According to Cinemex, in fact, "[t]o date, the Khan Parties have not provided . . . the contract with Vistar." Resp. Br. at 29. The Khan Parties never even try to rebut this assertion in their briefing. *See generally* Appellants' Reply Brief ("Reply Br.") [ECF No. 38]. The March 27 Email also implied that the Khan Parties had no intention of turning over certain *other* agreements. *See* March 27 Email ("Any other company not listed here is comparable to [the] Conroe agreement."). Simply put, since the Khan Parties failed to make *all* contracts available to Cinemex for inspection, this condition precedent to closing remained (and remains) unsatisfied.

Ignoring this important detail, the Khan Parties argue that the Bankruptcy Court "erred in . . . concluding that [they] did not comply with Section 7.2(A)." Initial Br. at 43. In their view, the fact that Cinemex "had enjoyed access to the Dat[a] Room and Khan Parties' employees for nearly 2 months" demonstrates "the reasonableness of access." *Ibid.* But the EPAs didn't (as the Khan Parties seem to imply) demand reasonable access to *some* contracts: Cinemex was entitled to "reasonable access to . . . *all* . . . contracts." Tex. EPA at 41 (emphasis added); Ill. EPA at 40 (same). And, while

Cinemex may have had "reasonable access" to the contracts *in the data room*, it's undisputed that the data room didn't contain *all* the contracts.

The Khan Parties also note that, in Cinemex's bid letter, Cinemex represented that it had "completed the bulk of its due diligence efforts, with only a few areas pending[.]" Initial Br. at 44 (quoting Final Offer Letter [ECF No. 28-1] at 32). But that's entirely irrelevant. A "bulk of" its due diligence is not *all* of its due diligence. "And all means all." *Gibson v. Colvin*, 2013 WL 2285762, at *1 (S.D. Ga. May 23, 2013); *see also All*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1961) (noting that *all* means "every member or individual component of" or "the whole number, quantity, or amount"). In any event, any understanding between the parties that preceded the execution of the EPAs was *expressly* superseded by the terms of both EPAs. *See* Tex. EPA at 66 ("This Agreement . . . constitute[s] the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties[.]"); Ill. EPA at 61 (same). Nothing in the bid letter, therefore, can alter (let alone vitiate) the Khan Parties' obligation to comply with the express terms of the EPAs. *Cf. BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *7 (Del. Ch. Nov. 2, 2017) (refusing to enforce the parties' prior understandings because a newer agreement "constitute[d] the entire agreement" and "supersede[d] all prior or contemporaneous oral or written agreements, understandings or representations").

The Bankruptcy Court, in sum, correctly found that the Khan Parties had failed to satisfy Section 7.2(A) by not disclosing *all* their contracts.

## 2.  Access to and Inspection of Premises.

Section 7.2 of the EPAs also required the Khan Parties to give Cinemex reasonable access to—and to allow Cinemex to inspect—the theaters' premises "[f]rom the date hereof until the Closing[.]" Tex. EPA at 41; Ill. EPA at 40; *see also* Final Process Letter [Bankr. ECF No. 104-7] at 4

("Inspections are expected to occur after signing of an Agreement."). But it's undisputed that, from the date the parties signed the EPAs to the date the Khan Parties filed the Texas suit, Cinemex conducted *no* physical inspections of the theaters. *See* Initial Br. at 42 ("The Debtors could have inspected the Khan Parties [sic] theaters at any time from and after March 10, 2020, through March 24, 2020, but . . . cho[se] not to[.]"). In fact, the parties were still negotiating a date for those inspections when the Khan Parties filed their lawsuit.[14] By declaring all closing conditions satisfied on March 24, the Khan Parties "foreclos[ed] Cinemex's ability to conduct the inspections"—instead of either "waiting to see if the theaters would open closer to the Outside Closing Date, or at least taking additional time to come to another resolution." Mem. Op. ¶ 130. Remember, the Texas and Illinois EPAs had outside closing dates of April 30, 2020, and May 31, 2020, respectively (and the Illinois transaction *couldn't* be closed before April 10, 2020). Since there was no requirement that the parties close before these dates *unless* all closing conditions had been satisfied, this blatant violation of Section 7.2—standing alone—means that Cinemex wasn't obligated to close on March 26.

Still resisting, the Khan Parties push two arguments—both meritless. *First*, they claim that the inspections *did* occur. Here, they bizarrely (and counter-factually) insist that the early-February tours—which occurred *before* Cinemex even submitted its binding bid—*were* the inspections the EPAs

---

[14] On March 12, 2022, Mr. Khan reached out to Cinemex, asking if Cinemex had "nailed down any travel plans for next week?" March 12, 2020, Email Exchange [ECF No. 28-5] at 33. Mr. Martí testified that the inspections were scheduled but then postponed:

> Q: On what dates were you planning to conduct the inspection?
> A: It was going to be the week of the 16th or 17th of March.
> Q: Did the inspection go ahead that week?
> A: No, it didn't. We postponed it.

July 9 Hr'g Tr. 521:13–18. The "inspection scheduled for March 17th [was] postponed until the following week[.]" *Id.* at 523:17–19. It didn't go forward out of concern for Cinemex's "employees' health" and because, with the cinemas closed, "it wouldn't have made any sense to do the inspections." *Id.* at 524:12–15.

*subsequently* contemplated. *See* Initial Br. at 47 ("Considering Marti's testimony and his definition of 'inspection,' [Cinemex] performed those tasks during the Tours."). *Second*, they say that, "[r]egardless of whether the Tours were inspections, . . . the Khan parties . . . [n]ever prevented [Cinemex] from visiting or inspecting the [theaters]," and, "by choosing not to" inspect the theaters, Cinemex has only itself to blame for the missed inspections. *Id.* at 41–42. These arguments are frivolous.

The Khan Parties' first argument is—to borrow from the Bankruptcy Court—"completely unfounded" for four reasons. Mem. Op. ¶ 132. *One*, to call the February tours "inspections" would contradict the terms of the EPAs. The EPAs, recall, expressly contemplated that the inspections would take place sometime *after* March 10—the day the parties *signed* the EPAs. *See* Tex. EPA at 41 ("From the date hereof until the Closing . . . the Company shall . . . afford Buyer . . . reasonable access to and the right to inspect all of [its] properties . . . [and] premises[.]"); Ill. EPA at 40 (same). And, as we've seen, the Khan Parties' own final process letter made clear that the tours—which occurred *before* the EPAs were signed—were *not* inspections. *See* Final Process Letter at 4 ("Inspections are expected to occur after signing of an Agreement."). In other words, *both* the EPAs *and* the written negotiations leading up to them established that the inspections would occur only *after* the EPAs were signed.

*Two*, the tours weren't nearly comprehensive enough to constitute proper inspections. For example, although Cinemex spent "between 45 minutes to an hour at each theater," the tour of each theater consisted of walking through the "lobby, box office, concession area, auditoriums, kitchens, bathrooms, and projection rooms." Mem. Op. ¶ 17. As a result, Cinemex spent only "two or three minutes" in each of these areas. *Ibid.*[15] And the tours didn't include *any* time on the theaters' roofs, in

---

[15] We afford significant deference to the Bankruptcy Court's factual findings about how much time Cinemex spent at each theater and in each space. *See Colwell v. Royal Int'l Trading Corp.*, 226 B.R. 714, 717 (S.D. Fla. 1998) (Gold, J.) ("District Courts must give considerable deference to a bankruptcy court's findings of fact, and will not overturn a bankruptcy court's factual findings unless it determines that those findings are clearly erroneous." (citing *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990))). And the Khan Parties have given us no viable reason for second-guessing those findings

their HVAC systems, or with their technology framework. *See* June 18 H'rg Tr. at 311:24–312:1 ("Q: … [W]ere there any inspections of the roofs or HVACs? A: No[.]"); *id.* at 348:4–21 ("Q: Was Cinemex ever able to have its IT personnel specifically inspect the IT equipment at each theater? . . . A: They were allowed to re-request if the conference call did not answer their questions . . . . We never heard another request for them to come."). Since no reasonable person would ever buy a house without fully inspecting its roof, its HVAC system, *and* its electrical components, we think it's absurd to expect Cinemex to lay down tens of millions of dollars on a massive theater acquisition without comprehensively inspecting those theaters.

*Three*, Omar Khan's conduct strongly suggests that he *himself* didn't consider the tours to be inspections. After Cinemex postponed its March 17 inspection of the Houston theaters, remember, Khan began proposing alternative ways to satisfy the inspection requirement. So, for instance, he offered—in exchange for a "good-faith deposit," Khan Dep. Tr. at 427:23—"to provide a private plane" to bring Cinemex's representatives to Houston for the closing, May 20 Hr'g Tr. at 227:6–7; to hold "a virtual closing," *id.* at 227:21–23; to "use a third party" to conduct inspections, *id.* at 143:19–20; to discount the purchase price, *see id.* at 228:2–4; and to "extend the closing date," *id.* at 143:14–15. These proposals persuaded the Bankruptcy Court that "Khan knew Cinemex had the right to inspect and that he recognized that the February Tours were not inspections." Mem. Op. ¶ 132 n.26. And that makes sense. After all, if the Khan Parties truly believed that Cinemex had *already* conducted its inspections, then why would Mr. Khan be willing to "discount" the purchase price in exchange for Cinemex's agreement to hold *only* virtual (or third-party) inspections? Mr. Khan's agreement to take

---

here. *See generally* Reply Br. at 2 ("During the Tours, the Appellees state 'the group spent an average of two to three minutes tops in each space of every theater visited.' The Appellees reference Marti's Trial testimony, but Marti testified he 'only went to four tours or visits.'" (cleaned up)). Indeed, given Mr. Khan's testimony that "each tour lasted approximately an hour," May 20 Hr'g Tr. at 201:14–17, and that the theaters ranged in size "from 22,000 square feet, up to 55,000 square feet," *id.* at 202:2–3, we see nothing erroneous (much less clearly so) in the Bankruptcy Court's findings.

less money (obviously) makes sense only if, as the Bankruptcy Court found, the inspections had not yet occurred.

*Four* (and perhaps most obvious), the tours took place *only at the Texas theaters. See* Joint Pretrial Stipulation ¶ 10 ("[R]epresentatives of Cinemex traveled to Houston for . . . tours of all the Texas theaters."). It's undisputed, in other words, that no Cinemex employee spent *any time* touring *any* of the Illinois theaters. Ignoring everything we've said thus far, then, the tours simply did not constitute inspections of "all of the properties [and] premises," as required by the Illinois EPA. Ill. EPA at 47.

The Khan Parties' second argument fares no better. According to the Khan Parties, Cinemex "could have inspected the [SCG] theaters at any time from and after March 10, 2020, through March 24, 2020, but by choosing not to, [Cinemex] cannot rely upon the failure of condition." Initial Br. at 42. Put another way: "Regardless of whether the tours were inspections, . . . the Khan parties . . . [n]ever prevented [Cinemex] from visiting or inspecting the [theaters]." *Id.* at 41–42. But that's exactly what the Khan Parties did by prematurely declaring that all conditions precedent had been satisfied on March 24, 2020. By demanding that Cinemex close within two business days, in other words, the Khan Parties denied Cinemex the opportunity to reschedule the inspections—despite the fact that the EPAs' outside closing dates were still several weeks away. And nothing in the record suggests that Cinemex acted unreasonably in trying to reschedule the inspections at the outset of a global pandemic—when there was precious little information about (among other things) future border closures. Indeed, the record establishes quite the opposite—that Cinemex made *repeated* efforts to reschedule the inspections, all while trying simultaneously to keep its employees safe and comply with constantly-shifting travel restrictions. *See supra* note 14. We thus cannot agree that Cinemex was somehow to blame for having failed to inspect the theaters.

To recap: On March 24, 2020, when the Khan Parties claimed that all conditions precedent to closing had been satisfied, Cinemex (1) didn't have access to all the Khan Parties' contracts and (2)

hadn't inspected the theaters. Since the Khan Parties thus failed to comply with two aspects of this covenant (the covenant to provide Cinemex with access and the right to inspect), they had not satisfied all conditions precedent to closing. For this additional reason, then, Cinemex wasn't obligated to close on March 26.

### d. The Covenant to Provide Reasonable Access to Corporate Employees.

Section 7.9 of the Texas EPA[16] required the Khan Parties to give Cinemex "reasonable access to each Corporate Employee (including but not limited to by providing contact information for each such Corporate Employee) and to the personnel record of each Corporate Employee[.]" Tex. EPA at 44. It also stated that Cinemex "may conduct interviews and discussions" with those Corporate Employees. *Ibid.*

The Texas EPA defines "Corporate Employee" as "each employee of SCG-AH, Inc. as of the date hereof." Tex. EPA at 4. But, as the Bankruptcy Court correctly noted, "SCG-AH, Inc. is not a party to *either* EPA." Mem. Op. ¶ 124 n.23 (emphasis added); *see also* Tex. EPA at 1 (defining the "Parties" as SCGC Inc., SCGM Inc., SCG-B Inc., SCG-VP Inc., District Theaters Inc., SCG-WR LLC, SCG-CS Inc., SCGK Inc., SCG-SW Inc., SCGWL Inc., Omar Khan, Cinemex USA Real Estate Holdings, Inc., and Cinemex Holdings USA, Inc.); Ill. EPA at 1 (defining the "Parties" as SCG-N Inc., Omar Khan, Cinemex USA Real Estate Holdings, Inc., and Cinemex Holdings USA, Inc.). So, we're left with a muddled definition of "Corporate Employee."[17]

---

[16] The Illinois EPA doesn't include a Section 7.9—and none of the Illinois EPA's covenants mandate access to Corporate Employees. *See* Ill. EPA at 39–43. Despite this omission, *both* the parties *and* the Bankruptcy Court discuss this covenant as though it *does* appear in the Illinois EPA. *See* Initial Br. at 34 ("[T]he Khan Parties failed . . . to comply with Section 7.9(A) of the EPAs."); Resp. Br. at 44 ("The Khan Parties did not satisfy Section 7.9 of the EPAs."); Mem. Op. ¶ 138 ("Under Section 7.9 of the EPAs . . . ."). But this error doesn't affect our outcome because, as we've seen, the Khan Parties violated their covenants under *both* agreements in a variety of *other* dispositive ways.

[17] Despite acknowledging this, the Bankruptcy Court went on to decide that Michael Pawlowski, the culinary director of the Khan Parties' theaters, *was* a Corporate Employee—and that, as a result, his

Still, while the definition of "Corporate Employee" is "nonsensical," Mem. Op. ¶ 139 n.28, Section 7.9 *does* give us one important clue. According to Section 7.9(B), Corporate Employees are *salaried* employees. *See* Tex. EPA at 44 (describing the hourly rate of Corporate Employees for transition services as being "based on the applicable Corporate Employee's salary"). And we know that the Khan Parties furloughed "a hundred percent of the [hourly and salaried employees]" by April 1, 2020. Khan Dep. Tr. 2 at 344:19–21, 345:15–17. If this is right—and the Khan Parties never explain why it isn't—then the company-wide furloughs also[18] violated the covenant to provide reasonable access to Corporate Employees.

Ignoring all of this, the Khan Parties dispute only the Bankruptcy Court's factual findings about *when* the furloughs occurred. *See* Initial Br. at 36–37 ("[T]he evidence demonstrated that any furloughs did not occur until following the Debtors' breach."). The Bankruptcy Court found that "it is undisputed that Mr. Khan furloughed one hundred percent of his employees by April 1, 2020." Mem. Op. ¶ 140. Trying to rebut this finding, the Khan Parties cite to three things: (1) Mr. Khan's "uncontroverted" trial testimony "[t]hat [the furloughs] actually did not happen until—I believe until almost March—April 1st, or after the month was over, after the breach had occurred"; 2) the March 27 Email Exchange between Khan Party employees and Cinemex employees; and 3) Mr. Martí's testimony that "between March 10th and March 24th . . . communication continued with the corporate employees." Initial Br. at 36. But evidence that Cinemex continued to have access to the SCG employees as of March 24 and March 27 does nothing to undermine the Bankruptcy Court's finding

---

dismissal was further evidence that the Khan Parties had violated this covenant. *See* Mem. Op. ¶ 142 ("[A]t least one key Corporate Employee was not available. Michael Pawlowski was the SCG Theaters former culinary director. Despite Mr. Pawlowski being a Corporate Employee . . . ."). But, since we have no idea who was (or was not) a "Corporate Employee," we don't base our decision in this Section on Mr. Pawlowski's termination.

[18] We say "also" because, as we've established, these furloughs violated *other* covenants too. *See supra* Sections I.B.ii.a & I.B.ii.b.

that the furloughs occurred before April 1 (which, of course, is several days *after* March 24 and 27). And the suggestion that Mr. Khan's trial testimony was "uncontroverted" is demonstrably false. To begin with, he never really said that the furloughs occurred after April 1. He said only that they happened in either "March," or "April 1st," or "after the month [which month is anyone's best guess] was over, after the breach occurred." May 20 Hr'g Tr. at 222:12–14. And, in a part of his trial testimony the Khan Parties conveniently omit, Mr. Khan said that "[t]here was [sic] no changes made to the amount of staff that we had *prior to March 26*." *Id.* at 223:11–12 (emphasis added). In other words, even if we were to cut out the inconvenient part of Mr. Kahn's trial testimony—the one where Mr. Khan seems to admit that the furloughs might have taken place in March—this self-serving testimony was directly contradicted by Mr. Khan's *own* deposition, where he testified that the furloughs occurred either "a few days after . . . all the theaters closed on March 17th," Khan Dep. Tr. 2 at 345:14–15, or "probably a week or ten days later," *id.* at 346:8. We won't overturn the Bankruptcy Court's factual finding about when these furloughs occurred unless we're "left with the definite and firm conviction that a mistake has been committed," keeping in mind the "due regard" we must afford to the Bankruptcy Court's credibility determinations. *In re Mut. Benefits Offshore Fund, Ltd.*, 508 B.R. 762, 775 (S.D. Fla. 2014) (Moore, J.) (citing *Crawford v. W. Elec. Co., Inc.*, 745 F.2d 1373, 1378 (11th Cir. 1984)).

We're left with no such "firm conviction" here. Even if the Bankruptcy Court had relied *solely* on Mr. Khan's deposition testimony, its conclusion that this testimony was more credible than his trial testimony—which, as we've seen, was somewhat ambiguous in any event—is precisely the type of factual finding we must generally leave undisturbed. And, of course, by furloughing *all* its employees during the term of the EPAs, the Khan Parties plainly breached the covenant in Section 7.9 of the Texas EPA—which required them to provide "reasonable access" to any corporate employees. Tex. EPA at 44.

e.   **The Covenant to Use Reasonable Best Efforts to Cause Closing to Occur.**

Section 7.4 of the EPAs required both parties to "use reasonable best efforts to cause the [parties'] respective obligations to consummate the Closing to be satisfied[.]" Tex. EPA at 42; Ill. EPA at 41. "Under Delaware law, reasonable best efforts clauses 'impose obligations to take all reasonable steps to solve problems and consummate the transaction.'" *In re WeWork Litig.*, 2020 WL 6375438, at *7 (Del. Ch. Oct. 30, 2020) (quoting *Williams Cos.*, 159 A.3d at 272). In assessing these reasonable best efforts, Delaware courts ask whether a party "(i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty." *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018).

Given everything we've said thus far, we don't think the Khan Parties used reasonable best efforts to cause the closing to occur. "Not only did the Khan Parties *not* meet all closing conditions, they also demanded—and indeed, threatened—that Cinemex close prematurely, to meet a closing deadline of Mr. Khan's unilateral choosing, one that was not even mentioned in the EPAs." Mem. Op. ¶ 145 (cleaned up). Then, when Cinemex declined to close by March 31—refusing to waive its rights under the EPAs—the Khan Parties sued Cinemex in the Southern District of Texas.

So, did the Khan Parties have "reasonable grounds to take the action [they] did"? *Akorn*, 2018 WL 4719347, at *91. Of course not. The Khan Parties brought the Texas suit after Cinemex refused to close by March 31. But, as we've said, March 31 was *a completely made-up* closing date. And Mr. Khan's only justification for demanding a March 31 closing was that he "wanted to spend time with [his] family," that he "wanted to invest in a real estate project," that he "wanted the money," and that "those were [his] God-given rights to do so[.]" Khan Dep. Tr. 2 at 439:6–13. When asked why he brought the Texas suit on April 1, Mr. Khan testified that he "just felt like it was the right time," *id.* at 524:2–3, and that he filed "because [he] wanted to. I was frustrated with . . . the proposal that they

38

sent," *id.* at 527:25–528:3. Being "frustrated" and "just fe[eling] like it" aren't valid reasons for suing Cinemex during the terms of the EPAs—and Mr. Khan's behavior doesn't come close to constituting "reasonable best efforts" to cause the closing to occur.

Against all this, the Khan Parties emphasize (again) the alternatives Mr. Khan proposed to Cinemex in his efforts to facilitate a closing before March 31. *See* Initial Br. at 53–54 (recounting Mr. Khan's "substantial efforts to facilitate a closing," including his offers of "a discounted price," "a private plane," "a virtual inspection," and "third-party inspectors").[19] But Cinemex had no obligation to close by March 31, so Cinemex was free to reject any of these modifications to its original rights under the EPAs. *See* Tex. EPA at 63 (requiring any "amendment or waiver" to be "set forth in writing" and agreed to by each party); Ill. EPA at 59 (same). Cinemex, in other words, was well within its rights to decline Khan's alternatives and to carry on with its attempts to reschedule the inspections. The Khan Parties' frustration with Cinemex's intransigence doesn't justify *their* decision to sue Cinemex in federal court. As the Bankruptcy Court aptly concluded: The Khan Parties' actions "do not come close to constituting reasonable best efforts." Mem. Op. ¶ 148.

*     *     *

In sum, the Bankruptcy Court correctly concluded that (1) the Illinois EPA precluded a closing before April 10, 2020, and (2) the Khan Parties failed to satisfy several conditions precedent to closing. For these two reasons, Cinemex wasn't required to close the transaction by March 26 and, accordingly, didn't breach either EPA.

---

[19] The Khan Parties also note that Mr. Khan offered to "postpon[e] the closing date[.]" Initial Br. at 46. This argument is (at best) misleading. What Mr. Khan *really* offered was to allow the parties to close *after* March 31 *if* Cinemex wired a "good-faith deposit" of between "7 million to 20 million" dollars. Khan Dep. Tr. 2 at 428:4–25. But Cinemex was under *no obligation* to pay an *extra* deposit fee to exercise its *existing* rights under the EPAs.

## II.     The Bankruptcy Court Correctly Found that the Khan Parties Breached the EPAs.

The Khan Parties didn't just fail to use "reasonable best efforts" to close the transaction. They, in fact, *breached* the EPAs when they filed the Texas lawsuit and declared that Cinemex had repudiated the agreements. And that breach relieved Cinemex of any duty to follow through on its obligations under the EPAs.

"Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling the other contracting party to treat the contract as rescinded." *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000) (cleaned up). To constitute repudiation, a party's statements must be "positive," "unconditional," and "unequivocal" about its intent to eschew its contractual obligations. *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *15 (Del. Ch. Sept. 18, 2014). Repudiation, however, is a double-edged sword: If a party sues its counter-party for anticipatory repudiation—but is shown to be wrong—then the former is liable to the latter for breach of contract. *See HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *14 (Del. Ch. May 2, 2007) ("A party acts at his peril if, insisting on what he mistakenly believes to be [the other party's repudiation], he refuses to perform his duty." (cleaned up)).

The Khan Parties wrongly assumed that Cinemex had repudiated the EPAs. Based on this erroneous conclusion, the Khan Parties sued Cinemex for breach of contract. Because they were incorrect about Cinemex's alleged repudiation, the Khan Parties' suit materially breached the EPAs and gave Cinemex the right to terminate those agreements. *See Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *32 (Del. Ch. Apr. 29, 2005) ("[A]fter Frontier concluded, wrongly it turns out, that Holly had repudiated the Merger Agreement, and then Frontier proceeded with this action, Frontier ceased its efforts to complete the transaction. Under the circumstances, that constitutes a repudiation, or breach[.]"); *BioLife Sol., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").

Remember that, to qualify as repudiation, Cinemex had to state *unequivocally* that it would *not* perform its obligations under the EPAs. *See Frontier Oil*, 2005 WL 1039027, at *27 ("An unequivocal statement by a promisor that he will not perform his promise is the essential underpinning for a repudiation claim." (cleaned up)). As the Bankruptcy Court held, however, "[t]he Khan Parties have not identified any 'clear and precise' statement of refusal to perform made by Cinemex, as required under Delaware law." Mem. Op. ¶ 88. The Khan Parties continue to insist that they found just such a statement in Cinemex's March 24 email. *See* Initial Br. at 52–53 ("[Cinemex] clearly stated that 'in light of COVID-19-related fallout, Cinemex will not and is not obligated to close *this transaction*.'" (emphasis in original)). But this email was *not* unequivocal.

For one thing, the email responded to the Khan Parties' unilateral (and, as we've seen, unreasonable) demand that the transaction close on March 26, *see* March 24 Email Exchange I at 387 ("[P]lease confirm that [Cinemex] is prepared to proceed to Closing[.]")—something Cinemex wasn't obligated to do. That's why the email talks about Cinemex's "[a]ttempt[s] to close under *these* circumstances" and emphasizes that the parties were "speaking in an effort to resolve *the* situation." March 24 Email Exchange I at 386 (emphases added). Indeed, in its letter response to the Khan Parties' "breach" letter (sent on March 25), Cinemex clarified that it was *not* obligated "to close the transaction *at this time*." March 26 Letter at 1 (emphasis added). Cinemex, in other words, wasn't saying that it would *never* close the EPAs; it was simply making clear that the closing conditions hadn't *yet* been satisfied as of March 24—and that it wouldn't (and wasn't required to) close *on March 26*. It's worth pointing out, too, that Cinemex sent this clarifying letter well *before* the Khan Parties sued on April 1.

For another thing, even after the Khan Parties sent the March 24 email—and even after they sent their "breach" letter on March 25—Cinemex *continued working* to satisfy its closing conditions. *See* March 24 Email Exchange II at 673 ("They are still communicating with our team asking for

41

things[.]"); June 18 Hr'g Tr. at 393:16–19 ("[T]here were lease consents and other documents that I believe were still traveling back and forth up until . . . the morning of [March] 25th."); March 27 Email Exchange at 4–5 (Cinemex employee asking the Khan Parties to send over some missing contracts). Contra the Khan Parties' position here, in other words, Cinemex's insistence that it wasn't required to close "at this time"—coupled with its continued efforts to close at some later date—strongly suggest that it had not (on March 24) made a "positive and unconditional" refusal to perform its contractual obligations. *See Carteret Bancorp, Inc. v. Home Grp., Inc.*, 1988 WL 3010, at *6 (Del. Ch. Jan. 13, 1988) ("The theory justifying an action for breach of contract prior to the contracted-for time of performance really only holds when the repudiation is, in the language of Professor Williston, 'positive and unconditional.'" (citation omitted)).

In the end, the Khan Parties sued Cinemex for repudiating the EPAs at their own peril. Because they turned out to be wrong, the Khan Parties breached the EPAs and forfeited their right to enforce Cinemex's obligations under those agreements. *See PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1014–15 (Del. Ch. 2004) ("Once a party repudiates or breaches a contract, it cannot claim the benefits of that contract.").

\*     \*     \*

The Khan Parties' claims against Cinemex's bankruptcy estate hinged entirely on Cinemex's supposed breach of the EPAs. *See* Resp. to Objection to Claims [Bankr. ECF No. 550] ¶ 4 (asserting that the Khan Parties' claims are "the direct result" of Cinemex's alleged breach of the EPAs). As we've now established, however, Cinemex *didn't* breach the EPAs—the Khan Parties did. Accordingly, the Bankruptcy Court properly sustained Cinemex's objections and disallowed the Khan Parties' claims. After careful review, therefore, we hereby **ORDER AND ADJUDGE** as follows:

1.  The Bankruptcy Court's Order Disallowing the Khan Parties' Claims [Bankr. ECF No. 244] is **AFFIRMED**.

2.   This case shall remain **CLOSED**.

3.   All pending deadlines and hearings are **TERMINATED**, and any pending motions are

    **DENIED AS MOOT**.

    **DONE AND ORDERED** in the Southern District of Florida on April 4, 2023.


                                            _____
                                            **ROY K. ALTMAN**
                                            **UNITED STATES DISTRICT JUDGE**

cc:      Counsel of record